MARK WRAY, #4425
LAW OFFICES OF MARK WRAY
608 Lander Street
Reno, Nevada 89509
(775) 348-8877
(775) 348-8351 – Fax
mwray@markwraylaw.com
Attorney for Petitioning Creditor
BRADLEY J. BUSBIN, AS TRUSTEE
OF THE GONZALES CHARITABLE
REMAINDER UNITRUST ONE

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. BK-S-18-12454-LEB |
| DESERT LAND, LLC, | Chapter 11 |
| _____ Debtor. _____/ | (Jointly Administered with |
| In re | BK-S-18-12456-LEB, |
| | BK-S-18-12457-LEB, and |
| DESERT OASIS APARTMENTS, LLC, | BK-S-18-12458) |
| Debtor. | |
| _____/ | |
| In re | **MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE** |
| DESERT OASIS INVESTMENTS, LLC, | |
| Debtor. | |
| _____/ | Hearing Date: August 28, 2018 |
| In re | Hearing Time: 9:30 a.m. |
| SKYVUE LAS VEGAS, LLC, | |
| Debtor. | |
| _____/ | |

1

Creditor Brad Busbin, as Trustee of the Gonzales Charitable Remainder Unitrust One ("Busbin"), moves for an order pursuant to 11 U.S.C. §1104(a) approving the appointment by the Office of the United States Trustee of a Chapter 11 Trustee in the bankruptcy cases of Debtors Desert Land, LLC, Desert Oasis Apartments, LLC, Desert Oasis Investments, LLC (collectively, "Desert Entities") and SkyVue Las Vegas, LLC.

## **INTRODUCTION**

This motion is made on the basis that cause exists for appointment of a Chapter 11 trustee under 11 U.S.C. §1104(a)(1) and that a trustee is in the best interests of creditors and the estate under 11 U.S.C. §1104(a)(2).  Section 1104(a) provides:

[A]fter notice and hearing, a court **shall** order the appointment of a trustee –

 (1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case**, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; **or**

(2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. (Emphasis added).

Thus, if the evidence supports a finding that the managers of Debtors are guilty of dishonesty, incompetence, gross mismanagement or similar cause, Section 1104(a)(1) makes appointment of a trustee mandatory.  Or, if the evidence shows that a trustee is in the best interests of creditors and the estate, a trustee also is mandatory.  This is as it should be.  As the court stated in *In re v. Savino Oil & Heating Co.*, 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989):

[D]ebtor-in-possession governance is the norm in Chapter 11. However, the encompassing language of Section 1104(a)(1) prefaced by a mandatory "shall" reflects an equally important countervailing or balancing congressional intent. The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, **Section 1104(a)(1) commands** that the stewardship of the

2

reorganization effort must be turned over to an independent trustee.  (Emphasis added).

*See also, Fukutomi v. United States Trustee (In re Bibo Inc.)* 76 F.3d 256, 258 (9th Cir. 1996) (emphasizing that a trustee **"shall"** be appointed upon a finding of cause).

In a motion to appoint a trustee, a court examines a debtor's conduct "either before or after the commencement of the case." 11 U.S.C. §1104(a)(1).  The history of Debtors' management therefore is highly probative as to whether a trustee should be appointed.

The story of the 18 years of gross mismanagement of Debtors by Howard Bulloch and David Gaffin is set forth below.  This evidence was compiled as a result of litigation with the Desert Entities before Judge Robert Clive Jones in the U.S. District Court for the District of Nevada.  In that litigation, Tom Gonzales obtained a judgment against the Desert Entities and SkyVue, based on Judge Jones's finding that Debtors damaged Gonzales in a sum in excess of $13 million when they violated their Chapter 11 reorganization plan from their 2002-2003 bankruptcy.  The evidence not only supports the judgment that Judge Jones entered in favor of Gonzales, it mandates the removal of Bulloch and Gaffin and the appointment of a trustee in these administratively-consolidated cases.

## FACTS

Bulloch, 59, and his cousin, Gaffin, 56, are business partners who formerly were licensed Nevada commercial real estate brokers.  *Wray Decl. Ex. 1, Bulloch Depo. 2015:66.*  Through alter ego entities,[1] Bulloch and Gaffin controlled and managed 38.5 acres of mostly vacant land on the Las Vegas Strip across from the Mandalay Bay.

Within the 38.5-acre assemblage are approximately 26 acres known as "Parcel A." In 2000, Tom Gonzales loaned $41.5 million to Desert Land and Desert Apartments secured by a trust deed on Parcel A.  When Desert Land and Desert Apartments could not

---

[1] *See* Debtors' *Amended Motion to Substantively Consolidate Cases* (ECF No. 27) at 3:25-27; Gaffin Decl., ¶11: "The managers of the Desert Entities used the funds available from each entity to pay the expenses of all entities.  The Desert Entities have always been treated as a single business since 2004 or from the creation of each member entity."

3

repay Gonzales, they filed a Chapter 11 bankruptcy petition in 2002, Case No. BK-S-02-16202-RCJ, assigned to Bankruptcy Judge Robert Clive Jones. *Wray Decl., Ex. 2 at 4.*

In the 2002 bankruptcy before Judge Jones, Debtors proposed a Second Amended Plan of Reorganization, pursuant to which Gonzales would reconvey his $41.5 million deed of trust on Parcel A to Debtors and Debtors would convey to Gonzales their membership interests in a limited liability company which owned nearby property known as Parcels B, C and D. The plan further provided that Debtors would pay Gonzales a $10 million "Parcel A Transfer Fee" when (1) Parcel A was sold, transferred or conveyed, or alternatively, (2) Bulloch and Gaffin transferred their equity in the companies that owned Parcel A, with resulting "net proceeds" to them or their companies. *Ex. 2 at 5; Wray Decl. Ex. 3 at 18 of 66.*

Debtors' plan prohibited Desert Land and Desert Apartments from borrowing more than $25 million against Parcel A, a lending cap that was intended to protect Gonzales from the property being over-encumbered by Bulloch and Gaffin before Gonzales was paid. *See, Ex. 2, p. 18 of 66, ¶(f); Wray Decl. Ex. 4, Statements of Lenard Schwartzer in Case No. 3:11-cv-00613-RCJ-VPC, Nov. 28, 2011 at 24:5-22.*

Debtors unilaterally inserted into their plan a provision to subordinate payment of the Parcel A Transfer Fee to financing obtained by Debtors against Parcel A. Gonzales objected to the subordination of the Parcel A Transfer Fee, but in April 2003, Judge Jones approved Debtors' Second Amended Plan of Reorganization, with the subordination provision, over those objections. *Ex. 2 at 7.*

Gonzales appealed the order confirming the plan to the Bankruptcy Appellate Panel of the Ninth Circuit. In a March 31, 2004 decision, the BAP struck the provision subordinating the Parcel A Transfer Fee to other Parcel A financing. Debtors appealed, and the Ninth Circuit affirmed the BAP decision. *Ex. 2 at 8.*

Thus, the BAP has determined, and the Ninth Circuit has affirmed, that the debt owed to Gonzales is **not subordinated** to **any** of the loans obtained by Debtors and secured by any part of Parcel A.

4

In his BAP appeal, Gonzales only challenged the Debtors' attempt to subordinate his Parcel A Transfer Fee. He did not seek a stay. The appeal did not impede any sale of Parcel A and there was no stay in effect. Bulloch and Gaffin could have sold Parcel A by simply paying the transfer fee from the proceeds of the sale of the property. During the years 2003-2007, Gonzales indeed sold neighboring parcels B, C and D. *See ECF No. 58 at 3:1-2.*

In 2008, Bulloch met Wayne Perry, 68, a Medina, Washington lawyer with over four decades' experience in mergers, acquisitions and real estate. *Ex. 1, 80:22-24 and 81:1-4; Wray Decl., Ex. 5, Perry Depo. 2012:13:4-5; Wray Decl., Ex. 6, Perry Depo. 2015:31*). Perry is the manager of the "Shotgun Entities": Shotgun Creek Investments, LLC, Shotgun Creek Las Vegas, LLC and Shotgun Investments Nevada, LLC. (*Ex. 6 pgs. 6, 9, 12, 13 & 14 and Wray Decl. Ex. 7, Perry Depo. 2014:13*).

Bulloch told Perry about the 38.5 acres and a proposed 500-foot observation wheel called "SkyVue" that Bulloch and Gaffin were planning to develop on the property. (*Ex. 1, 77:15-18).*

As discussions about SkyVue were ongoing between Bulloch and Gaffin, on January 13, 2011, Gonzales filed a complaint against Desert Land in Clark County District Court, alleging that payment of the Parcel A Transfer Fee was due because Defendants had made a Parcel A transfer by exercising an option through a different Desert Entity for purchase of additional Parcel A property. Gonzales also requested a judicial declaration that the Parcel A Transfer Fee constituted a lien on Parcel A. The case was removed to federal court before Judge Jones. The judge granted summary judgment in favor of Desert Land, denying Gonzales's claims that payment was due at that time and that Gonzales had a lien on Parcel A. The Ninth Circuit affirmed.

On June 21, 2011, Bulloch and Gaffin formed SkyVue Las Vegas, LLC ("SkyVue") to transfer control of the 38.5 acres owned by the Desert Entities into a separate entity into which Perry could then contribute cash for operations. In exchange

for his cash, Perry would receive an equity position in the new entity. (*Wray Decl. Ex. 8, Gaffin Depo. 2012:33:19*).

Bulloch, via Compass, and Gaffin, via Citation, contributed their ownership in Desert Land and Desert Apartments to SkyVue (*see Wray Decl. Ex. 9, Bulloch Depo. 2014:36:10-24 and Ex. 1, 92:4-8*). In October, 2011, Perry's Shotgun Creek Investments, LLC contributed to SkyVue $10 million in cash, and in January 2012, Shotgun Creek Family Investments, LLC contributed another $5 million in cash, in exchange for which they received a total membership interest of 8.01% in SkyVue. (*Ex. 9, 18:8-12*). The ownership structure thus looks like this:



(*Exhibit 1, 114:18*).

Debtors' equity transfers put the development of Parcel A in the control of SkyVue under the continued management of Bulloch and Gaffin. (*Ex. 9, 17:23-25*). Through its ownership of the Desert Entities, SkyVue was now the indirect owner of Parcel A. (*Ex. 9, 27:15-18 and Ex. 1, 41:11-13*).

Bulloch told Perry about the Gonzales lawsuit and the obligation to pay Gonzales for the Parcel A Transfer Fee prior to any loan or equity infusion by the Shotgun Entities. (*Ex. 9, 56:2-57:22*). Perry confided to Bulloch that in Perry's opinion, the equity transfers likely triggered the obligation to pay Gonzales's $10 million Parcel A Transfer

6

Fee under the Second Amended Plan of Reorganization, although of course, Gonzales was not paid.  (*Exhibit 1, 67:10-21*).

The cash infusions and equity transfers involving the Shotgun Entities were done on handshakes, without paperwork.  Perry later said it was "definitely the first time I've ever made a $10 million investment without a document."  (*Exhibit 5, 22:16-17*).  No one informed Gonzales that SkyVue had been formed or that control of Parcel A was now in a new entity.

In addition to obtaining equity in SkyVue, Perry's Shotgun Entities began making loans to the Desert Entities, secured by deeds of trust against Parcel A.  The promissory notes are convertible into equity of SkyVue at the option of Perry.  The chart of loans against Parcel A, including the Shotgun Entities' loans, and their principal amounts, is as follows:

| DATE | AMT. OF LOAN | CURRENT APN | LENDER | BORROWER |
|---|---|---|---|---|
| 7/14/2011 | $5,000,000 | 162-28-301-036 | Shotgun Investments Nevada, LLC | Desert Oasis Investments, LLC |
| 5/23/2012 | $16,500,000 | 162-28-301-037 | Shotgun Creek Las Vegas, LLC | Desert Oasis Investments, LLC |
| 5/23/2012 | $3,500,000 | 162-28-301-010 | Shotgun Creek Las Vegas, LLC | Desert Oasis Investments, LLC |
| 6/11/2012 | $5,000,000 | 162-28-301-032 | Shotgun Creek Las Vegas, LLC | Desert Land, LLC |
| 7/19/2012 | $1,000,000 | 162-28-302-001 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 7/25/2012 | $3,500,000 | 162-28-310-001 | Mutual of Omaha Bank | Desert Oasis Apartments, LLC |
| 8/24/2012 | $2,000,000 | 162-28-302-001 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 1/3/2013 | $4,500,000 | 162-28-301-001, 2 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 1/3/2013 | $250,000 | 162-28-301-001, 2 | Shotgun Las Vegas LLC | Desert Land, LLC |
| 1/3/2013 | $250,000 | 162-28-301-001, 2 | Shotgun Nevada, LLC | Desert Land, LLC |
| 3/15/2013 | $4,000,000 | 162-28-301-033 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 12/23/2013 | $1,175,000 | 162-28-301-029 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 11/10/2014 | $1,058,872 | 162-28-301-029 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 3/3/2015 | $2,650,000 | 162-28-301-029 | Shotgun Creek Investments, LLC | Desert Land, LLC |

| | | | | |
|---|---|---|---|---|
| 2/2/2016 | $1,250,000 | 162-08-301-029 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| 12/15/2016 | $1,250,000 | 162-28-301-029 | Shotgun Creek Investments, LLC | Desert Land, LLC |
| Total | $52,883,872 | | | |

Despite a provision in Debtors' Chapter 11 plan requiring Debtors to send quarterly status reports to Gonzales, no reports were ever sent, and no one informed Gonzales about the Shotgun Entities' loans.

As the chart above shows, by June 11, 2012, the loans of the Shotgun Entities secured by Parcel A exceeded the $25 million limit on permitted financing imposed by Debtors' 2002 reorganization plan. This flaunting of the terms of the Chapter 11 plan, which was unknown to Gonzales at the time it occurred, later became the basis of Judge Jones' judgment in favor of Gonzales.

In addition to $52 million dollars in loans against Parcel A from the Shotgun Entities, Bulloch and Gaffin also borrowed:

(a)    $10 million from Olympic Coast Investment secured by a parcel within the 38.5 acres and immediately adjacent to Parcel A (*Wray Decl., Ex. 10, Gaffin Depo. 2015:95*);

(b)    $25.9 million from Aspen Financial on 3.1 acres immediately adjacent to Parcel A, which is also included in the 38.5 acres. (*Ex. 10, pg. 97*); and

(c)    $5 million against the Desert Oasis Apartments, which is part of Parcel A.

In sum, as managers of the Desert Entities, Bulloch and Gaffin borrowed approximately $82 million, excluding interest. Unfortunately, the amount of interest is considerable. The Shotgun Entities are hard-money lenders. (*see Wray Decl. Ex. 11, Greg Perry Depo. 2014:29:5*). Their loans carry interest at 16%, compounded monthly, except in the event of default, in which case the rate of interest is **18%, compounded monthly**. All the loans are cross-collateralized, such that a default on any single loan allows Perry to foreclose on any and all of Parcel A. All of the loans are in default, meaning, the default rate of interest of 18%, compounded monthly, applies. At the

8

default rate of 18%, compounded monthly, basic math shows that the amount owed on each Shotgun loan increases 19.56% by the end of year one, 42.95% by the end of year two, 70.91% by the end of year three, and 204.35% by the end of year four.  Going forward from there, the debt increases at even higher rates.  It is estimated that unpaid principal and interest **on the Shotgun Entities loans alone** currently is at least $140 million.

Perry and the Shotgun Entities are more than mere hard-money lenders, however; they are equity partners of Bulloch and Gaffin.  After contributing $15 million for an ownership interest, Bulloch and Gaffin grew dependent on Perry for loans to keep SkyVue afloat, and Perry came to have great influence and control.  Bulloch compared Perry and his son Greg Perry to a "board of directors," (*Ex. 1, 56:24-57:2*) with whom Bulloch and Gaffin consulted before making major decisions. (*Ex. 1, 56:16-17*).  It was Perry who suggested, for example, the merger of Desert Investments into Desert Land. (*Ex. 1, 37:13-17 and 39:17-22*).

As managers, Bulloch and Gaffin have never been the least bit interested in whether Gonzales is ever paid.  Gonzales was 58 years old when the 2003 plan was confirmed and is 73 years old today.  Perry had confided to Bulloch in a November 13, 2012 email that he wanted to see Gonzales "kicked down the road with zero interest," (*Ex. 7, 82:4-8; Ex. 9, 69:11-15*).  The same sentiment was expressed in slightly different fashion by Bulloch, when he warned Gonzales to stop suing to enforce payment of the Parcel A Transfer Fee or his partner Perry would foreclose on Parcel A, taking all the assets of Debtors and leaving Gonzales with nothing:  "That's the real world; and the more you piss off my partner [Wayne Perry], that may happen.  So welcome to the real world, Tom." (*Ex. 1, 141:9-11*).  "I'm asking you guys to stop pissing off my good friends." (*Ex. 1, 159:1*).

Gonzales saw that Bulloch, Gaffin and Perry were determined not to pay him, as they violated their Chapter 11 plan and encumbered the 38.5 acres with loans that could not be paid.  Recognizing this reality, Gonzales filed suits to enforce the 2003 bankruptcy

plan.  In 2013, Gonzales sued Perry and the Shotgun Entities for interfering with his right to payment of the Parcel A Transfer Fee.  Judge Jones heard the case under Case No. 2:13-cv-00931-RCJ-VPC.  The action was dismissed by stipulation pursuant to an agreement reached between Gonzales and Perry to work together to sell the property.  The cooperation that Gonzales expected from Perry never materialized.  Perry instead filed foreclosure proceedings on Parcel A, *see Wray Decl., Ex. 12,* and when Perry set a foreclosure sale date of May 1, 2018, the involuntary bankruptcy petitions against Debtors were filed on April 30, 2018.

Additionally, in 2015, Gonzales sued Debtors in *Gonzales v. Desert Land,* Case No. 2:15-cv-00915-RCJ-VPC, alleging that they violated their reorganization plan when they exceeded the $25 million limit on permitted financing.  On March 27, 2018, Judge Jones found that Debtors had breached the Chapter 11 plan and that Gonzales was entitled to damages.  *See Ex. 13.*  Judge Jones entered judgment in favor of Gonzales and against Debtors for principal and interest in the sum of $13,177,708.33.  *See Ex. 14.*  Gonzales subsequently assigned the judgment to Brad Busbin, as Trustee of the Gonzales Charitable Remainder Unitrust One, *see Ex. 15,* and Busbin is therefore the petitioning creditor in this involuntary bankruptcy proceeding.

The SkyVue observation wheel and retail development were never built.  After a discussion with the Perrys, Bulloch and Gaffin shut down the SkyVue project for good in approximately March of 2015. (*Ex. 1, 8:17-19 and 9:9-12*).  The legacy of SkyVue is over $100 million in hard-money debt added to the property, with nothing to show for it except two poles jutting out of the desert sand, which were intended at one time to hold a giant observation wheel, but now stand as a monument to Bulloch and Gaffin's incompetency and gross mismanagement.

Debtors have no means to satisfy the debt against the 38.5 acres except to sell it.  But Bulloch and Gaffin are unable to accomplish a sale.  Parcel A has been listed for sale since 2003. (*Ex. 1, 23:22-23*).  Over the past 15 years, Bulloch and Gaffin claim that they listed the 38.5 acres with the biggest investment banking firms in the world, (*Ex. 1,*

26:12-15) including Merrill Lynch in 2005 (*Ex. 1, 24:5-7),* Goldman Sachs in 2006, CB Richard Ellis in 2007, Cantor Fitzgerald (*Ex. 1, pg. 28*) and Cushman-Wakefield in 2015. (Perry "suggested" to Bulloch that they use Cushman Wakefield because Perry knows some of the senior people at Cushman Wakefield (*Exhibit 6, pg. 89*)).

Not only have Bulloch and Gaffin been unable to sell the 38.5 acres over the past 15 years, even with the assistance of top investment banking firms, Debtors say they have not even received an offer. (*Ex. 1, 12:22-23*). Meanwhile, Gonzales was able to sell Parcels B, C and D next door. *See ECF No. 58 at 3.*

Bulloch and Gaffin cannot sell the property because they refuse to sell the property for what it is actually worth. In 2015, they claimed that the 38.5 acres was worth $9-$15 million an acre, for a total market value of up to $578 million. (*Ex. 1, 14:14-17; Ex. 10, 92:6-7*). In their motion to convert this case to Chapter 11, Debtors further claimed that they have an appraisal (which they have yet to provide to the undersigned) allegedly supporting a fair market value of $460 million, or approximately $12 million per acre. (*ECF No. 30*). These are fictitious alleged values that bear no relation to the real fair market value of the property.

In 2017, Gonzales commissioned an appraisal by Integra Realty Resources ("IRR") which concluded the property is worth $5.1 million per acre. This market value is corroborated by the court's findings in *Sher Development, LLC v. Desert Land Loan Acquisition, LLC*, Case No. A-16-743298-B, in the District Court of Clark County, Nevada.[2] The *Sher Development* action concerns the $25.9 million loan by Aspen Financial Services, LLC ("Aspen") to Desert Land, LLC in 2007 that is secured by a 3.11-acre vacant parcel that is part of the 38.5-acre assemblage. *Ex. 16, ¶6.* The beneficial interest in the Aspen loan was owned by 459 investors. *Id., ¶ 8.*

---

[2] The Court is respectfully requested to take judicial notice of the *Findings of Fact and Conclusions of Law* filed March 1, 2017 in the *Sher Development* case; *see Wray Decl. Exhibit 16.*

Initially, on April 4, 2012, Desert Land and Aspen entered into an option agreement for Desert Land to pay off the entire indebtedness for a one-time payment of $16.5 million, *Id., ¶17*, which equates to approximately $5.4 million an acre. Desert Land defaulted on that agreement. *Id., ¶ 20.*

On January 4, 2016, Bulloch, on behalf of Desert Land, wrote a letter to the Aspen investors reiterating that Desert Land was standing by its prior commitment to pay investors "$16.5 million when the property sells." *Id., ¶ 23.*

The same month, Bulloch and Gaffin formed another entity called Desert Land Loan Acquisition, LLC ("DLLA") and began buying up individual investor interests in the Aspen Financial note until they acquired 51% of the outstanding interests in the loan. *Id., ¶¶ 24, 27.*

*Sher Development* and other holders filed suit against DLLA, Bulloch, Gaffin, their family trusts and Compass Investments, LLC. In its findings and conclusions, the court determined that "[t]he most reasonable current value of the real property securing the Loan based upon comparables used for the evaluation is most likely the $13,460,000 appraised value by Matt Lubaway, MAI." *Id., ¶ 50.* Based on the Lubaway appraisal, the Aspen parcel – which is part of the 38.5 acres – is worth an average of approximately $4.3 million per acre. The state court judge has now entered an order allowing Bulloch and Gaffin to acquire the Aspen Financial parcel for that price.

Thus, in a pending state court action to which Bulloch and Gaffin are parties, the court placed a value on 3.11 of the 38.5 acres at $4.3 million per acre, although Bulloch and Gaffin offered to purchase the property at $5.3 million per acre. The *Sher Development* case proves that Bulloch and Gaffin truly know that the 38.5 acres is worth in the range of $4.3 million to $5.3 million an acre, or between $165 million to $204 million for all 38.5 acres.

In July of 2017, Perry recorded the foreclosure notice for all the properties in Parcel A securing the Shotgun Entities' loans. *See Ex. 12, attached.* Another year has now passed since the foreclosure notice was recorded. Despite the pressure being

brought to bear by Perry through his foreclosure notice, Bulloch and Gaffin still have been unable to sell the property.

**A TRUSTEE MUST BE APPOINTED PURSUANT TO 11 U.SC. §1104(a)(1)**

**1.    Gross Mismanagement**

The term "gross mismanagement" is not defined in the Bankruptcy Code, but mismanagement is defined by case law as managing "ineptly, incompetently or dishonestly," and gross is defined as "glaring, flagrant, very bad." *In re McTiernan*, 519 B.R. 860, 867 (Bankr. D. Wyo. 2014). Accordingly, gross mismanagement is flagrantly inept, incompetent or dishonest managing.

As managers, Bulloch and Gaffin violated a settlement agreement and a Chapter 11 plan adopted in 2003 in which they made important promises to Gonzales and to the Court and other creditors as to how they would manage Debtors and the 38.5 acres. Not the least of their management obligations was to keep their borrowing under $25 million as to Parcel A.

It is not as if Bulloch and Gaffin were merely making occasional, inept management decisions. After their 2003 plan was confirmed, they managed Debtors for 15 years. They had many years to sell the property. They failed with every opportunity they had. They borrowed enormous sums with no means to repay the money they were borrowing. They had no take-out financing in place to repay the loans they obtained from the Shotgun Entities, and despite that fact, Bulloch and Gaffin continued recklessly to borrow far beyond the $25 million cap. By 2017, even their partner Perry had seen enough and began a foreclosure proceeding on Parcel A.

Their gross mismanagement is evidenced by the unconscionable loan terms by which the Shotgun Entities obtained notes accruing interest of 16% per annum, compounded monthly, except in case of default, when the interest is 18% per annum, compounded monthly. At these rates, if one does the math, the debt doubles approximately every four years.

13

Bulloch and Gaffin glaringly and ineptly managed by wasteful spending on the SkyVue project fiasco. Today, the only remnant of the SkyVue project is two concrete poles in the sand that were erected to hold an observation wheel Bulloch and Gaffin could never build. These poles are now a liability, in that Bulloch believes it will cost an estimated $2 million to remove them before the land on which they sit can be turned to profitable use. *Ex. 1at 23*.

Debtors actually have income-producing assets, the Desert Oasis Apartments and a motel, but Bulloch and Gaffin don't even manage those properties. They are managed by a private management company, and Bulloch and Gaffin merely review monthly reports. *Ex. 10, at 12-13*.

Back at their offices, Bulloch and Gaffin cannot even keep the records straight between the Desert Entities. In their *Amended Motion to Substantively Consolidate Cases* (ECF No. 27), Debtors admit:

> The managers of the Desert Entities used the funds available from each entity to pay the expenses of all entities. The Desert Entities have always been treated as a single business since 2004 or from the creation of each member entity.

*See, Motion,* at 3:25-27; Gaffin Decl., ¶11. By this admission, Bulloch and Gaffin concede that as managers, they could not even maintain separate books and records for each Debtor. Indeed, an admission that assets and liabilities were commingled is a ground for finding Debtors and non-debtor entities are alter egos under NRS 78.747(2).

Even facing threatened foreclosure and strong encouragement by Perry to sell the 38.5 acres during the past year, Bulloch and Gaffin refused to salvage the property by selling it for a reasonable price.

Ultimately, indisputable evidence of Bulloch and Gaffin's gross mismanagement is enshrined in the judgment by the U.S. District Court for $13,177,708.33, based on their violation of the borrowing cap that Bulloch and Gaffin expressly agreed to abide by in their 2003 reorganization plan.

Cause to appoint a trustee is "manifest when creditors may reasonably lose all confidence in the ability of management to direct the reorganization effort." *In re Eagle*

14

*Creek Subdivision, LLC*, No. 08-4292, 2009 Bankr. LEXIS 632, *11 (Bankr. E.D.N.C. March 9, 2009).  Without question, creditors may reasonably have no confidence in Bulloch and Gaffin's ability to direct the sale and distribution of proceeds of the 38.5 acres.  Based on a finding of gross mismanagement alone, cause exists under Section 1104(a)(1) for appointing a Chapter 11 Trustee.

## 2.    Incompetence

"The term 'incompetence' is not defined in the Bankruptcy Code, but is generally defined as the 'state or fact of being unable or unqualified to do something.'"  *In re Ricco, Inc.*, 2010 Bankr. LEXIS 1916 (Bankr. N.D.W.Va. June 28, 2010), citing *Black's Law Dictionary* 780 (8th ed. 2004).

Everyone in this bankruptcy proceeding, Debtors and creditors alike, all seem to agree that the objective is to sell the 38.5 acres and pay the proceeds to creditors.  *See, e.g., Gaffin Decl. in Support of Motion to Substantively Consolidate, ECF No. 28, ¶9.*

Bulloch and Gaffin have demonstrated over the past 18 years that they are unable to sell the property.  They have now controlled most of the 38.5 acres since the year 2000.  Despite their experience as commercial real estate brokers specializing in Las Vegas real estate, and despite marketing the property through a series of prestigious firms, in the 15 years since the 2003 plan of reorganization was approved by Judge Jones with the stated goal of maintaining, developing and selling the property, the property has not been sold.

In their recent filings with this Court, Bulloch and Gaffin are now full of excuses.  They allege they were unable to sell the property because of the recession years and because of lawsuits by Tom Gonzales.  (ECF No. 58, at 7-8).  These are dishonest excuses.  **Neither the recession nor Tom Gonzales is to blame**.  The property was for sale before and after the recession.  The property was for sale long before the first lawsuit by Gonzales in 2011.  Furthermore, it is specious to claim that a lawsuit blocked the sale of the property, because no buyer was dissuaded by the fact that part of the seller's proceeds had to be used to pay something called the "Parcel A Transfer Fee."  The buyer

obtains title to the land by simply paying the agreed price.  The buyer has no interest or concern in how the seller's proceeds may be distributed.  Hence the lawsuit was no hindrance whatsoever.  All Debtors had to do is what they agreed to do in the 2003 Chapter 11 plan; namely, sell the property.  Notably, Gonzales's lawsuits did not deter lenders such as the Shotgun Entities from continuing to loan huge sums to Bulloch and Gaffin against the property.

The irrefutable fact is that Bulloch and Gaffin are incompetent with respect to being unable to sell the property.  Based on a finding of incompetency alone, cause exists under Section 1104(a)(1) for appointing a Chapter 11 trustee.

### 3.    Dishonesty

"Dishonesty" is defined in case law as "lack of honesty or integrity: disposition to defraud or deceive." *In re Amerejuve, Inc.*, 2015 Bankr. LEXIS 1496 (Bankr. S.D. Tex. Apr. 29, 2015), citing *Merriam-Webster Online Dictionary*. 2015. http://www.merriam-webster.com (28 Apr. 2015).

Bulloch and Gaffin display their lack of honesty or integrity every time they misrepresent the true value of the 38.5 acres.  Despite their representation that the 38.5 acres has an appraised value of $460 million,[3] Bulloch and Gaffin know, in truth, it is worth less than half that amount.

As proof of Bulloch and Gaffin's true knowledge, in the *Sher Development* case, Bulloch and Gaffin originally offered $16.5 million, or approximately $5.1 million per acre, for the 3.1-acre parcel known as the "Aspen Financial parcel" that is included as part of the 38.5 acres.  In that same *Sher Development* case, Bulloch and Gaffin fought hard to obtain court approval in 2018 of an offer to purchase the Aspen Financial deed of trust for $13 million, or approximately $4.3 million an acre.  These actions speak louder

---

[3] The *Amended Motion for Conversion of Case to Chapter 11* (ECF No. 30), at 1, claims this value based on an appraisal dated October/November, 2017, but Debtors have yet to produce the appraisal despite repeated requests.

16

than any words.  Bulloch and Gaffin know that the value of the acreage as established in the *Sher Development* case is between $4.3 million and $5.1 million per acre, not the $12 million - $15 million per acre they have represented to the Court in this case and to Judge Jones in the prior cases.

Bulloch and Gaffin also know that the IRR appraisal commissioned by Gonzales last year placed a value of $5.1 million per acre on Parcel A, which is consistent with the value-per-acre that the Court found in the *Sher Development* case.

As further evidence of their dishonesty, while this motion for appointment of a trustee was being drafted, Bulloch and Gaffin filed an emergency motion to approve use of cash collateral. (ECF No. 78).  As part of that motion, they offered into evidence a cash collateral stipulation between Debtors and Northern Trust Company which recites that standing alone, the 6.4 acres comprising the Desert Oasis Apartments is worth $9 million, which translates to approximately $1.3 million per acre.[4]  Deducting the 6.4 acres from the 38.5 acres, this means that in order to reach the market value of $460 million that Bulloch and Gaffin are claiming, the remaining 32 acres would have to be worth $451 million, or, an average of $14,375,000 per acre.  Yet the value of the remaining 32 acres cannot be $14.3 million per acre, because the Aspen Financial property comprises 3.1 of those remaining 32 acres, and Bulloch and Gaffin fought to obtain a state court order in the *Sher Development* case which finds the market value of those 3.1 acres to be $4.3 million per acre. In short, Bulloch and Gaffin are playing a dishonest game by knowingly misrepresenting the fair market value of Debtors' property to the creditors and to the various courts.

Being a fiduciary to a bankruptcy estate is not a game.  Playing with the value of

---

[4] In the original draft of the stipulation, the value of the Desert Oasis Apartments property was reported as $6 million.  Between the initial and final drafts of the stipulation, Bulloch and Gaffin arbitrarily increased the alleged value of the apartment property by $3 million.

the 38.5 acres is fundamentally dishonest.  Based on a finding of dishonesty alone, cause exists under Section 1104(a)(1) for appointing a Chapter 11 trustee.

### 4.    Similar Cause

The causes for appointment explicitly listed in Section 1104(a)(1) are not exclusive; the statute provides that any other "similar cause" may be ground for appointment of a trustee in a Chapter 11 case.  *In re Marvel Entm't Grp.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).  Cases hold that cause exists for appointment of a trustee under 11 U.S.C. §1104(a)(1) where the evidence shows:

(a) conflicts of interest;

(b) misuse of assets and funds;

(c) inadequate record keeping and reporting;

(d) non-filing of required documents, including lack of adequate disclosure;

(e) lack of appropriate cost controls;

(f) various transgressions as to taxes, including nonpayment of taxes, failure to file returns, and nonwithholding of taxes;

(g) various instances of conduct found to establish fraud or dishonesty;

(h) failure to make required payments; **or**

(i) lack of credibility and creditor confidence.

*In re Aardvark, Inc.* 1997 WL 129346 (D.Del. 1997) (emphasis added), citing *In re Clinton Centrifuge, Inc.* (Bankr. E.D. Pa 1988) 85 B.R. 980, 985).

Debtors and their management, Bulloch and Gaffin, have engaged in virtually all of the conduct identified in the cases as "similar cause" for appointment of a trustee. They misused the assets and funds of Debtors as indicated by Judge Jones's judgment and failed to maintain the Desert Entities as separate from each other.  They failed to provide quarterly reports to Gonzales as required by their former Chapter 11 plan.  They

18

failed to follow any concept of cost controls in the SkyVue project fiasco. They didn't even pay their taxes.[5]

They are dishonest as to the fair market value of the 38.5 acres. They obviously do not pay their creditors as agreed. They have zero credibility or creditor confidence.

There is more bad faith and abuse of the bankruptcy process in the instant case than can be found in any reported decision within the Ninth Circuit dealing with conversion under Bankruptcy Code §706(a). Here, Debtors' bad faith and abuse of the bankruptcy process has gone so far that it is actually the subject of a federal court judgment. Debtors' willingness to bury the 38.5 acres in debt now poses a threat to the likelihood of creditors ever being paid. In short, Debtors' material breach of their Chapter 11 plan was one that severely prejudiced creditors, which is the epitome of bad faith. A debtor-in-possession must be transparent, and these Debtors are not. They kept Gonzales in the dark as they violated their Chapter 11 plan. There is every reason to believe that as debtors-in-possession, they will fail to abide by their responsibilities to report fully and accurately on their handling of the bankruptcy estate.

Allowing Debtors again to take the reins of a Chapter 11 estate involving the 38.5 acres is a prospect that should be ruled out entirely. Debtors have already had their fresh start opportunity. They had a fresh start 15 years ago. They abused the privilege of bankruptcy protection and have proven beyond question they have no ability to sell the 38.5 acres. Accordingly, in addition to gross mismanagement, incompetence and dishonesty, there is "similar cause" under 11 U.S.C. §1104(a)(1) to appoint a trustee.

## A TRUSTEE MUST BE APPOINTED UNDER 11 U.S.C. §1104(a)(2) IN THE BEST INTEREST OF CREDITORS AND THE ESTATE

**A separate and independent basis for this motion** is found in 11 U.S.C. §1104(a)(2), which authorizes the court to appoint a trustee "in the interest of creditors,

---

[5] The bankruptcy schedules filed July 13, 2018 show that Desert Land owes Clark County $463,000 in unpaid real property taxes and Desert Investments owes $99,450.26 in back taxes.

any equity security holders, and other interests of the estate…".  *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999).  Unlike Section 1104(a)(1), which provides for mandatory appointment of a trustee upon a finding of cause, Section 1104(a)(2) "envisions a flexible standard" that gives the court discretion to appoint a trustee "when to do so would serve the parties' and the estate's interests."  *In re Marvel*, 140 F.3d at 474.  In determining whether the appointment of a trustee is appropriate in the interest of creditors and the estate, a court "eschew[s] rigid absolutes and look[s] to the practical realities and necessities inescapably involved in reconciling competing interests."  *In re Hotel Assoc*. (Bankr. E.D. Pa 1980) 3 B.R. 343, 345.

The estate and creditors need a trustee of the estate who will market and sell the 38.5 acres in reasonably prompt fashion and who will pursue appropriate claims for recovery of assets from Debtors' principals.  Bulloch and Gaffin do not fit this bill.  Indeed, they are the single biggest impediment to achieving goals of the creditors and the estate.

In a variety of cases, courts have found that the best interest of creditors and the estate required appointment of a Chapter 11 trustee under 11 U.S.C. §1104(a)(2).

In *In re Corona Care Convalescent Corp.,* 527 B.R. 379, 382 (Bankr. C.D. Cal. 2015) the court found grounds existed to appoint a Chapter 11 trustee when the debtors defaulted on a settlement agreement with their creditors and made no meaningful progress in paying down debt.  The court in *Corona Care* further found an asset sale was in the best interest of creditors but the debtors and their insiders were not inclined to sell the assets.

In *In re Pasadena Adult Residential Care, Inc.*, 2015 Bankr. LEXIS 3579, (Bankr. C.D. Cal. Oct. 22, 2015), the court found that the only hope for creditors and equity holders to realize value from the debtors' assets was a sale of those assets, and a trustee should be appointed to effectuate the asset sale.

In numerous cases, the courts have held that commingling of assets by the debtors required appointment of a trustee.  *See, In re Hotel Associates, Inc.,* 3 B.R. 343 (Bankr.

E.D.Pa. 1980); *In re Phila. Athletic Club, Inc.*, 15 B.R. 60, 63 (Bankr. E.D. Pa. 1981); *In re Taaf, LLC*, 2010 Bankr. LEXIS 449 (Bankr. E.D.N.C. Feb. 12, 2010); *In re Ford*, 36 B.R. 501, 504-05 (Bankr. W.D. Ky. 1983).

Failure to preserve the assets of the debtor for the benefit of the creditors is also grounds to appoint a trustee under §1104(a)(2). *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y 1990) ("A debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the benefit of the creditors,' and to 'refrain…from acting in a manner which could damage the estate'").

Of all the reported cases, none presents facts as compelling as the instant case for the appointment of a Chapter 11 trustee to protect and serve the interest of creditors and the estate. Over a 15-year period since the last Chapter 11 plan, Bulloch and Gaffin have placed the estate under a mountain of debt while they violated their Chapter 11 plan and commingled assets of Debtors. The judgment for over $13 million for breaching the Chapter 11 plan speaks for itself.

## CONCLUSION

Appointment of a trustee is mandatory under 11 U.S.C. §1104(a). Even without a motion, a court is empowered *sua sponte* to appoint a trustee in the circumstances that exist in this case. *Fukutomi v. United States Tr. (In re Bibo, Inc.)*, 76 F.3d 256, 258 (9th Cir. 1996). It is therefore respectfully requested that the motion be granted and that the Office of the United States Trustee be directed to appoint a Chapter 11 Trustee in these administratively-consolidated cases.

DATED: July 23, 2018          LAW OFFICES OF MARK WRAY


By _____/s/ *Mark Wray*_____
  MARK WRAY
Attorney for Petitioning Creditor
BRADLEY J. BUSBIN, AS TRUSTEE
OF THE GONZALES CHARITABLE
REMAINDER UNITRUST ONE

21

1

## CERTIFICATE OF SERVICE

2

    The undersigned employee of the Law Office of Mark Wray certifies that a true

3

copy of the foregoing document was served via the Court's ECF System on July 23, 2018

4

to the following:

5

6

ANTHONY W. AUSTIN on behalf of Creditor THE NORTHERN TRUST
COMPANY

7

aaustin@fclaw.com, gkbacon@fclaw.com

8

JAMIE P. DREHER on behalf of Petitioning Creditor BRADLEY J. BUSBIN, AS

9

TRUSTEE OF THE GONZALES CHARITABLE REMAINDER UNITRUST
ONE

10

jdreher@downeybrand.com, mfrazier@downeybrand.com

11

12

MICHAEL N FEDER on behalf of Creditors BARON H. WINDHAM JR., IRA,
DONDERO SURVIVORS TRUST, GREGG S. LAWRENCE SUBTRUST OF

13

CLIFFORD LAWRENCE AND CAROLYN LAWRENCE REVOCABLE

14

FAMILY TRUST DTD 9/30/96, JAMES C. CHACHAS TRUST, JONANNA
POLLARD LIVING TRUST, LEWIS ROY SHER LIVING TRUST, PATRICK

15

AND CLARA CARMEN DERMODY FAMILY TRUST, SHER

16

DEVELOPMENT, LLC, TERRY L. BELL IRREVOCABLE TRUST, THE
FRANK ARMINIO AND MARY ARMINIO REVOCABLE LIVING TRUST,

17

THE JOE P. SCHWAN FAMILY TRUST, THE JOSEPH D. EYSTAD AND

18

MARY ANN ARMINIO REVOCABLE TRUST DATED 09/03/03, THE
NEWBY 1984 TRUST, THE PAUL L. GARCELL AND PAMELA HERTZ

19

REVOCABLE FAMILY TRUST, VERONICA C. WOLF TRUST, VIVIAN A.

20

WEBER LIVING TRUST, WALTER BROELAND AND CAROL BROELAND
REVOCABLE TRUST, YARG, LLC, ANDREA DEANEAN GLENN, ANGELO

21

JOHN ARMINIO, BESSIE CHACHAS, CATHERINE WAGNER, GEORGE

22

CHACHAS, HELEN L. PEABODY, JAMES P. PEABODY, JANINE
MARSHALL, LINDA JEAN LUND, MACK CLAYTON, MARK E. JONAH,

23

TERRY WAGNER, TRACY L. CLAYTON, and WILLIAM MARSHALL

24

mfeder@dickinson-wright.com,
LV_LitDocket@dickinsonwright.com;lstewart@dickinson-

25

wright.com;merwin@dickinson-wright.com

26

EDMUND GEE on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11, 11

27

edmund.gee@usdoj.gov

28

JUSTIN J. HENDERSON on behalf of Creditor JUNIPER LOAN SERVICING CORPORATION
jhenderson@lrrlaw.com, cscruggs@lrrlaw.com

BRIGID M. HIGGINS on behalf of Creditors SHOTGUN CREEK FAMILY INVESTMENTS, LLC, SHOTGUN CREEK INVESTMENTS NEVADA, LLC, SHOTGUN CREEK INVESTMENTS, LLC, and SHOTGUN CREEK LAS VEGAS, LLC
bhiggins@blacklobello.law, dmeeter@blacklobello.law

ERIC R OLSEN on behalf of Interested Party WASH MULTIFAMILY LAUNDRY SYSTEMS, LLC
eolsen@gtg.legal

LENARD E. SCHWARTZER on behalf of Creditor DESERT OASIS APARTMENTS, LLC
bkfilings@s-mlaw.com

LENARD E. SCHWARTZER on behalf of Debtors DESERT LAND, LLC, DESERT OASIS APARTMENTS, LLC, DESERT OASIS INVESTMENTS, LLC and SKYVUE LAS VEGAS, LLC
bkfilings@s-mlaw.com

LENARD E. SCHWARTZER on behalf of Jnt Admin Debtors DESERT OASIS APARTMENTS, LLC, DESERT OASIS INVESTMENTS, LLC and SKYVUE LAS VEGAS, LLC
bkfilings@s-mlaw.com

U.S. TRUSTEE - LV - 7
USTPRegion17.LV.ECF@usdoj.gov

MARK M. WEISENMILLER on behalf of Interested Party WASH MULTIFAMILY LAUNDRY SYSTEMS, LLC
mweisenmiller@gtg.legal, bknotices@gtg.legal

_____ /s/ *Theresa Moore* _____