Lenard E. Schwartzer, Esq., NV Bar No. 399
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146-5308
Telephone:     (702) 228-7590
Facsimile:     (702) 892-0122
E-Mail:        bkfilings@s-mlaw.com
*Attorneys for Debtors and Debtors In Possession*

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re | BK-S- 18-12454 LEB |
| DESERT LAND, LLC, | Chapter 11 |
| Debtor. | (Jointly Administered with BK-S- 18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-12458-LEB) |
| In re | **MOTION TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, PAY SECURED CREDITORS AT CLOSING, PAY COMMISSION AND INVEST PROCEEDS IN BUYER** |
| DESERT OASIS APARTMENTS, LLC, | |
| Debtor. | |
| In re | |
| DESERT OASIS INVESTMENTS, LLC, | |
| Debtor. | |
| In re | |
| SKYVUE LAS VEGAS, LLC, | Date:  October 30, 2018 |
| Debtor. | Time:  9:30 a.m. |

Desert Land, LLC ("Desert Land"), Desert Oasis Apartments, LLC ("Desert Apartments"), Desert Oasis Investments, LLC ("Desert Investments") and SkyVue Las Vegas, LLC ("SkyVue") (collectively, the "Desert Entities" or "Debtors") by and through its counsel, Schwartzer & McPherson Law Firm, hereby propose the sale of substantially all of the Debtors' assets to LVB Acquisition Holdings I, LLC. The Desert Entities are debtors and debtors in possession under Chapter 11 of the Bankruptcy Code.  Their cases are pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").

### I.    INTRODUCTION

1.    Debtors submit this motion (the "Motion") pursuant to section 363 of title

11 of the United States Code (the "Bankruptcy Code"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004 of the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada (the "Local Rules"), authorizing and approving the sale of substantially all of the Debtors' assets for $462,000,000 to LVB Acquisition Holdings I, LLC , a Nevada limited liability company ("Buyer"), free and clear of all liens, claims and encumbrances, except as set forth herein or in the two Membership Interest Purchase Agreements for **an amount sufficient to pay all claims against the Debtors**. The sale is structured as a sale of membership interests in newly-formed limited liability companies for the purpose of not incurring real estate transfer taxes. The cash payment by the Buyer for the purchase will be reduced by a $46,200,000 investment in the Buyer making the total cash payment by the Buyer to the Debtors $415,800,000. Documentation of the proposed sale is as follows:

      a.     Membership Interest Purchase Agreement with Desert Land, Desert Investments, and Desert Apartments is attached as **Exhibits "A"** ("MIPA 1");

      b.     Membership Interest Purchase Agreement solely with Desert Land  **is** attached as **Exhibit "B"** ("MIPA 2") (collectively, the "MIPAs");

      c.     Non-Disclosure and Confidentiality Agreement is attached as **Exhibit "C"** ("Non-Disclosure Agreement");

      d.     proposed form of Operating Agreement for the Buyer is attached as **Exhibit "D"** ("LVB Operating Agreement"); and

      e.     Amended Letter of Intent for Branded Hotel Resort & Casino Development Project ("Letter of Intent") is attached as **Exhibit "E"**.

      f.     Assignments and Assumptions of the MIPAs from LVB Acquisition, LLC to and by Buyer attached as **Exhibit "F"**.

A proposed form of order approving the sale is attached as **Exhibit "G"** (the "Sale Order").

2.     This Motion is made and based upon the points and authorities herein, the *Declaration of David Gaffin* filed in support hereof, the papers and pleadings on file with the

1    Court in this case, judicial notice of which is respectfully requested, and any oral argument

2    presented to the Court at a hearing on this Motion.

3                                    **II.    JURISDICTION AND VENUE**

4        3.      Desert Land, Desert Apartments, Desert Investments and SkyVue and are debtors

5    under Chapter 11 of the Bankruptcy Code pursuant to four (4) ORDERs GRANTING AMENDED

6    MOTION FOR CONVERSION OF CASE TO CHAPTER 11 AND FOR ENTRY OF AN

7    ORDER FOR RELIEF UNDER CHAPTER 11 entered June 28, 2018.

8        4.      Desert Land, Desert Apartments and Desert Investments (collectively, "Sellers"

9    and each, individually as may be applicable thereto, a "Seller") are single asset real estate

10   entities within the meaning of section 101(51B) of the Bankruptcy Code.

11       5.      The Debtors are authorized to operate their business and property as debtors in

12   possession pursuant   to sections   1107(a) and   1108   of the Bankruptcy   Code.

13       6.      This Court has subject matter jurisdiction to consider and determine this matter

14   pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

15   Pursuant to Local Rule 9014.2, Debtor consents to the entry of final orders and judgments by the

16   bankruptcy judge.

17       7.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and  1409.

18                                         **III.    FACTS**

19       8.      Debtors own the following properties:

20       a.      *"Aspen Property"* means Assessor Parcel Number 162-28-301-034

21   consisting of approximately 3.11 acres located at 3965 Las Vegas Boulevard South, Las Vegas,

22   Nevada 89119 as more specifically described in **Exhibit "B"** hereto. On the Aspen Property is the

23   Desert Oasis Motel. The Aspen Property is owned by Desert Land.

24       b.      *"Desert Apartments Property"* means Assessor Parcel Number 162-28-310-

25   001 consisting of approximately 6.4 acres located on the south side of Mandalay Bay Road

26   approximately 800 feet east of Las Vegas Boulevard, Las Vegas, Nevada, as more specifically

27   described in **Exhibit "A"** hereto. On the property is an apartment complex consisting of 128 one-

28   and two-bedroom units.  The Desert Apartments Property is owned by Desert Apartments.

1      *c.*     *"Desert Investments Property"* means Assessor Parcel Number 162-28-

2    202-013 consisting of approximately 8.96 undeveloped acres at 95 E. Ali Baba Lane, Las Vegas,

3    Nevada 89119, as more particularly described in **Exhibit "A"** hereto. The Desert Investments

4    Property is owned by Desert Investments.

5          *d.*     *"Desert Land Property"* means Assessor Parcel Numbers 162-28-301-001,

6    162-28-301-002, 162-28-301-010, 162-28-301-029, 162-28-301-032, 162-28-301-033, 162-28-

7    301-036, 162-28-301-037 and 162-28-302-001 consisting of approximately 20 acres located along

8    the east side of Las Vegas Boulevard South, south side of Mandalay Bay Road, east side of Haven

9    Street and north side of Four Seasons Drive, Las Vegas, Nevada, as more particularly described in

10   **Exhibit "A"** hereto.  On the property are several buildings including the Desert Oasis Motel. The

11   Desert Land Property does not include the Aspen Property. The Desert Land Property is owned by

12   Desert Land.

13        *e.*     Each property referred to in (a), (b), (c) and (d) includes all buildings,

14   structures, and other improvements, including fixtures thereon (except to the extent fixtures are

15   excluded under the MIPAs).

16        *f.*    *"Other Assets"* means:

17          (i)     All licenses, permits, authorizations and approvals (collectively, the

18   "Permits") currently held by Seller, or to which Seller is entitled, relating to the ownership or

19   development of the Real Property, including, without limitation, those issued by governmental

20   authorities;

21          (ii)    All plans, specifications, drawings, concessions, warranties, and

22   other items of tangible and intangible personal property owned by Seller and relating solely to the

23   ownership, use and/or development of the Real Property; and

24          (iii)    The existing tenant leases, the service contracts and existing motel

25   management contracts described in Exhibit B to each of the MIPAs.

26      In this Motion, the Aspen Property, Desert Apartments Property, Desert Investments

27   Property and the Desert Land Property is referred to collectively as the "Real Property" and the

28   Real Property and the Other Assets are referred to collectively as the "Assets".  Unless otherwise

1  defined herein, capitalized terms herein shall have the meaning ascribed to such terms in the

2  MIPAs.

3        9.    The Sellers' Real Property, as an aggregation of property suitable for development

4  as a casino-resort, have been appraised for $460,000,000.

5        10.    The Sellers' Real Property is subject to liens in excess of $165,000,000.

6        11.    Pursuant to the terms of the MIPAs and the Letter of Intent, the Buyer has offered a

7  gross cash payment of $415,800,000 for the newly formed limited liability companies which will

8  own the Assets which is an amount sufficient to pay all undisputed and disputed secured and

9  unsecured claims and all expenses of administration of the Debtors.

10        12.    The Managers of the Debtors have determined that the proposed MIPAs represent a

11  sale which is in the best interests of the creditors of the Debtors, the equity holders of the Debtors

12  and the bankruptcy estate.

13        13.    The Sellers have executed the MIPAs (**Exhibits "A" and "B"**) which require the

14  Debtors to seek Court approval of the MIPAs and the transactions therein.

15        14.    The Sellers and others have executed a Non-Disclosure Agreement, a copy of

16  which is attached as **Exhibit "C"**, which requires the signers to keep certain information,

17  concerning the Buyer and its finances, confidential. Pursuant to the Non-Disclosure Agreement,

18  Debtors will file proof of Buyer's ability to fund the Escrow under seal.

19        15.    Debtors propose that at Close of Escrow:

20          a.    All undisputed secured creditors be paid in full;

21          b.    All disputed secured creditors be paid their undisputed portion of their debt

22  and the Debtors, at their option, will (i) deposit in a separate debtor in possession account, (ii)

23  leave with Escrow or (iii) post a supersedeas bond, the amount required to pay the disputed

24  portion of the funds including sufficient funds to pay any disputed interest, costs, and attorney's

25  fees which may be awarded;

26          c.    Disputed secured creditors shall be paid in full except to the extent the title

27  company will omit and insure against claims by insuring clear title and any bond shall be in

28  compliance with bankruptcy law and with the laws of the State of Nevada.

1        d.    All undisputed priority and non-insider unsecured creditors be paid in full;

2        e.    Any disputed priority and unsecured creditors shall have the amount of their

3  claims (i) held in a debtor in possession account pending a final order determining the amount of

4  their claim, or (ii) if there is a judgment, posted as a supersedeas bond with the court which

5  entered the judgment pending entry of a final judgment on appeal; and

6        f.    $46,200,000 shall be invested into Buyer as required by the Letter of Intent

7  on the terms shown in the LVB Operating Agreement in exchange for a 5% interest in Buyer

8  making the net cash payment to the Debtors $415,800,000.

9  **IV.    TERMS OF MIPAS**

10      16.    MIPA 1 provides for the transfer of all of the Desert Land Property, Desert

11  Investments Property and Desert Apartments Property (but not the Aspen Property) and related

12  Other Assets of the Desert Land, Desert Investments and Desert Apartments into three newly

13  formed limited liability companies which newly formed limited liability companies will be sold to

14  Buyer. The terms are as follows:

15        a.    At Close of Escrow, Desert Land (other than respecting the Aspen

16  Property), Desert Investments and Desert Apartments will transfer the ownership of all their real

17  estate and all buildings, structures, other improvements and fixtures (except to the extent certain

18  fixtures may be excluded under the MIPAs) and related Other Assets to new limited liability

19  companies.

20        b.    At Close of Escrow, Buyer will purchase the membership interests in these

21  new limited liability companies from the Debtors by payment of $401,800,000.

22        c.    As a condition of the sale, the Desert Land Property, Desert Investments

23  Property and Desert Apartments Property will be transferred free and clear of (i) any and all

24  claims against the properties (except approved exceptions to title), (ii) any and all claims against

25  Debtors and the new limited liability companies, and (iii) any and all claims of ownership or other

26  rights or interests in the Assets or in the new limited liability companies transferred to Buyer, and,

27  after the close of escrow, in any direct or indirect owners of such new companies. This requires

28  the Debtors, at Close of Escrow, to pay in full (or provide sufficient funds in escrow to pay in full)

1    all secured debt encumbering the property transferred.

2         d.    The Buyer has 25 days to conduct "due diligence" (the "Feasibility Period")

3    beginning on September 20, 2018 and ending October 15, 2018.

4         e.    Within five (5) days of the expiration of the Feasibility Period (on or before

5    October 22, 2018), the Buyer shall deposit $4,831,650 (the "MIPA 1 Deposit") into escrow at First

6    American Title Insurance Company ("Escrow"). The MIPA 1 Deposit will be returned if any of

7    the Sellers is unable to close the same.

8         f.    The Debtors have the obligation to obtain approval of this sale from this

9    Court.

10        g.    Upon Court approval of the sale, ½ of the MIPA 1 Deposit shall become

11   non-refundable (unless closing fails to occur due to a Seller's default or Buyer's right to cancel

12   prior to the expiration of the Feasibility Period).

13        h.    Close of Escrow shall occur on the later of (i) the twentieth (20th) day

14   after the expiration of the Feasibility Period, and (ii) five (5) days after Seller has notified

15   Buyer that Seller has obtained bankruptcy court approval of the sale subject to Buyer's right

16   to adjourn closing for up to thirty (30) days, in which event, the other ½ of the MIPA 1

17   Deposit shall become non-refundable as provideD in (g).

18        i.    As a result of the transaction, the Buyer will own 100% of the new

19   limited liability companies which will own the Desert Apartments Property, Desert

20   Investment Property, Desert Land Property and Other Assets free and clear of liens.

21        j.    Title to the Desert Apartments Property, Desert Investment Property and

22   Desert Land Property transferred shall be insured by Escrow Holder.

23        k.    Debtors will pay all closing costs

24        l.    Buyer is accepting the Desert Apartments Property, Desert Investment

25   Property, Desert Land Property and Other Assets in "as is, where is" with all existing faults.

26        17.    MIPA 2 provides for the transfer of the Aspen Property from Desert Land to a

27   newly formed limited liability company which will be sold to Buyer. The terms are as follows:

28        a.    At Close of Escrow, Desert Land will transfer the ownership of the Aspen

1  Property to a new limited liability company.

2          b.      At Close of Escrow, Buyer will purchase the membership interests in this

3  new limited liability company from Desert Land for $14,000,000.

4          c.      As a condition of the sale, the Aspen Property will be transferred free and

5  clear of all liens and encumbrances. This requires the Desert Land, at Close of Escrow, to pay in

6  full all secured debt encumbering the property transferred as provide in Judge Gonzales' Findings

7  of Fact and Conclusions of Law. This requires the Debtors, at Close of Escrow, to pay in full (or

8  provide sufficient funds to Escrow to pay in full) all secured debt encumbering the property

9  transferred.

10         d.      The Buyer has 25 days to conduct "due diligence" (the "Feasibility Period")

11  beginning on September 20, 2018 and ending October 15, 2018.

12         e.      Within five (5) days of the expiration of the Feasibility Period (on or before

13  October 22, 2018), the Buyer shall deposit $168,350 (the "MIPA 2 Deposit") into escrow at First

14  American Title Insurance Company ("Escrow"). The MIPA 2 Deposit will be returned if the Seller

15  is unable to close the same.

16         f.      The Debtors have the obligation to obtain approval of this sale from this

17  Court.

18         g.      Upon Court approval of the sale, ½ of the MIPA 1 Deposit shall become

19  non-refundable (unless closing fails to occur due to Seller's default or Buyer's right to cancel prior

20  to the expiration of the Feasibility Period).

21         h.      Close of Escrow shall occur on the later of (i) the twentieth (20th) day

22  after the expiration of the Feasibility Period, and (ii) five (5) days after Seller has notified

23  Buyer that Seller has obtained bankruptcy court approval of the sale, subject to Buyer's right

24  to adjourn closing for up to thirty (30) days, in which event the other ½ of the MIPA 2

25  Deposit shall become non-refundable as provided in (g).

26         i.      As a result of the transaction, the Buyer will own 100% of a new limited

27  liability company which will own the Aspen Property free and clear of liens.

28         j.      Title to the Aspen Property transferred shall be insured by Escrow

Holder.

k. Desert Land will pay all closing costs.

l. Buyer is accepting the Aspen Property in "as is, where is" with all existing faults.

## V. ADDITIONAL TERMS

18. The principals of the Debtor have agreed to invest $46,200,000 from the proceeds of the sale in Buyer in exchange for a 5% interest in Buyer as provided in the Letter of Intent and the provisions of the LVB Operating Agreement. This interest in the Buyer will be owned by another newly formed limited liability company.

19. The proposed transaction provides more than sufficient funds to pay all creditors of the Debtors in full as well as to make the investment in Buyer. The debts to be paid are as follows:

a. Undisputed secured debts and the undisputed portion of disputed secured debts:

| | Creditors | Estimated Amount |
|---|---|---|
| (i) | Clark County | $463,000 |
| (ii) | Northern Trust | $4,950,000 |
| (iii) | Juniper | $17,700,000 |
| (iv) | Aspen Creditors[1] | $13,900,000 |
| (v) | Shotgun Entities | $130,000,000 |
| (vi) | Gonzales[2] | $10,000,000 |

| | | |
|---|---|---|
| b. | Disputed secured claims (Gonzales) | $3,600,000 |
| c. | Undisputed priority and unsecured claims | $275,000 |
| d. | Disputed priority and unsecured claims[3] | $1,500,000 |
| e. | Administrative expenses | $500,000 |
| f. | Closing costs (including commissions)[4] | $8,500,000 |
| | **Total amount required to pay all creditors:** | **$191,388,000** |

[1] The amount to be paid is the amount set by Judge Gonzales' final order in Case No. A-16-743298-B.

[2] The undisputed amount owed to Gonzales upon closing of a sale is $10,000,000. The amount is in excess of $10,000,000 and the validity of his lien is disputed.

[3] Includes the legal fees awarded by Judge Gonzales in Case No. A-16-743298-B.

[4] Includes a Brokers Commission of $6,720,000 per MIPA 1 and $210,000 per MIPA 2 to BVB Real Estate Partners LLC, a Delaware limited liability company, as provided in ¶16.1 of the MIPAs and up to $1,150,000 to Colliers International.

1    At this time, no payments will be made to insiders or on Debtors' inter-company

2 debts.

3    20.    The Debtors will have no federal income tax consequences as they are pass-

4 through entities for federal income tax purposes.

5    ## VI.    LEGAL ANALYSIS

6 **A.    The Court Has Authority to Approve the Sale**

7    21.    Section 363(b) of the Bankruptcy Code provides that a trustee or, pursuant

8 to Bankruptcy Code §1107(a), debtor in possession, "after notice and a hearing," may

9 use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

10 U.S.C. § 363(b). A proposed use or sale of property pursuant to section 363(b) is

11 appropriate if "some articulated business justification" exists for the transaction. *See 240*

12 *North Brand Partners, Ltd. v. Colony GFP Partners (In re 240 North Brand Partners,*

13 *Ltd.)*, 200 B.R. 653,659 (B.A.P. 9th Cir. 1996); *Walter v. Sunwest Bank (In re Walter)*, 83

14 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988).

15    22.    Consistent with the foregoing, bankruptcy courts consider a wide range of factors

16 in approving sales outside the ordinary course of business, generally including the  following:

17       a.    Whether a sufficient business reason exists for the sale;

18       b.    Whether the proposed sale is in the best interest of the estate, which

19 considers the following factors:

20          (i)    that terms of the sale are fair and reasonable;

21          (ii)    that the property has been adequately marketed;

22          (iii)    that the proposed sales terms have been properly negotiated and

23 proposed in good faith;

24          (iv)    that the purchaser is involved in an "arms-length" transaction

25 with the seller; and

26          (v)    Whether notice of the sale was sufficient. See *Walter*, 83 B.R. at

27 19-20.

28    23.    The bankruptcy court should consider all factors pertaining to the proceeding and,

1   accordingly, act to further the diverse interest of the debtor, creditors and equity holders, alike. It

2   is not necessary for the bankruptcy court to consider each factor listed in the cases, or to use any

3   specific set of factors. See *240 North Brand Partners, Ltd.*, 200 B.R. at 659; *In re Work Recovery,*

4   *Inc.,* 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (using a six factor-test). Moreover, to the extent

5   that any factors are utilized, there is no necessity that those factors must be given equal weight to

6   determine the outcome. See *Matter of Embrace Sys. Corp.*, 178 B.R. 112 (Bankr. W.D. Mich.

7   1995).

8        24.    In ruling on a motion to sell assets outside of the ordinary course of business,

9   courts recognize that the debtor's application of its sound business judgment in the use, sale,

10  or lease of property is subject to great judicial deference. See *Simantob v. Claims Prosecutor,*

11  *LLC (In re Lahijani)*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *In re Canyon Partnership*, 55

12  B.R. 520, 524 (Bankr. S.D. Cal. 1985).

13       25.    Debtors assert that the proposed sale should be approved because (a) the

14  property has been marketed for many years, (b) the sales price is relatively close to the

15  appraised value of the properties, (c) the sale is for cash, (d) the sale is to an unrelated third

16  party and (e) the sale provides for sufficient funds to pay all creditors in full.

17  **B.**    **Sale of Property Free and Clear of Liens, Claims and Encumbrances is**
          **Warranted**

18

19       26.    The general standard for approving sales free and clear of liens are stated in

20  Bankruptcy Code §363(f) which allows a trustee or debtor in possession to sell property "free and

21  clear of any interest in such property of an entity other than the estate," if any one of the following

22  conditions is satisfied:

23              a.    applicable nonbankruptcy law permits the sale of such property free and
                      clear of such  interests;

24

25              b.    such entity consents;

26              c.    **such interest is a lien and the price at which such property is to be sold**
                      **is greater than the aggregate value of all liens on such property;**

27              d.    **such interest is in bona fide dispute; or**

28              e.    such entity could be compelled, in a legal or equitable proceeding, to accept

a money satisfaction of such interest.

11 U.S.C. § 363(f). This section is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell the property free and clear of liens. See *Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co.)*, 178 B.R. 198, 203 n.7 (B.A.P. 9th Cir. 1995); *In re Elliot*, 94 B.R. 343,345 (E.D. Pa. 1988).

27.    As described in the Schedules on file and the Gaffin Declaration, the only known asserted liens against the Debtors' properties are as follows: are as follows:

        a.    Clark County;

        b.    The Northern Trust Company ("Northern Trust");

        c.    Juniper Loan Servicing Corporation ("Juniper");

        d.    Shotgun Creek Las Vegas, LLC, Shotgun Creek Investments Nevada, LLC, Shotgun Creek Family Investments , LLC and Shotgun Creek Investments, LLC (the "Shotgun Entities");

        e.    Holders of beneficial interests in a Promissory Note Secured by a Deed of Trust encumbering the Aspen Property owned by Desert Land which loan was originally arranged by Aspen Financial Services, Inc. (the "Aspen Creditors"); and

        f.    Tom Gonzales and his assignee Bradley J. Buspin as trustee of the Gonzales Charitable Remainder Unitrust One Dated January 12, 2018  ("Gonzales").

28.    The claims of Clark County, Northern Trust, Juniper and Shotgun Entities are not subject to dispute.

29.    A portion of the claims of the Aspen Creditors and Gonzales are subject to *bona fide* dispute as shown by the extensive litigation with both creditors in state and federal court. The extensive litigation with the Aspen Creditors has been previously described to this Court in Sher Development's Motion for Relief From Automatic Stay [ECF 50].  The extensive litigation with Gonzales has been described to this Court in the attachments to the Declaration of Mark Wray [ECF 36], the attachments to the Declaration of Mark Wray [ECF 38], the attachments to the Response and the attachments to the Reply Brief re Amended Motion for Conversion of Case to

1    Chapter 11 [ECF 58].

2          30.    Debtors assert that the proposed sale of assets free and clear can be approved

3    because the proceeds of the sale are sufficient to pay all undisputed secured creditors in full and to

4    set aside sufficient funds to pay the disputed secured creditors upon conclusion of the litigation

5    with those creditors. The price at which such property is to be sold is greater than the aggregate

6    value of all liens on such property. Furthermore, this court can authorize a sale free and clear of

7    secured claims in *bona fide* dispute.

8    **C.**        **The Court Should Find that Any Purchaser is a Good Faith Purchaser for Value**

9          31.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in

10   the event a sale authorized under section 363(b) is later reversed or otherwise modified on

11   appeal. *See* 11 U.S.C. § 363(m); see also *Paulman v. Gateway Venture Partners III, L.P.*, 163

12   F.3d 570, 576 (9th Cir. 1998) ("When a sale of assets is made to a good faith purchaser, it may

13   not be modified or set aside unless the sale was stayed pending appeal.").  Although "good faith"

14   purchase is not defined in the Bankruptcy Code, typical "bad faith" or misconduct would include

15   collusion between the seller and buyer, or any attempt to take unfair advantage of other potential

16   purchasers. *240 North Brand Partners, Ltd.*, 200 B.R. at 659 (citing *In re Wilde Horse*

17   *Enterprises, Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991)).

18         32.    The purpose of such a finding is to facilitate the operation of section 363(m) of the

19   Bankruptcy Code, which provides a safe harbor for purchasers of a debtor's property when the

20   purchase is made in "good faith." Section 363(m) of the Bankruptcy Code serves the important

21   purposes both of encouraging good faith transactions and of preserving the finality of the

22   bankruptcy court's orders unless stayed pending appeal. See *In re Abbotts Dairies of Pa., Inc.*,

23   788 F.2d 143, 147 (3d Cir. 1986). If purchasers at court-approved 363 sales of property of a

24   bankruptcy estate, and their lenders, cannot rely on the purchase agreement and transfer

25   documents they receive at the sale, it will be difficult to liquidate bankruptcy estates at

26   reasonable prices.

27         33.    As shown by the Declaration of David Gaffin, the Debtors and their Managers are

28   not general partners, officers or persons in control of the Buyer either before the sale and as shown

1   by the LVB Operating Agreement (**Exhibit "D"**), the Debtors and their Managers will not be

2   general partners, officers or persons in control of the Buyer after the sale.

3         34.    After the sale, the Buyer will not be an insider to the debtors pursuant to

4   Bankruptcy Code §101(31) no an affiliate of the Debtors pursuant to Bankruptcy Code §101(2).

5         35.    The selection of the Buyer is a result of good faith, arm's length negotiations

6   between the managers of the Debtors and the representatives of the Buyer. The proposed Buyer is

7   a limited liability company controlled and owned unrelated third parties. See Declaration of David

8   Gaffin. The Buyer is good faith purchaser entitled to the protections of section 363(m) of the

9   Bankruptcy Code.

10        36.    The fact that the Managers of the Debtors have agreed to invest a portion of their

11  (and their affiliates') sales proceeds in the Buyer from the sale after the full payment of or reserve

12  for full payment for all creditors of the Debtors does not change the conclusion that the Buyer is

13  acting in good faith

14        37.    After the sale and investment in the Buyer, SkyVue will still have sufficient funds

15  to pay the Shotgun Entities their share (approximately 8%) of the equity in SkyVue.

16  **D.**    **Local Rule 6004 Compliance**

17        38.    Local Rule 6004 requires certain disclosures, as follows:

18            a.    Copies of the proposed MIPAs are attached as **Exhibits "B" and "C"**;

19            b.    A list of all lien holders with an interest in the property to be sold under the

20               sale motion is included above;

21            c.    A copy of a proposed form of sale order is attached as **Exhibit "G"** (the

22               "Sale Order");

23            d.    No consumer privacy ombudsman is required under 11 U.S.C. § 332.

24            e.    The motion highlights the material terms, and indicates the location of any

25               such provision in the MIPAs.

26            f.    Additional terms

27               (i)    The proposed sale is not to an insider.

28               (ii)    The Buyer is requiring the equity interests of the Debtors to invest in

the Buyer by paying $46,200,000 for 5% of the Buyer.  See the LVB Operating Agreement attached as **Exhibit "D"** and the Letter of Intent attached as **Exhibit "E"**.

(iii)    The sale motion does not contain any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied except upon payment of creditors.

(iv)    The sale motion does not contemplate an auction, but the Debtors may solicit competing offers for the property during the pendency of this sale motion.

(v)    The deadline for the closing of the proposed sale is the later of (i) the twentieth (20th) day after the expiration of the Feasibility Period, and (ii) five (5) days after Seller has notified Buyer that Seller has obtained bankruptcy court approval of the sale. The Buyer has the right to adjourn the closing for up to 30 days.

(vi)    The Buyer is required to submit a good faith deposit upon the end of the Feasibility Period and ½ of the deposit may be forfeited in part if the Court approves the sale and the Buyer fails to close the sale. The remaining ½ of the deposit may be forfeited if the Buyer adjourns the closing and the Buyer fails to close the sale.

(vii)    There are no interim agreements or arrangements with the proposed purchaser concerning operations of the Debtors.  There is a Non-Disclosure Agreement (**Exhibit "C"**).

(viii)    The Debtor intends to release sales proceeds to secured creditors at closing of the sale.

(ix)    The mechanics of the sale will make the sale not subject to the Nevada real estate transfer tax pursuant to NRS 375.090(11), making an exemption pursuant to Bankruptcy Code §1146(a) unnecessary.

(x)    The Debtors will retain their books and records to enable them to administer their bankruptcy case.

(xi)    The Debtors do not seek to sell or otherwise limit any rights to pursue avoidance claims under Chapter 5 of Title 11 of the United States Code.

(xii)    The sale motion contains no provision limiting the proposed Buyer's successor liability. However, the Buyer is obtaining ownership of newly formed limited liability companies which are not assuming any liabilities of the Debtors

(xiii)    The sale motion contains no provision by which the Debtors seeks to sell property free and clear of a possessory leasehold interest, license or other similar right.

(xiv)    The sale motion contains no provision for credit bidding pursuant to 11 U.S.C. § 363(k).

(xv)    The sale motion contains a provision whereby the Debtors seek relief from the fourteen (14) day stay imposed by Fed. R. Bankr. P. 6004(h). The Debtors seek to be able to close the sale within 5 days of the entry of the Court's order approving the sale.

**E.    <u>Authority to Assume and Assign Executory Contracts and Unexpired Leases</u>**

39.    In connection with the sale, the Debtor seeks approval of the assumption and assignment of the residential leases of the tenants in the Desert Oasis Apartments, the commercial lease with Psychic Sessions, the contracts with Hospitality Associates for managing the Desert Oasis Motel, the contract with WestCorp Management Group for managing the Desert Oasis Apartments and any other contracts or equipment leases related to the operation of the Desert Oasis Motel and the Desert Oasis Apartments (the "Contracts"). See Exhibit B to each of the MIPAs. Bankruptcy Code § 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts in this jurisdiction and others apply

a business judgment standard in determining whether to approve a debtor's request to assume or reject executory contracts and unexpired leases. See, *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) ("In making its determination, a bankruptcy court need engage in 'only a cursory review of a [debtor-in- possession]'s decision to reject the contract. Specifically, a bankruptcy court applies the business judgment rule to evaluate a [debtor-in-possession]' s rejection decision . . . ." ') (citations omitted); *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate"). In connection with the proposed sale, the Debtors will only assume and assign the above-mentioned Contracts to the Buyer, and the Debtors' assumption and assignment of these contracts will be effective only upon the closing of the sale.

40.    The Debtors assert that there are no material defaults by the Debtors under these Contracts and no cures are required.

41.    Furthermore, Bankruptcy Code §365(k) states that a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). As a result, following assumption and assignment of the above-mentioned contracts, the Debtors and their estates will be relieved of any and all liability for the Contracts.

42.    The Debtors assert that the assumption and assignment of the Contracts will be a valid exercise of the Debtors' sound business judgment.

**F.    Request for 14 Day Waiver Pursuant to Bankruptcy Rules 6004 and 6006 is Warranted**

43.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court

1   orders otherwise." Fed.R. Bankr. P. 6006(d). Debtor submits that a waiver of the stay under

2   Bankruptcy Rules 6004(h) and 6006(d) is appropriate and justified for the Sale Order in light of

3   the Buyers' requirement for the sale to close quickly, the amount of proceeds which will pay

4   creditors in full and the continuing accrual of interest on Debtors' secured debt. As such, and in

5   the absence of any objection, this stay should be waived, and Debtor should be authorized to

6   consummate the sale as expeditiously as possible.

7   **G.    Payment of Commission**

8          44.    Debtors have requested this court to employ Colliers Nevada, LLC dba Colliers

9   International ("Colliers") as its realtor.  See Motion For Approval Of The Employment Of Colliers

10  International As Broker Of Record For Debtors [ECF 212]. The Exclusive Authorization to Sell

11  provides:

12         2.3   Reduced Commission Sales.       If the Property is sold to one of the persons
           or entities identified on Addendum 1 (attached hereto) during the Agency Period
13         because of the pre-existing interest by such persons or entities, the Broker shall be
           entitled to a reduced commission of 0.25%. If the Property is sold to one of the
14         persons or entities to be identified by letter from Client to Broker. The reduced
           commission sales for the pre-existing interested parties shall expire after 6 months
15         from the beginning of the Agency Period.  After said period, Broker shall be
           entitled to a full commission if the Property is sold, in accordance with the terms of
16         this Agreement.

17

18         In the Addendum to this agreement, the Debtor and Colliers agreed that one of the

19  identified potential buyers was:

20         Hospitality Investors / Atelier Real Estate Partners LLC
           LVB Acquisition Holdings LLC
21         George Villar

22         45.    Pursuant to the terms of Colliers' agreement and the addendum, the Sellers should

23  pay Colliers a commission of 0.25% (instead of 1%) of the sales price upon the closing of the sale

24  to LVB Acquisition Holdings I, LLC.

25         46.    Pursuant to the terms of the MIPAs, the Sellers should pay BVB Real Estate

26  Partners a 1 ½ % commission of $6,930,000.

27                              **VII.    CONCLUSION**

28         47.    Debtors request that the Court grant this Motion and enter the Sale Order, thereby:

(a) approving the sale of the Sellers' Assets to the LVB Acquisition Holdings I, LLC pursuant to the terms of the MIPAs for $462,000,000, subject to the terms and conditions as set forth herein, free and clear of all liens, claims and encumbrances, (b) authorizing the Sellers, through a closing escrow, to pay all undisputed secured creditors and the undisputed portions of debts owed to partly disputed secured creditors; (c) authorizing the Sellers to (i) hold any disputed portion of claims on deposit in a separate debtor in possession account, (ii) leave the disputed portion of a secured claim on deposit with Escrow or (iii) post a supersedeas bond in the amount required to pay the disputed portion of the funds so long as all claims are excluded as exceptions to title by the Escrow Holder in its title insurance policy; (d) authorizing Sellers and their Managers to execute any documents necessary to effectuate the sale of the sale to LVB Acquisition Holdings I, LLC or such higher and better offer; (e) authorizing the Debtors to invest $46,2000,000 in LVB Acquisition Holdings I, LLC pursuant to the terms of the Letter of Intent and LVB Operating Agreement; (f) waive any stay of effectiveness of the Sale Order pursuant to Bankruptcy Rule 6004(h) such that the sale may be consummate and on or after 5 days of entry of the Sale Order; (g) finding that LVB Acquisition Holdings I, LLC is a good faith purchaser entitled to the protection of Bankruptcy Code §363(m); (h) authorizing the Sellers to pay all closing costs including but limited to the payment of the commissions to BVB Real Estate Partners, LLC and Colliers International,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    (i) authorizing the Sellers to assume and assign the Contracts to LVB Acquisition Holdings I, LLC,

2    and (j) grant such other and further relief as is just and proper in order to complete the sale.

3    Dated:  September 27, 2018

4    */s/ Lenard E. Schwartzer*
     Lenard E. Schwartzer, Esq.

5    Schwartzer & McPherson Law Firm
     2850 South Jones Blvd., Suite 1

6    Las Vegas, NV 89146

7    *Attorneys for Debtors and Debtors in Possession*

8    Dated: September 27, 2018

9    Desert Land, LLC

10   Desert Oasis Apartments, LLC
     Desert Oasis Investments, LLC

11   SkyVue Las Vegas, LLC

12   By:    /s/ Howard Bulloch
     Title:  Co-Manager

13

14   By:    /s/ David Gaffin
     Title:  Co-Manager

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (the "Agreement") is made as of September 12, 2018, by and among LVB ACQUISITION LLC, a formed or to be formed Nevada limited liability company, and/or Assigns (the "Buyer"), and DESERT LAND, LLC ("Land"), DESERT OASIS INVESTMENTS, LLC ("Investments"), and DESERT OASIS APARTMENTS, LLC ("Apartments"), Nevada limited liability companies (collectively, the "Seller"), with reference to the following facts and circumstances:

### RECITALS

A.    Desert Land Property.  Land is and warrants and represents that it is the owner of the following assets (collectively, the "Land Property"):

(1)    Fee title to approximately 20.03 acres of real property more specifically described in Exhibit A as Parcels 1 through 9 and Parcels 13, 15 and 16 (APNs 162-28-301-001, 002, 010, 029, 032, 033, 036 and 037 and 162-28-302-001) (together with all easements, rights of way, hereditaments and appurtenances thereto, collectively, the "Land Parcels");

(2)    All buildings, structures, and other improvements, including such fixtures as shall constitute real property (collectively, the "Improvements") located on the Land Parcels (together with the Land Parcels, collectively the "Land Real Property");

(3)    All licenses, permits, authorizations and approvals (collectively, the "Permits") currently held by Land, or to which Land is entitled, relating to the ownership or development of the Land Real Property, including, without limitation, those issued by governmental authorities;

(4)    All plans, specifications, drawings, concessions, warranties, and other items of tangible and intangible personal property owned by Land and relating solely to the ownership, use and/or development of the Land Real Property; and

(5)    The leases ("Leases") and the service contracts ("Service Contracts") described on Exhibit B as relating to the Land Parcels.

B.    Desert Oasis Apartments Property.  Apartments is and warrants and represents that it is the owner of the following assets (collectively, the "Apartments Property"):

(1)    Fee title to approximately 6.4 acres of real property more specifically described in Exhibit A as Parcel 17 (APN 162-28-310-001) (together with all easements, rights of way, hereditaments and appurtenances thereto, collectively, the "Apartments Parcel");

(2)    All Improvements located on the Apartments Parcel (together with the Apartments Parcel, collectively the "Apartments Real Property");

(3)    Certain Permits currently held by Apartments, or to which Apartments is entitled, relating to the ownership or development of the Apartments Real Property, including those issued by governmental authorities;

(4)    Certain plans, specifications, drawings, concessions, warranties, and other items of tangible and intangible personal property owned by Apartments and relating solely to the ownership, use and/or development of the Apartments Real Property; and

(5)    The Leases and the Service Contracts described on Exhibit B that relate to the Apartments Parcel.

C.    Desert Oasis Investments Property. Investments is and warrants and represents that it is the owner of the following assets (collectively, the "Investments Property" and, together with the Land Property and the Apartments Property, collectively, the "Property"):

(1)    Fee title to approximately 8.96 acres of real property, more specifically described in Exhibit A as Parcels 18 through 25 (APN 162-28-202-013) (together with all easements, rights of way, hereditaments and appurtenances thereto, collectively, the "Investments Parcel");

(2)    All Improvements located on the Investments Parcel (together with the Investments Parcel, collectively the "Investments Real Property" and, together with the Land Real Property and the Apartments Real Property, collectively, the "Real Property");

(3)    Certain Permits currently held by Investments, or to which Investments is entitled, relating to the ownership or development of the Investments Real Property;

(4)    Certain plans, specifications, drawings, concessions, warranties, and other items of tangible and intangible personal property owned by Investments and relating solely to the ownership, use and/or development of the Investments Real Property; and

(5)    The Leases and the Service Contracts described on Exhibit B that relate to the Investments Parcel.

D.    Excluded Property. Notwithstanding anything contained in this Agreement to the contrary, the Property does not include (i) any Permits which may not lawfully be transferred, which are identified on Exhibit C hereto as "Excluded Property: (ii) any right, title or interest of any tenant under any Lease (each, a "Tenant") in or to its tenant improvements at the Real Property or any other personal property owned by such Tenant and (iii) any other personal property identified on Exhibit C as "Excluded Property" (collectively, the "Excluded Property").

E.    The Newcos.

(1)    Land proposes to form a new Nevada limited liability company (the "DL Newco") whose only assets will be the Land Property.

(2)    Apartments proposes to form a new Nevada limited liability company (the "DA Newco" and, together with the DL Newco, each a "Desert Newco" and collectively, the Desert Newcos") whose only assets will be the Apartments Property.

(3)    Investments proposes to form a new Nevada limited liability company (the "<u>DI Newco</u>" and, together with the DL Newco and the DA Newco, each a "<u>Newco</u>" and collectively, the "<u>Newcos</u>") whose only assets will be the Investments Property.

F.    Buyer desires to purchase from Seller one hundred percent (100%) of the membership and profits interests in the Newcos from Seller (collectively, the "<u>Membership Interests</u>").

G.    Buyer desires to purchase the Membership Interests in connection with its plans for a resort hotel ("<u>Buyer's Project</u>").

H.    Seller is willing to sell the Membership Interests to Buyer on the terms and conditions set forth herein.

I.    In connection with the transaction, the Seller will form a new Nevada limited liability company (Newco 2") which will receive a five percent (5%) interest in the Buyer, or another entity formed by Buyer to own the Newcos, with the Buyer or such other entity being the ninety-five percent (95%) owner, in the form agreed to by the Parties (the "<u>Venture</u>"), to close concurrently with this Agreement.[1]

J.    Buyer and Seller are each sometimes referred to as a "<u>Party</u>" and sometimes collectively referred to as the "<u>Parties</u>."

K.    The Parties desire that the transactions described in this Agreement be consummated through an escrow (the "<u>Escrow</u>") with First American Title Insurance Company (the "<u>Escrow Holder</u>"), attention Gregg Corlyn, First American Title Insurance Company, National Commercial Services, 2500 Paseo Verde Pkwy, Suite 120, Henderson, NV 89074.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Sale.</u>

1.1    <u>Sale; Purchase Price</u>.  Upon the terms and subject to the conditions set forth herein, Seller hereby agrees to sell to Buyer the Membership Interests for the sum of Four Hundred One Million Eight Hundred Thousand and No/100 Dollars ($401,800,000.00) (the "<u>Purchase Price</u>").  The Purchase Price, less the Deposit (<u>as defined in Section 1.2</u>) shall be payable by wire

---

[1] Hereafter in this Agreement, in the event that there are any references to "Seller" in a capacity of a 5% owner in Buyer, said reference shall be deemed to mean "Newco 2" as opposed to Seller.

3

transfer or other immediately available funds ("Immediately Available Funds") at the Close of Escrow (as hereinafter defined).

    1.2   Deposit.

    (a)   As a condition to this Agreement, Buyer shall deposit the sum of Four Million Eight Hundred Thirty-One Thousand Six Hundred Fifty and no/100 Dollars ($4,831,650) in escrow (together with any interest earned thereon in Escrow, collectively, the "Deposit") by wire transfer or other immediately available funds ("Immediately Available Funds"), payable to Escrow Holder within five (5) days after the expiration of the Feasibility Period, as hereinafter defined.

    (b)   If Buyer fails to make the Deposit into Escrow within the time required by this Section 1.2, this Agreement shall automatically terminate and be of no further force or effect, and neither party shall have any rights against the other except as may be otherwise set forth in this Agreement.

    (c)   Non-refundable Portion of Deposit. Upon the later of (i) Escrow Holder's receipt of the Deposit, or (ii) the Bankruptcy Court's approval of the Transaction pursuant to Section 6.3, one-half of the Deposit, or Two Million Four Hundred Fifteen Thousand Six Hundred Fifty and no/100 Dollars ($2,415,825.00) (the "Non-refundable Portion"), shall become hard and non-refundable except upon the failure of Escrow to close as the result of a material default by Seller or Buyer's election to terminate this Agreement in accordance with the express provisions hereof. Escrow Holder shall not release the Non-refundable Deposit to Seller but shall continue to hold the Non-refundable Portion pending Close of Escrow.

    2.   Additional Closing Payments.

    2.1   Closing Funds. In addition to the balance of the Purchase Price (less the Deposit), Buyer shall deposit Buyer's share of the closing costs and prorations, less any credits due to Buyer hereunder, in Immediately Available Funds with Escrow Holder, payable to Escrow Holder, no later than 2:00 p.m. on the business day prior to the Close of Escrow.

    2.2   Closing Adjustments. Buyer shall also pay Seller at the Close of Escrow any amounts required as a result of the closing adjustments under Section 14.

    3.   Escrow.

    3.1   Opening of Escrow. For the purposes of this Agreement, the Escrow shall be deemed opened on the date Escrow Holder receives a fully executed copy of this Agreement (original, copy or facsimile) ("Opening of Escrow"). Seller shall deliver a fully executed Agreement to Escrow Holder within one (1) business day of mutual execution of this Agreement. Promptly after the Opening of Escrow, Escrow Holder shall notify Buyer and Seller, in writing, of the date Escrow is opened, the date of the expiration of the Feasibility Period (Section 3.3) and the Closing Date. Escrow Holder is hereby directed by Buyer and Seller to take all actions and make

all deliveries, recordings, and disbursements reasonably necessary in order to comply with its obligations contained in this Agreement.

3.2    <u>Investment of the Deposit</u>.  Escrow Holder shall invest the Deposit in one or more interest bearing trust accounts with local, federally insured banking institutions; provided, Buyer executes and delivers to Escrow Holder an Internal Revenue Service Form W-9.  All interest earned on the Deposit shall constitute part of the Deposit and shall be payable to the Party entitled to receive it under this Agreement.

3.3    <u>Feasibility Period</u>.  The "<u>Feasibility Period</u>" shall expire at 5:00 p.m. Pacific time on the twenty-fifth (25th) day after Opening of Escrow. During the Feasibility Period, but subject to the rights of the Tenants under the Leases, Buyer and its agents and designees shall have the right to conduct and complete such tests, inspections, inquiries and examinations of the Property that Buyer deems necessary in its sole discretion, all at Buyer's sole expense; PROVIDED, HOWEVER, that Buyer shall not conduct any invasive testing affecting the Real Property or any Tenant without Seller's and the affected Tenant's prior written consent, which consent by Seller shall not be unreasonably withheld, conditioned or delayed.  Buyer shall provide Seller complete copies of all reports so obtained by Buyer.  Buyer shall give the Seller reasonable advance notice of Buyer's intent to enter upon the Real Property for such purpose, and shall conduct such activities in a manner which will minimize interference with the existing use and occupancy of the Property and not result in a violation of any of the Leases.  Upon completion of such activities Buyer shall, at its sole expense, cause the Property to be restored to substantially the same condition it was in prior thereto, including filling, compaction and re-sodding of all excavations and the repair of any and all other damage to the Property in a manner reasonably satisfactory to Seller, which obligation of Buyer shall survive the termination of this Agreement. Prior to entry on the Property to perform such testing, Buyer will provide Seller an insurance certificate demonstrating liability coverage of at least $1,000,000 per occurrence and aggregate covering Buyer and its consultants, and Seller shall be listed as an additional insured on such policy. Buyer shall also indemnify and hold harmless Seller (including managers, members, officers, directors, employees, agents and representatives) from and against all claims for bodily injury or property damage, claims, expenses and losses (including mechanics' and materialmen's liens) which arise or may be asserted against Seller and/or the Property arising out of or in any way related to any such activities on the Property by or on behalf of Buyer (including any claims by any Tenants), which obligation of Buyer shall survive the closing or the termination of this Agreement.

3.4    <u>Buyer's Termination of Escrow</u>.   Buyer may elect to terminate this transaction for any reason or for no reason at all (and whether or not any conditions under this Agreement have been or will be or can be satisfied by Seller) in Buyer's sole and absolute discretion during the Feasibility Period by delivering a written notice to Seller and Escrow Holder (a "<u>Termination Notice</u>") prior to the expiration of the Feasibility Period.  Subject to the provisions of the following paragraph, upon Escrow Holder's timely receipt of Buyer's Termination Notice, in the event that Buyer had previously paid the Deposit Escrow Holder shall return the Deposit to Buyer within three (3) business days thereafter without requiring any consent, approval or other documentation from Seller, the Escrow shall be canceled and the Parties shall thereafter be released

5

from all obligations hereunder, other than those which, by the express terms of this Agreement, survive termination. Seller hereby authorizes Escrow Holder to return the Deposit to Buyer and cancel Escrow upon Escrow Holder's timely receipt of Buyer's Termination Notice.

If Buyer terminates this Agreement pursuant to this Section 3.4 or if for any other reason the transaction contemplated by this Agreement is not completed, Buyer agrees (i) that the copies of the Property Documents (as hereinafter defined) delivered to Buyer by Seller shall promptly be returned to Seller; (ii) Buyer shall deliver to Seller, without representation or warranty, copies of all Buyer Studies (as defined in Section 17.6); and (iii) Buyer shall provide Seller with unconditional lien releases from all persons employed or otherwise acting on behalf of Buyer, who may be entitled to claim any statutory lien rights under Nevada Revised Statutes ("NRS") 108.221 et seq. in connection with Buyer's due diligence or other pre-closing activities on the Real Property. In the event that, as of the date Buyer is entitled to a return of the Deposit, Buyer has not delivered to Seller all of the items required by this paragraph, Escrow Holder or Seller, as applicable, shall withhold the sum of $50,000 until such time as Buyer has delivered to Seller all of the items required by this paragraph.

      3.5   Close of Escrow. The term "Close of Escrow" shall mean the date when Seller and Buyer have each performed their respective obligations under this Agreement and all conditions precedent have been satisfied such that Escrow Holder is unconditionally obligated and committed to deliver (i) to Seller in Immediately Available Funds, the unpaid balance of the Purchase Price, (ii) to Buyer, the Membership Interests and (iii) to Buyer, the Owner's Title Policy (as defined herein). Close of Escrow shall occur on the later of (i) the twentieth (20th) day after the expiration of the Feasibility Period, and (ii) five (5) days after Seller has notified Buyer that Seller has obtained bankruptcy court approval as required in Section 12.1(d) (the "Closing Date").

      (a)   Seller's Deliveries to Escrow Holder. No later than 2:00 p.m. on the business day prior to the Closing Date, Seller shall execute and acknowledge, where appropriate, and deposit with Escrow Holder for delivery to Buyer upon the Close of Escrow the following documents and instruments, in form and substance reasonably satisfactory to Buyer and its counsel: (1) proof satisfactory to Escrow Holder and Buyer that the parties executing such documents have the power and authority to bind Seller; (2) proof satisfactory to Escrow Holder and Buyer that each Newco was duly formed as a Nevada limited liability company, is in good standing under the laws of the State of Nevada, has the authority to own and is (or as of the close of Escrow will be) the owner of the Property free and clear of any liens and has no assets other than the Property and has no liabilities of any kind; (3) an assignment of the Membership Interests in the form attached hereto as Exhibit D (the "Membership Assignment"), duly executed by Seller; (4) any personal property included in the Property, including the originals or, if applicable, copies of all contracts, permits, licenses, maps, reports, correspondence, governmental approvals, surveys and test results relating to the Real Property, not presently located at the Real Property, provided that Seller may cause Newcos to deliver such personal property directly to Buyer outside of Escrow; (5) all books and records relating to Newcos, including, without limitation, the operating agreements and articles of organization; (6) the written resignations of all managers and officers of Newcos; (7) replacement signature cards for any Newcos' bank or other accounts; and (8) such other instruments or supplemental instructions as Escrow Holder or Buyer may reasonably request

6

in order to consummate the transaction and such other documents required of Seller, under the terms of this Agreement. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

(b)    Buyer's Deliveries to Escrow Holder. No later than 2:00 p.m. on the business day prior to the Closing Date, Buyer will deliver to Escrow Holder (1) proof satisfactory to Escrow Holder and Seller that the parties executing this Agreement and any closing documents have the power and authority to bind Buyer; (2) the Purchase Price in Immediately Available Funds, less the Deposit, plus such additional funds as are required to pay charges payable by Buyer hereunder, less any credit to which Buyer is entitled under the terms hereof; and (3) such other instruments or supplemental instructions as Escrow Holder or Seller may reasonably request in order to consummate the transaction and such other documents required of Buyer under this terms of this Agreement. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

(c)    Extension of Closing Date. Buyer, at its election, may choose to adjourn the Closing Date to a date up to thirty (30) days after the Closing Date. Buyer shall notify Seller and Escrow Holder of its election to adjourn the Closing Date by written notice at least two (2) days prior to the Closing Date. In exchange for the extension, Buyer agrees that the Non-refundable Portion of the Deposit shall increase to 100% of the Deposit.

3.6    Governmental Permits and Approvals. From and after the expiration of the Feasibility Period, each of the Parties shall, upon the reasonable written request of the other, as promptly as practicable prepare, submit and file (or cause to be prepared, submitted and filed) all applications, notices and requests for, and shall use all reasonable efforts to obtain as promptly as practicable, all permits and approvals of any governmental authorities that may be or become necessary on each of their parts, respectively, for the performance of their obligations under, this Agreement, and will cooperate fully with each other (at no out of pocket cost to the cooperating Party) in promptly seeking to obtain all such permits and approvals. Seller, on the one hand, and Buyer, on the other hand, shall, unless otherwise set forth in this Agreement, bear their own costs and expenses incurred or fees paid to governmental authorities to obtain such approvals and permits. In addition, Seller shall, at no cost to Buyer, use its commercially reasonable efforts to arrange meetings or consultations with governmental officials and Seller's consultants, including but not limited to engineers, architects and land use and planning advisers, as may be reasonably requested by Buyer.

4.    Policies of Title Insurance. At the Close of Escrow, Escrow Holder shall cause to be issued an ALTA standard coverage owner's policy of title insurance, insuring the Newcos as owners of the Real Property, with a liability equal to the Purchase Price (the "Owner's Title Policy"). The Owner's Policy shall, in addition to the pre-printed exceptions, contain the exceptions approved by Buyer pursuant to the terms of this Agreement. The cost of a standard owner's policy ("Standard Policy") shall be paid by Seller and the cost of extended coverage and any endorsements requested by Buyer shall be paid by Buyer.

7

4.1     ALTA Survey. The Property Documents contain one or more ALTA surveys of the Real Property (collectively, the "ALTA Survey"). Seller shall cooperate with Buyer in having the ALTA Survey certified to Buyer. Any update to the ALTA Survey or additional surveys required by Buyer shall be obtained by Buyer at its own cost and expense and shall not be a condition to the Close of Escrow.

4.2     Buyer Approval of ALTA Survey. Buyer may object to the ALTA Survey or any matter disclosed thereon by written notice to Escrow Holder as provided in Section 5.1. Buyer shall be deemed to have approved those matters specifically disclosed by the ALTA Survey if Buyer fails to notify Seller and Escrow Holder in writing of Buyer's objections within the Feasibility Period in the manner required by Section 5.1.

5.     Title Commitment. Buyer acknowledges its prior receipt of an ALTA Title Commitment concerning the Real Property issued by First American Title Insurance Company, dated June 8, 2018 (Order No. NCS-717594-HHLV) (the "Commitment"). Seller shall, at its sole cost and expense furnish Buyer with an update to the Commitment within ten days of the date of this Agreement.

5.1     Buyer Objections. Buyer may object to any matter contained in the ALTA Survey or the Commitment by notifying Seller and Escrow Holder, in writing, of any objections to the title of the Real Property disclosed by the Commitment on or before September 17, 2018; if any updates to the Commitment or ALTA Survey are provided to Buyer, Buyer may object to same within five (5) days after receipt thereof (in either case, the "Buyer's Title Objection"). If Buyer shall fail to give Seller and Escrow Holder written notice within such period of Buyer's disapproval of the Commitment or the ALTA Survey or updates, as applicable, or any item contained in either or any of them, any items not objected to shall conclusively be deemed approved without any additional consent, approval or documentation required by Buyer. Notwithstanding anything to the contrary contained in this Agreement, but subject to Section 5.5, monetary liens, security interests and encumbrances which can be cured solely by the payment of a liquidated sum of money, other than: (A) current taxes and current special assessments within Special Improvement District No. 114B ("SID 114B"), which shall be prorated as provided in Section 14.4 and (B) any such matters created by or with Buyer's consent, (collectively, "Monetary Liens") shall be deemed to be automatically objected to by Buyer, and Seller agrees to cause any such Monetary Liens (other than current taxes, SID 114B special assessments and Buyer matters, as aforesaid) to be removed prior to the Close of Escrow, subject to the provisions of Section 5.4.

5.2     Seller's Election. If Buyer shall timely disapprove or conditionally approve the Commitment or the ALTA Survey or any part thereof (each as updated) within the time permitted by Section 5.1, Seller shall notify Buyer and Escrow Holder within five (5) days of its receipt of the Buyer's Title Objection whether Seller, in its sole and absolute discretion, elects to cure or correct any disapproved items prior to the Close of Escrow, or to elect not to cure such disapproved items ("Seller's Election" and "Seller's Election Notice"). Seller's failure to give any such notice shall conclusively be deemed Seller's Election not to cure any disapproved items. Without limiting any other provision of this Agreement, Escrow Holder's willingness to issue an

8

endorsement to the applicable Owner's Title Policy insuring over a Buyer's Title Objection shall constitute an acceptable cure or correction of such Buyer's Title Objection.

5.3    <u>Seller's Election Not to Cure</u>. If Seller elects not to cure such disapproved item or items (either by giving Seller's Election Notice or by failure to give any notice within the required time period), or any of them, then Buyer shall have the right to either accept title to the Real Property subject to such disapproved item or items or to terminate this transaction by giving notice within five (5) days after receipt of Seller's Election Notice. Buyer's failure to give a timely notice shall conclusively be deemed to be an election by Buyer to accept title subject to the matters set forth in Buyer's Title Objection and any matters which Seller's Election Notice specifically states will be cured or corrected by Seller. If Buyer elects to terminate this Agreement pursuant to this provision, Escrow Holder shall return to Buyer the Deposit, if previously paid, and thereafter the Parties shall have no further obligations under this Agreement except under those provisions which, by their express terms, survive the termination of this Agreement.

5.4    <u>Permitted Exceptions; Amended Commitment</u>. The matters contained in the Commitment and the ALTA Survey (as same may have been updated) that have been approved or deemed approved pursuant to this <u>Article 5</u> or are required pursuant to this Agreement are referred to as the "<u>Permitted Exceptions</u>." If any title commitment or preliminary title report or survey dated after the date of the Commitment (or any update furnished hereunder) discloses any title exception not previously disclosed in the Commitment or the ALTA Survey, that materially and adversely affects the development of the Property or has a material and adverse economic impact on the Property (a "<u>Material New Matter</u>"), each Party shall give notice of disapproval or willingness to cure with respect to such new exception in the same manner as set forth in this <u>Article 5</u>, except that the time periods for notifications and responses shall be reduced to five (5) days. As used herein, the term "materially and adversely" or "material and adverse" means a title exception having a demonstrated economic impact of greater than $250,000.00 (though if it can be cured monetarily, Seller shall do so prior to Close of Escrow). In the event of a Material New Matter that Seller is unable to cure or correct within a reasonable time after notice thereof, not to exceed thirty (30) days, Buyer's sole remedy shall be to accept an Owner's Title Policy containing such Material New Matter or terminate this Agreement with respect to any Property affected by the Material New Matter. If Buyer is entitled to terminate this Agreement and elects to terminate this Agreement pursuant to this provision, Seller shall return the Deposit and be responsible for the payment of the reasonable charges and cancellation fees of Escrow Holder, and thereafter the Parties shall have no further obligations under this Agreement with respect to the affected Property except under those provisions which, by their express terms, survive the termination of this Agreement.

6.    <u>Seller's and Newcos' Obligations before Close of Escrow</u>.

6.1    <u>Covenants</u>. Seller, and Seller on behalf of Newcos, covenants to the extent applicable to such person, that, from the date of this Agreement until the earlier of the termination of this Agreement or each applicable Close of Escrow, except as otherwise provided in this Agreement:

(a)    <u>Ordinary Course</u>.  Seller and Newcos (once formed) will each carry on its respective business and activities in substantially the same manner as they previously have been carried out (or, in the case of Newcos, consistent with Seller's past practices) and shall not make or institute any unusual or novel methods of purchase, sale, lease, management, accounting or operation that vary materially from those methods used by Seller during the prior fiscal year. Without limiting the foregoing, without the prior written consent of Buyer in each case, which consent may be withheld by Buyer in its sole discretion, (1) Seller will not sell, assign, convey (absolutely or as security), or grant a security interest in or encumbrance on the Real Property (or any interest or estate therein) other than the conveyance to each Newco; (2) (i) neither Seller (with respect to the Property) nor Newcos will enter into any new contract or agreement with respect to its assets or its business having a term that extends beyond the Close of Escrow, or that cannot be terminated upon no less than thirty (30) days or one (1) month's notice, (ii) neither Seller nor Newcos will enter into any new lease with respect to the Real Property other than pursuant to Lease renewal options of and exercised by the tenant existing as of the date of this Agreement, or (iii) neither Seller nor Newcos will enter into any new service contract affecting the Property unless the same can be terminated upon no less than thirty (30) days or one (1) month's notice; and (3) Seller and Newcos shall not sell, abandon or dispose of any of the Real Property, fail to comply with any laws or regulations affecting the Property, Seller or Newco, or take any action not provided for herein that would materially and adversely affect the financial condition, liabilities, or the operation of the Real Property or Seller or Newcos.  As used in this paragraph, the term "materially and adversely" means a matter have a negative adverse effect of more than $100,000.00 (in the aggregate as to the Real Property and all of the parcels referred to in Section 12.1 of this Agreement).

(b)    <u>Articles of Organization</u>.  Each Newco shall be formed as a Nevada limited liability company in accordance with the articles of organization and operating agreement attached hereto as <u>Exhibit E</u> (the "<u>Newco Organizational Documents</u>").  Once formed and organized, Seller shall deliver to Buyer copies of the Newco Organizational Documents, including articles of organization and good standing certificates file stamped by the Nevada Secretary of State.  Neither Seller nor Newcos will (1) amend Newcos' articles of organization or operating agreements; (2) issue any additional membership interests; (3) issue or create any warrants, obligations, subscriptions, options, convertible securities, or other commitments under which any additional membership interests of any class might be directly or indirectly authorized, issued, or transferred from treasury; or (4) agree to do any of the acts listed in this paragraph. At or prior to Close of Escrow, Seller shall cause to be furnished to Buyer a deed to the Real Property from Seller to Newco with appropriate documentation evidencing that all real property transfer taxes on such transfers have been paid in full by Seller, and that all real property transfer taxes, if any, on Buyer's purchase of the Membership Interests in Newco have been paid by Seller; and Seller shall hold harmless and indemnify Buyer from any and all claims, damages, liabilities and costs, including but not limited to attorney's fees, in the event that such real property transfer taxes or any other transfer taxes which may be due or payable by virtue of the transactions contemplated by and set forth in this Agreement have not been paid in full by Seller.

10

(c)     Insurance. Seller will continue to carry its existing insurance on the Property. Once the Property has been transferred to a Newco, such Newco will carry the same levels and types of insurance on such Property.

6.2     Access and Investigations; Confidentiality.    Throughout the Feasibility Period, Buyer and its counsel, accountants, and other representatives shall have full access during normal business hours to all books, accounts, records, contracts, and documents of or relating to Seller and Newcos (other than Seller's confidential proformas, projections, internal accounting and financial information, appraisals, and architectural and engineering work relating to the Property, which may be inspected at Seller's offices but not copied by Buyer), and Seller and Newcos shall furnish or cause to be furnished to Buyer and its representatives all data and information concerning the Property and the business and finances of Seller and Newcos that may reasonably be requested, including, without limitation, to the extent the same relate to the Property or Seller or Newcos, operating statements and tax returns for the year immediately prior to the current fiscal year, and operating statements for all reporting periods during the current fiscal year. Prior to the Close of Escrow (but continuing beyond the termination of this Agreement) Buyer will maintain (and will cause its agents, employees and other representatives to maintain) in confidence any written, oral or other information obtained from Seller or Newcos relating to the Property, unless (a) such information is already known to Buyer or to others from sources other than Seller or their agents not bound by a duty of confidentiality or such information becomes publicly available through no fault of Buyer or its agents, employees or other representatives, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the contemplated transaction or (c) the furnishing or use of such information is required by legal proceedings.

6.3     Bankruptcy Court Approval. Within five (5) business days of the deposit of the Deposit in Escrow, Seller will prepare and file a motion seeking approval of this Agreement and the transactions required by this Agreement with the United States Bankruptcy Court for the District of Nevada in Case Nos. BK-S-18-12454-LEB, BK-S-18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-124548-LEB and shall diligently prosecute said motion.

7.     Representations, Warranties, and Covenants of Seller. As an inducement for Buyer to enter into this Agreement and to purchase the Membership Interests, Seller represents and warrants that each of the following statements is true and correct as of the date of this Agreement and as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations, warranties, and statements constitute a condition precedent to Buyer's obligation to purchase the Membership Interests from Seller:

7.1     Ownership. Upon the formation of Newcos, Seller will be the only record and beneficial owner of the Membership Interests in the Newcos. Seller has full power to transfer the Membership Interests to Buyer, without obtaining the consent or approval of any other person or governmental authority.

7.2     Title: No Encumbrances. After the formation of Newcos and prior to the Close of Escrow, Seller will be the beneficial and record owner of all of the Membership Interests

11

in the Newcos, which will be uncertificated and not evidenced by any instrument or other document (other than Newcos' operating agreements), and Seller will have valid and good title thereto free and clear of any and all claims, liens, pledges, charges, restrictions, encumbrances, security interests or other rights or interests of any person whatsoever. On the Close of Escrow, upon the transfer by Seller of the Membership Interests to Buyer pursuant to this Agreement, Buyer will receive valid and good title to the Membership Interests, free and clear of any and all claims, liens, pledges, charges, restrictions, encumbrances, security interests or other rights or interests of any person whatsoever. Prior to the Close of Escrow, Seller have not and will not sell, assign, encumber, dispose of, pledge, or otherwise transfer all or any part of the Membership Interests, except in accordance with this Agreement.

7.3    Valid Existence. Once formed and as of the Close of Escrow, Newcos will be limited liability companies duly organized, validly existing and in good standing, in accordance with the Newco Organizational Documents, under the laws of the State of Nevada and will have all necessary limited liability company power to own and operate the Property previously owned by Seller. No later than ten (10) days prior to the end of the Feasibility Period, Seller will deliver to Buyer true, correct and complete copies of the Newco Organizational Documents, in their final form, which documents may not be modified without Buyer's prior written consent.

7.4    Capitalization. The Membership Interests will be issued in compliance with applicable federal and state securities laws or applicable exemptions thereunder. There will be no preemptive rights, options, warrants, conversion rights or other rights outstanding to purchase any other membership interests in Newcos or interest in the profits and losses of Newcos.

7.5    Effect of Agreement. The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, will not violate the articles of organization or operating agreements of Seller or any judgment, award or decree or any material indenture, agreement or other instrument to which Seller is a party, or by which Seller or any of its properties or assets are bound, including the Newco Organizational Documents, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge, security interest or encumbrance of any nature whatsoever upon the Membership Interests or the Property.

7.6    Governmental Approvals. Except for the authorization of the bankruptcy court set forth at Section 7.3, no approval, authorization, consent or order or action of or filing with any court, administrative agency or other governmental authority is required to be obtained by Seller for the execution and delivery by Seller (i) of a deed to the Real Property to Newcos, (ii) of this Agreement, or (iii) of the consummation by Seller of the transactions contemplated herein.

7.7    Taxes. Within the times and in the manner prescribed by law, each of the Seller and Newcos has filed all federal, state, and local tax returns required by law and has paid all taxes, assessments, and penalties due and payable. There are no present disputes as to taxes of any nature payable by Seller with respect to Newcos. Any and all real property transfer taxes of whatever kind and description in connection with the transfer of the Real Property from Seller to

12

Newcos or in connection with the purchase by Buyer of the Membership Interests in Newcos shall be paid in full by Seller prior to Close of Escrow.

7.8    <u>Compliance with Law</u>. Seller (a) has no notice of any default by Seller with respect to any material order of any court or governmental authority to which Seller is a party or is subject which applies to the Property, and (b) to Seller's actual knowledge Seller is not in violation of any material laws, ordinances, governmental rules or regulations to which it or the Property is subject (collectively, "<u>Laws and Regulations</u>").

7.9    <u>United States Person</u>. Seller is not a foreign person and is a "United States Person" as defined in the Internal Revenue Code of 1986, as amended ("<u>IRC</u>"). Pursuant to IRC section 1445, Seller shall deliver to Buyer prior to the Close of Escrow an affidavit of Seller on Escrow Holder's usual form, setting forth Seller's United States tax identification number and stating that Seller is not a foreign person and is a United States person as defined in the IRC.

7.10    <u>Hazardous Materials</u>.    Except as may be disclosed in the Property Documents, Seller has received no written notice from any federal, state, county or other governmental authority regarding the violation of any applicable Laws and Regulations relating to Hazardous Materials.    As used herein, "<u>Hazardous Materials</u>" means any substance, water or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety and property, including, but not limited to, petroleum and all of those materials, wastes and substances designated as hazardous or toxic by the U.S. Environmental Protection Agency, the U.S. Department of Labor, the U.S. Department of Transportation and/or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

7.11    <u>Leases</u>.  The schedule of Leases and Contracts attached hereto as <u>Exhibit B</u> is accurate and complete in all material respects.  Except as set forth in the Commitment or on <u>Exhibit B</u>, there are no Leases or other rights of possession to all or any part of the Real Property held by persons other than Seller or contracts which may not be terminated on thirty (30) days' or one (1) month's notice.

7.12    <u>Actual Knowledge</u>.    As used in this Agreement, Seller's or Newcos' "knowledge," "actual knowledge" or words of like import shall mean the actual knowledge of Howard Bulloch or David Gaffin, without duty of investigation.

7.13    <u>No Commercial Leases</u>. The Seller shall deliver the Property free of any commercial leases.

7.14    <u>Miscellaneous</u>. Prior to Close of Escrow, or at the Close of Escrow out of the sale proceeds, Seller shall have paid, bonded, or properly reserved for (i) all judgments against Seller, (ii) all obligations and liabilities of Seller, (iii) any and all employees, principals, consultants or agents of Seller, and (iv) all trade and other creditors of Seller.

13

8.    <u>Representations, Warranties, and Covenants of Newcos</u>.    As of the Close of Escrow, Newcos represent and warrant that the representations made in <u>Sections 7.1 through 7.14</u>, inclusive, will be true and correct as of the Close of Escrow, and shall survive the Close of Escrow, provided that any representation or warranty made to Seller's knowledge likewise shall be limited to Newcos' actual knowledge.

9.    <u>Representations, Warranties, and Covenants of Buyer</u>.    Buyer represents and warrants that each of the following statements is true and correct as of the date of this Agreement, shall be true and correct as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations, warranties, and statements constitute a condition precedent to Seller's obligation to sell and assign the Membership Interests to Buyer:

9.1    <u>Valid Existence</u>.    Buyer is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Nevada.

9.2    <u>Authorization of Agreements</u>.    This Agreement and each of the instruments and agreements required to be executed by Buyer pursuant to this Agreement constitutes (in the case of this Agreement) and will constitute (in the case of any such instruments or agreements to be delivered at the Close of Escrow) the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

9.3    <u>Buyer's Investigations</u>.    Buyer is a sophisticated owner and/or investor in real property similar to the Property.    Buyer acknowledges and agrees that it is purchasing the Membership Interests based on its own due diligence investigations and studies, as further provided in <u>Section 10.1</u>.

9.4    <u>Indemnity</u>.    Buyer shall protect, defend, indemnify and hold Seller and Newcos harmless from and against any and all expenses, costs, fees, obligations, liabilities and damages resulting directly or indirectly from such entry, activities, acts and/or omissions upon the Real Property by Buyer and its representatives, including any related claims by any Tenants pertaining directly to actions taken by Buyer or its representatives. Buyer shall not cause or permit in any way any liens or encumbrances upon the Real Property or any interest therein as a result of Buyer's or Buyer's representatives' acts or omissions with regard to the Real Property.    The provisions of this Section shall survive the Close of Escrow and the termination of this Agreement.

9.5    <u>Investment</u>.    Buyer is acquiring the Membership Interests from Seller for Buyer's own account, for investment purposes only and not with a view to an immediate resale.

9.6    <u>Buyer's Financials</u>.    Any and all information that has been supplied to Seller by or on behalf of Buyer concerning the financial ability of Buyer to enter into and perform the transactions contemplated by this Agreement and/or Buyer's knowledge and experience is true and correct in all material respects and does not omit to contain any other information necessary to make such information not misleading.

10.    <u>Condition of Property</u>.

14

10.1    <u>As-Is Purchase</u>.

(a)    Buyer acknowledges that it has or will have, as of the expiration of the Feasibility Period, (i) inspected to its satisfaction the Property, including the physical condition of the Real Property, the Newco Organizational Documents and all information contained in the Property Documents relating to the Membership Interests and the Property; (ii) obtained such surveys, engineering studies, soils and geotechnical reports, hazardous material studies, maps, master plans, height and airport environs studies, feasibility studies and other similar items prepared by or for Buyer relating to Buyer's Project as Buyer deemed necessary or appropriate to its purchase of the Membership Interests and Newcos' ownership of the Property (collectively, the "<u>Buyer Studies</u>"); and (iii) investigated the financial feasibility of Buyer's Project and the availability of the necessary land use approvals, utility service, including water and other necessary services (collectively, "<u>Buyer's Investigations</u>"). Buyer is purchasing the Membership Interests in reliance upon Buyer's Investigations and Buyer's investigation of such matters affecting the Property and the Newcos, as Buyer deems relevant and in reliance upon only those representations and warranties of Seller and Newcos set forth in this Agreement. Buyer acknowledges and agrees that neither Seller nor Newcos make any representation or warranty concerning the Membership Interests or the Property except as set forth herein, except for any conditions beyond reasonable wear and tear which arise between the date of this Agreement and the Close of Escrow (as to which Seller shall be responsible).

(b)    Buyer represents that it or its principals are experienced in the acquisition and ownership of real estate and is purchasing the Membership Interests pursuant to its independent examination, study, and inspection of the Property and Seller's and Newcos' books and records. Buyer acknowledges that the Property to be owned by Newcos will remain in its present "AS IS" "WHERE IS" "WITH ALL FAULTS" condition, and that Buyer will have no right of set off or reduction in the Purchase Price by reason of any condition of the Property. Moreover, Buyer hereby waives every claim, liability, cost, cause of action or damage arising out of or in any manner related to the Property's condition, uses, utility, operation, merchantability, fitness or compliance with Laws and Regulations.

(c)    In addition to, and not by way of limitation of the foregoing, Buyer acknowledges that Buyer will undertake such studies and investigations, conduct such tests and surveys and engage such specialists as Buyer deems appropriate to evaluate fairly the Property and its risks with respect to Hazardous Materials and Laws and Regulations applicable to Hazardous Materials (collectively, "<u>Environmental Laws</u>"). Accordingly, Buyer releases Seller from, and waives all claims and liability against Seller for, any structural, physical or environmental condition at the Property (including subsurface conditions) and further releases Seller from, and waives all liability against Seller attributable to, the structural, physical and environmental condition of the Property, including, without limitation, the presence, discovery or removal of any Hazardous Materials in, at, under, about or from the Property, or for, connected with or arising out of any and all claims or causes of action based upon any Environmental Laws. Without limiting the foregoing, Buyer also acknowledges that certain materials and substances that were in common use without regulation at and since the original construction of the Improvements may now deemed

15

to be Hazardous Materials or the use, or the method of use, of such items may now be prohibited or regulated, that some of those materials and substances may have been used in the original construction of the Improvements or the subsequent maintenance of the Real Property, that prior owners of the Real Property or adjacent property may have stored, released, transported or otherwise disposed of material on such properties deemed to be Hazardous Materials, and that Buyer will be solely responsible for all investigation or inquiry into such items and all costs of removal and remediation (including consequential damages) of such items, including without limitation asbestos containing materials and lead based paint.

        (d)    Buyer hereby acknowledges and agrees that Seller has not and will not make any representation or warranty that the existing zoning classification of the Real Property and other Permits are appropriate or will permit Buyer's intended use of the Property. Buyer hereby represents that it has made (or will make) its own independent investigation and has determined (or will determine) prior to the expiration of the Feasibility Period, to Buyer's satisfaction, that such zoning classification and Permits are appropriate for Buyer's use of the Property. Buyer agrees that Seller shall have no obligation whatsoever to pursue any zoning reclassification, use permit, variance, waiver, subdivision, parcel map or land division, or other land use approval or permit (collectively, "Land Use Approvals") with respect to the Real Property. Notwithstanding the foregoing, Seller agree to cooperate with Buyer for the purpose of assisting Buyer in procuring any necessary or desirable Land Use Approvals, including the execution of any necessary or desirable applications therefor after the expiration of the Feasibility Period, provided that such Land Use Approvals shall be without cost to Seller and, unless Seller otherwise agree in writing, in their sole discretion, shall not be effective prior to the Close of Escrow.

        (e)    EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES IN ARTICLE 7 AND NEWCOS' REPRESENTATIONS AND WARRANTIES IN ARTICLE 8, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, OR (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY.

        10.2   Notice of Inaccuracy.

(a)     Promptly upon either Party becoming aware of the occurrence of, or the impending or threatened occurrence of, any event which would cause a breach of any of its own representations or warranties contained in Sections 7, 8, 9 or 10.1, as the case may be, such Party shall disclose each such event, in reasonable detail, by means of a written notice thereof to the other Party or Parties. No disclosure by any Party pursuant to this Section 10.2(a), however, shall be deemed to amend or supplement the representations or warranties contained herein or to prevent or cure any misrepresentations, breach of warranty, or to satisfy any condition to the Close of Escrow.

(b)     Each Party shall, promptly upon acquiring knowledge of the occurrence of any event that would cause the conditions to its obligations set forth Section 12 or Section 13, as applicable, to fail to be fulfilled as of the Closing Date, notify in writing the other Party or Parties of such event in reasonable detail.

(c)     Each Party shall promptly notify the other Party or Parties of any action, suit or proceeding that shall be instituted or threatened against in writing such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

(d)     The representations and warranties of Seller and Newcos contained in Section 7 of this Agreement shall be deemed to be qualified by any information contained in the Schedules to this Agreement or in the Property Documents.

11.     Due Diligence Property Documents.    Buyer acknowledges receipt of the due diligence Property documents (collectively, the "Property Documents") identified on Exhibit F attached to this Agreement. Buyer acknowledges that Seller has delivered the Property Documents to Buyer as an accommodation to Buyer, and that Seller has not investigated, evaluated or in any way verified the content, completeness or accuracy of any of the Property Documents. Buyer understands and agrees that Seller makes no representation or warranty whatsoever, express or implied, with respect to the content, completeness or accuracy of any of the Property Documents, and Buyer hereby releases and agrees to hold harmless Seller and its constituent members and managers, and its and their respective officers, directors, employees, agents and representatives from all loss, cost, liability and expense arising in any way in connection with Buyer's receipt of the Property Documents, including without limitation, any such loss, cost, liability or expense resulting from any reliance by Buyer on the Property Documents. Buyer agrees that Buyer will not attempt to assert any liability against Seller (and/or its members, managers, officers, directors, employees, agents and representatives) for furnishing such information, and Buyer agrees to indemnify and hold Seller and its respective agents free and harmless from any and all such claims of liability. This indemnity shall survive the Close of Escrow or the termination of this Agreement.

Except as otherwise specifically provided in this Agreement, it is expressly understood by Buyer and Seller that all statements and representations made by Seller and Seller's agents and independent contractors (a) are intended by Buyer and Seller to be made only as an accommodation to Buyer and Buyer's investigations of the Property and are not in lieu of such investigations, and (b) are not to be relied and acted on by Buyer.

12.    <u>Buyer's Conditions to Closing.</u>

12.1    <u>Conditions.</u>  The obligation of Buyer to purchase the Membership Interests under this Agreement is subject to the satisfaction or waiver, at or before the Close of Escrow, of all of the following conditions.

(a)    <u>Title.</u>  As of the Closing Date, fee title to the Real Property shall be vested in the Newcos, subject only to the applicable Permitted Exceptions, Leases and Service Contracts, and Escrow Holder shall be prepared to issue the Owner's Title Policy as of the Close of Escrow.

(b)    <u>Representations and Warranties.</u>  Except as otherwise provided by this Agreement, all representations and warranties by Seller and Newcos in this Agreement shall be true in all material respects.

(c)    <u>Covenants.</u>  Seller shall have performed, satisfied, and complied in all material respects with all material covenants, agreements, and conditions required by this Agreement to be performed or complied with by them.

(d)    <u>Bankruptcy Court Approval.</u>  Entry of orders approving of this Agreement and the transactions required by this Agreement by the United States Bankruptcy Court for the District of Nevada in Case Nos. BK-S-18-12454-LEB, BK-S-18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-124548-LEB free and clear of (i) any and all claims against Seller, the Property, or Newco or, after the Close of Escrow, any direct or indirect owners of Newco, and (ii) any and all claims of ownership or other rights or interests in the Property or Newco, or, after the Close of Escrow, any direct or indirect owners of Newco. Seller shall use its commercially reasonable efforts to obtain such approval prior to Close of Escrow.

(e)    <u>Related Agreements.</u>  The contemporaneous close of escrow (unless the failure to close escrow is solely due to default by the Buyer) pursuant to a separate Membership Interest Purchase Agreement dated as of the date hereof between Buyer and Land with respect to the following adjacent or proximal parcels of land: (i) 3.11 acre parcel of land.

12.2    <u>Buyer's Rights If Conditions Not Fulfilled.</u>  The conditions contained in <u>Section 12.1</u> are intended solely for the benefit of Buyer. If any of such conditions are not satisfied, Buyer shall have the right in its sole discretion either to waive in writing the condition and proceed with the purchase of the Membership Interests, or terminate this Agreement. Any unwaived or unsatisfied conditions which were disclosed in writing by Seller or contained in documentation provided by Seller shall be deemed to have been known by Buyer shall be deemed waived or satisfied upon the occurrence of the Close of Escrow. If the failure of such condition is the result of a default by Seller or Newcos, Buyer shall be entitled to exercise any of Buyer's remedies as provided in <u>Section 15</u>.

13.    <u>Seller's Conditions to Closing.</u>

13.1 <u>Conditions</u>. The obligation of Seller to sell and transfer the Membership Interests under this Agreement are subject to the satisfaction or waiver, at or before the Close of Escrow, of all of the following conditions.

(a) <u>Purchase Price</u>. As of the Closing Date, Escrow Holder shall be prepared to deliver to Seller the Purchase Price in Immediately Available Funds, plus such additional funds as are required to pay charges payable by Buyer under and less any credit to which Buyer is entitled under this Agreement.

(b) <u>Representations and Warranties</u>. All representations and warranties by Buyer contained in this Agreement shall be true in all material respects.

(c) <u>Covenants</u>. Buyer shall have performed and complied with all covenants and agreements and satisfied all conditions that it is required by this Agreement to perform, comply with, or satisfy before or at the Close of Escrow.

13.2 <u>Seller's Rights If Conditions Not Fulfilled</u>. The conditions contained in <u>Section 13.1</u> are intended solely for the benefit of Seller. If any of such conditions are not satisfied, Seller shall have the right in their sole discretion either to waive in writing the condition and proceed with the sale of the applicable Membership Interests, or terminate this Agreement, provided, however, that any unwaived or unsatisfied condition with respect to the Close of Escrow shall be deemed waived or satisfied upon the occurrence of the Close of Escrow and provided further, if the failure of such condition is the result of a default by Buyer, Seller shall be entitled to exercise any of Seller's remedies provided in <u>Section 15</u>.

14. <u>Closing; Closing Costs and Prorations</u>.

14.1 <u>Escrow</u>. The Seller will be responsible for the fees of Escrow Holder.

14.2 <u>Seller's Costs</u>. Seller will pay (a) with respect to the Owner's Policy the cost of the Standard Policy and (b) all expenses and charges incurred with the discharge of Monetary Liens as provided in <u>Section 5.2</u>.

14.3 <u>Buyer's Costs</u>. Buyer shall pay (a) all title insurance premiums and costs associated with obtaining the Owner's Title Policy in excess of the cost of a Standard Policy and (b) all charges and fees in connection with any liens or encumbrances placed on the Property by Buyer.

14.4 <u>Rents and Impositions</u>. Escrow Holder shall determine the amounts, as of the Closing Date, of (a) all rents and all other sums due and payable or paid under the Leases (including prepaid rents) (collectively, "<u>Rents</u>") for the month in which the Closing Date occurs and (b) all ad valorem property taxes, special assessments and property owner association dues or similar assessments due and payable or paid by Seller or Newcos with respect to the Property (collectively ("<u>Impositions</u>") for the month or quarter, as applicable, in which the Closing Date

19

occurs. At the Close of Escrow, Buyer or Newcos (as owned by Buyer) shall receive a credit for any Rents received by Seller or Newcos (as owned by Seller) with respect to the period after the Closing Date, and Seller shall receive a credit at the Close of Escrow for any Impositions paid by Seller or Newcos (as owned by Seller) with respect to the period after the Closing Date. In the case of any unpaid Rents due and payable with respect to any period prior to the Closing Date, nothing contained in this paragraph shall require any payment by a Newco or Buyer to the Seller after the Closing Date for any payments other than those actually received by a Newco after the Closing Date; however, any such sums received by a Newco or Buyer after the Closing Date shall be promptly remitted to Seller.

14.5    Payable and Receivables; Utilities. Seller itself shall cause Newcos to cause all utilities and other amounts payable in the ordinary course of owning or operating the Property (other than Impositions) (collectively, "Accounts Payable") to be paid current as of the Closing Date. Following the Closing Date, Seller and Newcos (as owned by Buyer) or Buyer shall make any necessary adjustments between themselves to reflect the Parties' intention that Accounts Payable shall be paid current to the Closing Date. Accounts receivable (other than Rents) with respect to Leases and Contracts shall be prorated between Seller and each Newco (as owned by Buyer) in the same manner as Rents, to reflect the intention of the Parties that the Seller shall be entitled to the benefit of any income relating to the period prior to the Closing Date and each Newco (as owned by Buyer) or Buyer shall be entitled to the benefit of any such income on and after the Closing Date, provided that nothing contained in this paragraph shall require any payment by the Buyer or a Newco to the Seller after the Closing Date for any payments other than those actually received by a Newco after the Closing Date; however, any such sums received by a Newco or Buyer after the Closing Date shall be promptly remitted to Seller.

14.6    Insurance. Buyer acknowledges and agrees that Seller shall be entitled to terminate or to cause Newcos to terminate its existing insurance policies as of the Closing Date by written notice to Buyer no later than ten (10) business days prior to the Close of Escrow, and, in such event Buyer shall cause Newcos to obtain replacement insurance policies in amounts and with coverages determined by Buyer in its sole discretion.

14.7    Possession. Seller shall deliver or cause each Newco, as applicable, to deliver possession of all keys in Seller's possession to all locks within the Real Property to Buyer at the Close of Escrow. Delivery of any personal property may be accomplished by leaving the same at the Real Property.

15.    Default and Remedies.

15.1    Seller's Remedies. Seller, before entering into this transaction, has been concerned with the fact that substantial damages will be suffered by Seller in the event Buyer shall fail to purchase the Membership Interests by reason of its default. Therefore, if Escrow shall fail to close solely by reason of Buyer's default, then, upon the written demand of Seller, the Seller shall be entitled to receive the Non-refundable Portion of the Deposit (as defined in Section 1.2(c), except that if Buyer has exercised its option to adjourn the Closing Date pursuant to Section 3.5(c) of this Agreement, the Non-refundable Portion shall be 100% of the Deposit). The Escrow Holder

shall, within two (2) days of receipt of Seller's demand, notify the Buyer of Seller's demand. If Buyer does not object to Seller's demand within five (5) days of receipt of the Escrow Holder's notice, the Escrow Holder shall release the Non-refundable Portion to Seller. If Buyer objects to the release of the Non-refundable Portion to Seller, the Parties shall resolve the dispute as set forth in Section 15.4. THE PARTIES AGREE THAT THE AMOUNT OF THE NON-REFUNDABLE PORTION OF THE DEPOSIT IS A REASONABLE ESTIMATE OF THE EXTENT TO WHICH SELLER WOULD BE DAMAGED BY BUYER'S FAILURE TO CONSUMMATE THIS PURCHASE. Buyer acknowledges that the provisions of this Section 15.1 are an integral part of the transaction contemplated by this Agreement, and that without these provisions, Seller would not enter into this Agreement.

Buyer's Initials:

    15.2    Buyer's Remedies.    If the Close of Escrow fails to occur by reason of a Seller's default, (a) Buyer may elect to treat this Agreement as cancelled, in which case the Deposit shall be returned to Buyer and Buyer may recover payment from Seller of an amount equal to (i) Buyer's actual out of pocket costs to unrelated and independent third party vendors, and (ii) reasonable attorneys' fees, all of which shall not exceed One Hundred Thousand and no/100 Dollars ($100,000.00), and the Parties shall have no further obligations hereunder, except for any provisions which expressly survive termination, or (b) Buyer may elect within sixty (60) days from the date of such default to treat this Agreement as being in full force and effect, and Buyer shall have the right to seek specific performance of Seller's obligations under this Agreement. Buyer shall have no right to recover damages except as expressly set forth in this Section 15.2.

    Buyer and Seller, and others, have entered into an agreement contemporaneously herewith involving, indirectly the transfer of an additional approximately 3.11 acres of real property (the "Second Agreement"). It is understood and agreed that Buyer is not required to proceed with this transaction to Close of Escrow unless the Second Agreement proceeds to Close of Escrow; therefore in the event that after the Feasibility Period, Buyer has the right to cancel and does cancel the Second Agreement, then this Agreement shall be deemed cancelled by the cancellation of the Second Agreement.

15.3  Obstruction of Payment of Liquidated Damages or Release of Deposit.  If Buyer or Seller wrongfully withholds payment or wrongly obstructs payment of any amounts in Escrow due the other, and Seller or Buyer thereafter seeks to enforce its rights to collect such amounts, by court proceedings or arbitration or otherwise, then Buyer and Seller agree to pay, in addition to any other sums to which Buyer or Seller may be entitled, all reasonable costs and expenses of Buyer or Seller incurred in connection with the enforcement of its rights against the other under this Section 15.3, including, without limitation, court costs, reasonable attorney's fees, witness fees and expenses, and interest on said amounts at 10% per annum or the maximum interest rate allowed by applicable state and federal law, whichever is less. Such remedies and damages shall also be available to Buyer in the event that Buyer sues Seller for specific performance pursuant to Section 15.2 of this Agreement. The Parties specifically agree that any dispute arising out of Sections 15.1 and 15.2(a) only may, at the option of either Party, be determined by final and binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules") using the AAA Expedited Procedures. The Parties agree to use a single arbitrator with experience in commercial real estate matters, and the place of arbitration shall be Las Vegas, Nevada. The award rendered by the arbitrator shall be final, non-reviewable, non-appealable, and binding on the Parties and may be entered and enforced in any court having jurisdiction.

15.4  WAIVER OF JURY TRIAL.  SELLER AND BUYER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.  FURTHERMORE, SELLER AND BUYER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK CONSEQUENTIAL AND PUNITIVE DAMAGES FROM THE OTHER WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY ONE PARTY AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY SELLER AND BUYER OF ANY RIGHT THEY MAY HAVE TO SEEK CONSEQUENTIAL AND PUNITIVE DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

16.  Commissions and Fees.

16.1  Brokers' Commission. At Close of Escrow, Seller shall pay through Escrow a total combined commission of one and one-half percent (1.5%) of the Purchase Price and the joint venture investment, for a total commission of Six Million Seven Hundred Twenty Thousand

Dollars ($6,720,000.00 USD) to BVB Real Estate Partners LLC, a Delaware limited liability company, for its services in connection with this Agreement.

16.2    No Other Commissions. Buyer and Seller each represent and warrant to the other that, with the exception of BVB Real Estate Partners LLC as set forth in Section 16.1, neither has had any dealings with any person, firm, broker, finder, or consultant in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated hereby. No other person, firm, or entity is entitled to any broker's commissions, finder's fees, or consulting fees in connection with this transaction. Buyer and Seller do each hereby indemnify and hold the other and the Newcos harmless from and against any costs, expenses, or liability for compensation, commission, fees, or charges (collectively "Expenses") that may be claimed by any other broker, finder, consultant, or the like, by reason of any dealings or actions of the indemnifying party; and Seller further specifically indemnifies and hold harmless Buyer from and against any Expenses by virtue of Seller's relation with and or agreement with Colliers Nevada, LLC d/b/a Colliers International (or any affiliated entities).

17.    Miscellaneous.

17.1    Further Assurances. Subject to the terms and conditions of this Agreement, each of the Parties agrees to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and Regulations to consummate and make effective all of the transactions contemplated by this Agreement. In case at any time after the Close of Escrow any further action is necessary to carry out the purposes of this Agreement, to vest Buyer with full title to the Membership Interests, or to transfer record and beneficial ownership of the Membership Interests to Buyer, Seller shall take all such necessary action as may be reasonably requested by Buyer.

17.2    Governing Law; Severability. This Agreement has been negotiated and entered into in the State of Nevada and all questions with respect to this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of Nevada, regardless of the choice of law provisions of Nevada or of any other jurisdiction. Buyer and Seller agree that the proper forum for the hearing of any matters concerning this transaction and the rights and remedies of the Parties hereunder is the County of Clark, State of Nevada. In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Agreement shall become illegal, null or void, or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void, or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in force and effect to the full extent permitted by law.

17.3    Limitation of Waiver. No waiver of any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit of such provision. A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other Party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof. The delay or forbearance by Buyer or Seller in exercising any remedy or right, the time for the exercise of which is not specifically and

23

expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right. The waiver by any Party of the performance of any covenant, condition, or promise shall not invalidate this Agreement, nor shall it be considered a waiver of any other covenant, condition, or promise. The waiver by any Party of the time for performing any act shall not constitute a waiver of time for performing any other act or an identical act required to be performed at a later time. The delay or forbearance by any Party in exercising any remedy or right, the time for the exercise of which is not specifically and expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right. The exercise of any remedy provided in this Agreement shall not be a waiver of any remedy provided by law, and the provisions in this Agreement for any remedy shall not exclude any other remedy unless it is expressly excluded.

      17.4  <u>Nevada Real Estate Broker</u>. Under Nevada law, when a buyer or seller of real property is a licensed Nevada real estate broker, that person is obligated to make certain disclosures to each party to the transaction. In accordance with Nevada Revised Statutes Chapter 645, Seller hereby notifies Buyer that Howard Bulloch and David Gaffin have been licensed Nevada real estate brokers, have an interest in Seller, and are not acting on behalf of Buyer.

      17.5  <u>1031 Exchange</u>. Buyer and/or Seller reserve the right to accomplish this transaction as a 1031 exchange (the "<u>Exchange</u>") sufficient to meet the IRC requirements, and both parties agree to cooperate with each other to accomplish the same. However, no Party shall be obligated to assume any liability nor incur any costs or expenses, including attorney's fees, in connection with such Exchange. Further, said Exchange shall not delay the Close of Escrow and in the event that the Exchange shall not be ready to close when the sale and purchase of the applicable Membership Interests pursuant to this Agreement is scheduled to close, then the sale and purchase of such Membership Interests shall close without the Exchange.

      17.6  <u>Return of Property Documents</u>. If this Agreement terminates for any reason prior to the Close of Escrow, Buyer will return to Seller all Property Documents and all other written or tangible information pertaining to the Property or Newco, including all copies or extracts thereof within five (5) business days of such termination. In addition, if this Agreement terminates for any reason other than Seller's breach or default, then, at Seller's request, Buyer shall deliver to Seller, at no charge to Seller, all surveys, engineering studies, soils reports, maps, master plans, feasibility studies, and other similar items prepared by or for Buyer, other than Buyer's confidential proformas, projections, internal accounting and financial information and architectural and engineering work relating to Buyer's proposed development project on the Property (collectively, the "<u>Buyer Studies</u>") The obligations of Buyer set forth in this paragraph shall survive the Close of Escrow and the termination of this Agreement.

      17.7  <u>Survival of Representations, Warranties, and Agreements</u>. Notwithstanding anything to the contrary set forth anywhere in this Agreement, all covenants, representations, warranties, and agreements contained in this Agreement and not deemed to have been waived or satisfied by Buyer at Close of Escrow pursuant to Section 12.2 shall survive the Close of Escrow, the delivery of documents, and any performance on account of the obligations set forth herein for one (1) year following the Close of Escrow.

17.8    <u>Amendments</u>.  All amendments and supplements to this Agreement must be in writing and be executed by each party hereto.

17.9    <u>Successors and Assigns</u>.  Subject to <u>Section 17.10</u>, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

17.10    <u>Assignment</u>.  Buyer may assign or transfer any of its rights and/or obligations under this Agreement with the prior written consent of Seller, which consent shall not be unreasonably withheld. Any assignment in violation of this provision shall be void.

17.11    <u>Attorney's Fees</u>.  If either party becomes involved in any legal proceeding or arbitration arising out of this Agreement or the performance thereof, attorney's fees shall be awarded to the prevailing party.  The attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorneys' fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate for all the attorney's fees paid or incurred in good faith.

17.12    <u>Time of the Essence</u>.  Time is of the essence for this Agreement.

17.13    <u>Computation of Time Periods</u>.   All periods of time referred to in this Agreement shall include all Saturdays, Sundays, and Nevada or national holidays, unless the period of time specifies business days, provided that if the date or last date to perform any act or give a notice with respect to this Agreement shall fall on a Saturday, Sunday or a Nevada or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or a Nevada or national holiday.

17.14    <u>Headings</u>.  The article and section headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, extend or interpret the scope of this Agreement or of any particular article or section.

17.15    <u>Counterparts</u>.    This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument. Copies of signatures shall be as valid as if executed in original.

17.16    <u>Authority</u>.  Each person signing this Agreement on behalf of the respective parties represents and warrants that he or she is authorized to execute and deliver this Agreement and that this Agreement will thereby become binding upon Seller and Buyer, respectively.  In the event that Seller and Buyer is made up of more than one person, the signature of any one of the persons making up the group shall be binding upon the other members of the group.

17.17    <u>Entire Agreement</u>.  This Agreement, including all exhibits, schedules, and attachments, contains the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any prior agreements, negotiations, and other dealings between the

parties, including, without limitation, that certain Letter of Intent dated on or about August 29, 2018.

17.18 <u>No Offer</u>.  Buyer acknowledges that Seller's preparation of this Agreement is not an offer.

17.19 <u>Exhibits</u>.  All exhibits referenced herein are incorporated herein by such reference.

17.20 <u>Recitals</u>. All recitals referenced herein above are incorporated as if fully set forth herein.

17.21 <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of Seller and Buyer and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party (including, without limitation, Buyer's Broker) or the general public.

17.22 <u>Notices</u>.  Whenever Escrow Holder or any party hereto shall desire to give or serve upon the other any notice, demand, request, or other communication, each notice, demand, request, or other communication shall be in writing and shall be given or served personally or by fed ex or by confirmed telecopy, or by mail, postage prepaid (any first class mailing service shall also require service by telecopy) shall also, addressed as follows:

To Seller:              Desert Land, LLC et al.
                        c/o Howard Bulloch & David Gaffin
                        10181 Park Run Drive, Suite 200
                        Las Vegas, Nevada 89145
                        Phone: (702) 948-3344
                        Fax: (702) 948-3355

With a copy to:         Ballard Rawson Jorgensen
                        10181 Park Run Drive, Suite 110
                        Las Vegas, Nevada 89145
                        Attn: Kris T. Ballard, Esq.
                        Phone: (702) 452-3555
                        Fax: (702) 722-5525

To Buyer:               LVB Acquisition Holdings LLC
                        c/o HAAS H. HERTELL
                        BANCO POPULAR BLDG., 206 TETUAN ST. 509
                        SAN JUAN, PR (USA) 00901
                        Attn: JUAN SAAVEDRA, ESQ.
                        Phone: (787) 722-7540
                        Fax: (914) 761-2196

26

With a copy to:              Dahan & Nowick LLP
123 Main Street, 9th Floor
White Plains, New York 10601
Attn: David R. Taxin, Esq.
Phone: (914) 461-1650
Fax: (914) 761-2196

To Escrow Holder:       First American Title Company
2500 Paseo Verde Pkwy, Suite 120
Henderson, NV  89144
Attn:  Gregg Corlyn
Phone: (702) 254-1418
Fax: (702) 433-2252

Service of any such notice, demand, or request so made by mail shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or at the expiration of the third (3rd) business day after the date of mailing, whichever is earlier in time. Any party hereto may, from time to time, by notice in writing served upon the other party as aforesaid, designate a different mailing address or additional persons to which all such notices, demands, or requests are thereafter to be addressed.

      17.23  Exclusivity; Limitations on the Seller's Right to Market the Property.  During the Feasibility Period and until the Non-refundable Deposit has been released to Seller, Seller shall have the right to market the Property and to receive backup offers for the Membership Interests. Upon Seller's receipt of the Non-refundable Deposit, the Seller will not (i) actively market the Property, (ii) will inform callers that the Property is in escrow, and (iii) will not accept backup offers.

     18.    Condemnation and Casualty.

      18.1   Condemnation.  In the event of the actual or threatened taking by exercise of right of eminent domain, of all or any part of the Real Property, of which Seller has actual knowledge, Seller will give Buyer prompt notice of such event.  If prior to the Closing Date any part of the Real Property shall be taken or threatened to be taken by exercise by right of eminent domain, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Newcos shall be entitled to retain all proceeds and awards payable on account of such taking other than compensation relating to ownership, use or occupancy of the affected Property prior to the Close of Escrow; in the alternative, if more than ten percent (10%) of the Real Property is taken or threatened to be taken, Buyer may terminate this Agreement and receive back its Deposit in which event neither party shall thereafter have any obligations to the other.

      18.2   Casualty Loss.  All risk of loss concerning the Property shall be borne by Seller until the Close of Escrow.  In the event of damage or destruction of all or a material part of

the Property, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Newcos shall be entitled to retain all insurance proceeds payable on account of such damage or destruction other than compensation of Seller for loss of income at the Property prior to the Close of Escrow.

*[Signature Page Follows]*

28

This Agreement is executed as of the dates appearing immediately below each party's signature.

"**Seller**"

Desert Land, LLC,
a Nevada limited liability company

By: _Howard Bulloch._
    Howard Bulloch, Its Manager

By: _David Gaffin_
    David Gaffin, Its Manager
Dated: _SEPT 10, 2018_

Desert Oasis Investments, LLC,
a Nevada limited liability company

By: _Howard Bulloch._
    Howard Bulloch, Its Manager

By: _David Gaffin_
    David Gaffin, Its Manager

Dated: _SEPT 10, 2018_

Desert Oasis Apartments, LLC,
a Nevada limited liability company

By: _Howard Bulloch._
    Howard Bulloch, Its Manager

By: _David Gaffin_
    David Gaffin, Its Manager

Dated: _SEPT 10, 2018_

"**Buyer**"

LVB Acquisition LLC,
a Nevada limited liability company

By: _____
Its: _MEMBER_
Dated: _9-12-2018_

By: _____
Its: _____
Dated: _____

## ESCROW HOLDER ACKNOWLEDGMENT

The undersigned Escrow Holder (a) accepts the Escrow created by the foregoing Membership Interest Purchase Agreement ("Agreement"), (b) agrees to act in accordance with the terms of this Agreement, and (c) confirms that the Opening of Escrow occurred on September ___, 2018.

FIRST AMERICAN TITLE INSURANCE COMPANY


By: _____

Print Name: _____

Title: _____

LIST OF EXHIBITS

Exhibit A                Description of Land

Exhibit B                Leases and Service Contracts

Exhibit C                Excluded Property

Exhibit D                Assignment of Membership Interests

Exhibit E                Newco Organizational Documents

Exhibit F                Property Documents

## Exhibit A

## Legal Description of the Real Property

**PARCEL 1:**

**PARCEL 1A:**

GOVERNMENT LOTS 24 AND 122 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED NOVEMBER 28, 1962 IN BOOK 402 AS INSTRUMENT NO. 324194 OF OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED SEPTEMBER 19, 1972 IN BOOK 264 AS INSTRUMENT NO. 223960 OF OFFICIAL RECORDS.

**PARCEL 1B:**

THAT PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 122 OF SAID SECTION 28 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF SR-604 (FORMER US-91), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF SR-604 (FORMER US-91), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N 0°17'00" W, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T.

EXCEPTING THEREFROM THE NORTHERLY FORTY (40.00) FEET OF THE WESTERLY EIGHTY (80.00) FEET OF GOVERNMENT LOT 122 OF SECTION 28, T.21 S., R. 61 E., M.D.M., LYING EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE ABOVE DESCRIBED CENTERLINE, RELINQUISHED TO THE COUNTY OF CLARK BY RESOLUTION OF RELINQUISHMENT RECORDED ON JANUARY 21, 1982 IN THE OFFICIAL RECORDS OF CLARK COUNTY, NEVADA, IN BOOK 1513 AS INSTRUMENT NO. 1472121.

SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED DECEMBER 27, 1995 IN BOOK 951227 AS INSTRUMENT NO. 01170.

**PARCEL 2:**

GOVERNMENT LOT 25 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED DECEMBER 22, 1972 IN BOOK 288 AS INSTRUMENT NO. 247802 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN

ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

**PARCEL 3:**

GOVERNMENT LOTS 26, 27, 28, 29, 123 AND 124 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THOSE PORTIONS OF GOVERNMENT LOTS 123 AND 124, AS CONVEYED TO CLARK COUNTY BY DEEDS RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310411 AND OCTOBER 22, 1962 IN BOOK 394 AS INSTRUMENT NO. 318023 OF OFFICIAL RECORDS.

**PARCEL 4:**

**PARCEL 4A:**

GOVERNMENT LOTS 31 AND 125 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310410 OF OFFICIAL RECORDS.

**PARCEL 4B:**

THAT PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 125 OF SAID SECTION 28 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N 0°17'00" W, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED FEBRUARY 13, 1986 IN BOOK 860213 AS INSTRUMENT NO. 00972.

**PARCEL 5:**

GOVERNMENT LOT 30 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED APRIL 10, 1959 IN BOOK 193 AS INSTRUMENT NO. 157472 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

**PARCEL 6:**

GOVERNMENT LOTS 98 AND 99 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN GRANT, BARGAIN, SALE DEEDS RECORDED NOVEMBER 5, 1981 IN BOOK 1484 AS INSTRUMENT NOS. 1443019 AND 1443020 OF OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED JULY 25, 1989 IN BOOK 890725 AS INSTRUMENT NO. 00757 AND RE-RECORDED AUGUST 31, 1989 IN BOOK 890831 AS INSTRUMENT NO. 01307 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OFFICIAL RECORDS.

**PARCEL 7:**

**PARCEL 7A:**

A PORTION OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST (SW) CORNER OF GOVERNMENT LOT 126 AND GOING SOUTH 89°55.10" EAST A DISTANCE OF 80.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BLVD. SOUTH WHICH IS THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL AND MARKED WITH A CHISEL MARK ON A CONCRETE SLAB; THENCE CONTINUING SOUTH 89°55.10" EAST ON THE SOUTH LINE OF GOVERNMENT LOTS 126 AND 32 A DISTANCE OF 119.00 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002; THENCE NORTH 0°22.07" WEST A DISTANCE OF 62.68 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002; THENCE NORTH 89°55.16" WEST A DISTANCE OF 119.00 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002; THENCE SOUTH 0°22.00" EAST ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BLVD. SOUTH A DISTANCE OF 62.67 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 7B:**

THAT PORTION OF VACATED US HIGHWAY 91, DESCRIBED AS FOLLOWS:

THE SOUTH 62.67 FEET OF GOVERNMENT LOT 126 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE NORTH 0°17.00" WEST, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED DECEMBER 30, 1988 IN BOOK 881230 AS INSTRUMENT NO. 01399.

**PARCEL 8:**

**PARCEL 8A:**

ALL OF THAT REAL PROPERTY SITUATED IN THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF GOVERNMENT LOT 126 AND GOING SOUTH 89°55'23" EAST, A DISTANCE OF 80.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BOULEVARD SOUTH WHICH IS THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE CONTINUING SOUTH 89°55'23" EAST ON THE NORTH LINE OF GOVERNMENT LOTS 126 AND 32, A DISTANCE OF 348.54 FEET TO THE NORTHEAST CORNER OF GOVERNMENT LOT 32 MARKED BY A 2-1/2" IRON PIPE; THENCE SOUTH 0°22'21"EAST ALONG THE EAST LINE OF GOVERNMENT LOT 32, A DISTANCE OF 125.37 FEET TO THE SOUTHEAST CORNER OF GOVERNMENT LOT 32 MARKED BY A 2-1/2" IRON PIPE; THENCE NORTH 89°55'10" WEST ON THE SOUTH LINE OF GOVERNMENT LOT 32, A DISTANCE OF 229.54 FEET TO A POINT MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 0°22'07" WEST, A DISTANCE OF 62.68 FEET TO A POINT MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 89°55'16" WEST, A DISTANCE OF 119.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BOULEVARD SOUTH MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 0°22'00" WEST, A DISTANCE OF 62.67 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 8B:**

BEING A PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B & M. BEING THE NORTH 62.67+/- FEET OF GOVERNMENT LOT 126 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET OF AND PARALLEL WITH THE CENTERLINE OF US 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE NORTH 0°17'00" WEST, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED JUNE 6, 2003 IN BOOK 20030606 AS INSTRUMENT NO. 00734.

**PARCEL 9:**

GOVERNMENT LOT 33 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

[Intentionally omitted.]

**PARCEL 13:**

GOVERNMENT LOT 106 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

[Intentionally omitted.]

**PARCEL 15:**

LOCATED IN THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION 28; THENCE SOUTH 00°37'40" EAST ALONG THE CENTERLINE OF HAVEN STREET (WIDTH VARIES) A DISTANCE OF 689.55 FEET; THENCE SOUTH 89°49'19" WEST A DISTANCE OF 15.00 FEET TO A POINT ON THE WESTERLY RIGHT OF- WAY LINE OF SAID HAVEN STREET, SAID POINT ALSO BEING THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 89°49'19" WEST ALONG THE MOST NORTHERLY LINE OF GOVERNMENT LOTS

103 AND 104 A DISTANCE OF 314.57 FEET TO THE NORTHWEST CORNER OF GOVERNMENT LOT 104; THENCE SOUTH 00°37'17" EAST ALONG THE WEST LINE OF GOVERNMENT LOT 104 A DISTANCE OF 344.78 FEET TO THE NORTHEAST CORNER OF GOVERNMENT LOT 108; THENCE SOUTH 89°49'13" WEST ALONG THE NORTH LINE OF GOVERNMENT LOT 108 A DISTANCE OF 152.41 FEET TO A POINT 12.26 FEET EAST OF THE NORTHEAST CORNER OF GOVERNMENT LOT 107; THENCE SOUTH 00°35'51" EAST ALONG A LINE PARALLEL WITH AND 12.26 FEET EAST OF THE EAST LINE OF GOVERNMENT LOT 107 A DISTANCE OF 314.78 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF FOUR SEASONS DRIVE (60.00 FEET WIDE); THENCE NORTH 89°49'07" EAST ALONG SAID RIGHT-OF WAY LINE A DISTANCE OF 437.06 FEET TO A POINT ON A TANGENT CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 15.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 90°26'47" AN ARC LENGTH OF 23.68 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF THE AFOREMENTIONED HAVEN STREET SAID POINT ALSO BEING A POINT ON A REVERSE CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 660.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 08°50'59" AN ARC LENGTH OF 101.94 FEET TO A POINT ON A REVERSE CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 600.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 08°50'59" AN ARC LENGTH OF 92.67 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF THE AFOREMENTIONED HAVEN STREET; THENCE NORTH 00°37'40" WEST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 450.47 FEET TO THE POINT OF BEGINNING.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED JULY 6, 2001 IN BOOK 20010706 AS INSTRUMENT NO. 02494.

**PARCEL 16:**

GOVERNMENT LOTS 95 AND 102 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN DEEDS RECORDED MAY 6, 1964 IN BOOK 535 AS INSTRUMENT NO. 431059 AND JULY 13, 1988 IN BOOK 880713 AS INSTRUMENT NO. 00715 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GOVERNMENT LOT 102 AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED MARCH 7, 2001 IN BOOK 20010307 AS INSTRUMENT NO. 00643 OF OFFICIAL RECORDS.

**PARCEL 17:**

ALL OF THAT PROPERTY AS SHOWN ON THE RECORDED AMENDED PLAT OF THE OASIS, A CONDOMINIUM SUBDIVISION, ON FILE IN BOOK 31 OF PLATS, PAGE 72, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**PARCEL 18:**

GOVERNMENT LOT SEVENTY-NINE (79) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

TOGETHER WITH THAT PORTION OF ALI BABA LANE AND HAVEN STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED SEPTEMBER 7, 1988, IN BOOK 880907 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00489.

EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN DEEDS RECORDED APRIL 10, 1959, IN BOOK 193 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 157468 AND JULY 15, 1988, IN BOOK 880715 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00874.

**PARCEL 19:**

GOVERNMENT LOT EIGHTY (80) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

**PARCEL 20:**

GOVERNMENT LOT EIGHTY-ONE (81) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED APRIL 10, 1959, IN BOOK 193 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 157471.

**PARCEL 21:**

GOVERNMENT LOT EIGHT-TWO (82) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS DEDICATED BY CLARK COUNTY BY THAT CERTAIN DEDICATION RECORDED MAY 16, 1995, IN BOOK 950516 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 01164.

**PARCEL 22:**

GOVERNMENT LOT EIGHT-THREE (83) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED MAY 21, 1980, IN BOOK 1230 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1189739.

FURTHER EXCEPTING THEREFROM THAT PORTION AS DEDICATED BY CLARK COUNTY BY THAT CERTAIN DEDICATION RECORDED MAY 16, 1995, IN BOOK 950516 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO.01164.

**PARCEL 23:**

GOVERNMENT LOT EIGHT-FOUR (84) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

**PARCEL 24:**

GOVERNMENT LOT EIGHT-FIVE (85) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

**PARCEL 25:**

GOVERNMENT LOT EIGHT-SIX (86) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

**PARCEL 26:**

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS INVOLVING PORTIONS OF PARCEL 3 AND ALL OF PARCELS 4, 5, 7, 8 AND 9 AS SET FORTH IN THAT CERTAIN DOCUMENT ENTITLED "RECIPROCAL EASEMENT AGREEMENT", RECORDED JUNE 23, 2009 IN BOOK 20090623 AS INSTRUMENT NO. 02688 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

**Exhibit B**

**Leases and Service Contracts**

1.    Psychic Sessions Lease.

2.    Desert Oasis Motel Service Contracts

3.    Oasis Apartments Service Contracts

4.    Hospitality Associates Letter as Management Company of the Desert Oasis Motel

5.    Oasis Apartments Management Contract with WestCorp Management Group, LLC.

**Exhibit C**

**Excluded Property**

1. Cable

**Exhibit D**

**ASSIGNMENT OF MEMBERSHIP INTEREST**

For good and valuable consideration, the receipt of which is hereby acknowledged, _____, a Nevada limited liability company (collectively, the "Assignor") hereby sells, transfers, conveys and delivers to _____, a _____ ("Assignee"), all of Assignor's right, title, and interest in and to the membership interests and profits interests in and to [Newco], a Nevada limited liability company ("Newco"), together with all rights and benefits appurtenant thereto, pursuant to that certain Membership Interest Purchase Agreement dated as of _____, 201__. The assignment shall be effective as of the date of this Assignment.

DATED this ___ day of _____, 201__.

ASSIGNOR:

_____

By: _____

Its: _____

**Exhibit E**

**Newco Organizational Documents**

1.      Nevada Secretary of State form Articles of Organization Limited-Liability Company.  See: http://nvsos.gov/sos/home/showdocument?id=1005

2.      Operating Agreement.  [Attached]

OPERATING AGREEMENT

OF

[_____], LLC,
a Nevada limited liability company

This OPERATING AGREEMENT, dated as of the ____ day of [_____], 20[__], by [_____], as the sole member (the "Member") and [_____], a Nevada limited liability company (the "Company").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Purpose. The object and purpose of, and the nature of the business to be conducted and promoted by the Company is [_____], and engaging in any and all lawful activities necessary or incidental to the foregoing.

2. Member. The name and address of the Member is:

[_____]
[_____]
[_____]

3. Term. The term of existence of the Company commenced on [_____], the effective date of the filing with the Secretary of State of the State of Nevada of the Articles of Organization of the Company and shall thereafter continue unless earlier dissolved in accordance with the provisions of this Agreement.

4. Management.

(a)    The business and affairs of the Company shall be managed by the Member. The Member shall have, to the fullest extent permitted by the Nevada Limited Liability Company Act (the "Act"), full and complete authority, power and discretion to direct, manage and control the business, affairs and properties of the Company, to make all decisions regarding such matters and to perform any and all acts and to engage in any and all activities necessary, customary or incident to the management of the business, affairs and properties of the Company. The Member shall have authority to execute on behalf of the Company all contracts, deeds, mortgages, bonds, contracts, leases and all other documents, agreements and instruments.

(b)    The Member may, by written instrument executed by the Member, appoint a board of directors, officers and agents of the Company to which the Member may delegate such duties, responsibilities and authority as shall be provided in such instrument. Any director or officer may be removed at any time by written instrument executed by the Member. Only the Member and directors, officers and agents of the Company authorized by the Member to bind the

Company by written instrument executed by the Member shall have the authority to bind the Company.

5. <u>Title to Company Property</u>. All real and personal property shall be acquired in the name of the Company and title to any property so acquired shall vest in the Company itself rather than in the Member.

6. <u>Compensation of Member</u>. The Member shall be reimbursed for all expenses incurred in managing the Company and shall, at the election of the Member, be entitled to compensation for its management services, in an amount to be determined from time to time by the Member.

7. <u>Distributions</u>. Distributions shall be made to the Member (in cash or in kind) at the times and in the amounts determined by the Member and as permitted by applicable law.

8. <u>Tax Elections</u>. The Member may make any tax elections for the Company allowed under the Internal Revenue Code of 1986, as amended, or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company.

9. <u>Transferability of Membership Interest</u>. All or a portion of the membership interest of the Member in the Company may be sold, assigned, exchanged, mortgaged, pledged, granted, hypothecated, encumbered or otherwise transferred (whether absolutely or as security). Upon the transfer of the entire membership interest of the Member in the Company, the transferee shall be admitted as a member at the time of the transfer and shall obtain all of the rights appurtenant to being a member of the Company.

10. <u>Admission of Additional Members</u>. Additional members of the Company may be admitted to the Company at the direction of the Member. In the event that any additional members are added, this Agreement shall be construed to apply to all of the members, and the additional members shall be required to either: (i) enter into, ratify and approve this Agreement; or (ii) execute a new operating agreement after the Member has terminated this Agreement. Unless otherwise required by the Act (or any other law or regulation to which the Company is subject), if additional members have been added to the Company and this Agreement has not been terminated or modified, the decisions of the members owning at least a majority of the membership interests in the Company shall constitute the decisions of the Member for all purposes.

11. <u>Liability of the Member</u>. The Member shall not have any liability for any debt, obligation or liability of the Company or for the acts or omissions of any other member, director, officer, agent or employee of the Company except to the extent expressly provided in the Act. The failure of the Member to observe any formalities or requirements relating to the exercise of the powers of the Member or the management of the business and affairs of the Company under this Agreement or the Act shall not, by itself, be grounds for imposing personal liability on the Member for liabilities of the Company.

12. <u>Indemnification</u>. The Company shall indemnify the Member and such other persons as are identified by the Member by written instrument executed by the Member as entitled to be indemnified under this Section 12 for all costs, losses, liabilities and damages paid or accrued

by the Member or any such other person in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Nevada. In addition, the Company may advance costs of defense of any proceeding to the Member or any such other person upon receipt by the Company of an undertaking by or on behalf of the Member or such other person to repay such amount if it shall ultimately be determined that the Member or such other person is not entitled to be indemnified by the Company.

13.    Dissolution.

(a)    The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (i) the written direction of the Member, or (ii) the entry of a decree of judicial dissolution under the Act. The death, dissolution, retirement, resignation, expulsion or bankruptcy of the Member or the occurrence of any other event that terminates the continued membership of the Member shall not cause a dissolution of the Company.

(b)    Upon dissolution, the Company shall cease carrying on any and all activities other than the winding up of its business, but the Company is not terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of cancellation has been filed pursuant to the Act. Upon the winding up of the Company, the assets of the Company shall be distributed: (i) first to creditors, including the Member if the Member is a creditor, to the extent permitted by law, in satisfaction of the liabilities of the Company, whether by payment or the making of reasonable provision for payment thereof; and (ii) then to the Member. Such distributions shall be in cash or property or partly in both, as determined by the Member.

14.    Conflicts of Interest. Nothing in this Agreement shall be construed to limit the right of the Member to enter into any transaction that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company. The Member does not violate a duty or obligation to the Company merely because the conduct of the Member furthers the interests of the Member. The Member may lend money to and transact other business with the Company. The rights and obligations of the Member upon lending money to or transacting business with the Company are the same as those of a person who is not the Member, subject to other applicable law. No transaction with the Company shall be void or voidable solely because the Member has a direct or indirect interest in the transaction.

15.    Governing Law. This Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Nevada, without reference to its choice-of-law rules or those or any other jurisdiction.

16.    Entire Agreement. This Agreement represents the entire agreement between the Member and the Company.

17.    Amendment. This Agreement may be amended or modified from time to time only by a written instrument executed by the Member.

18.    Rights of Creditors and Third Parties. This Agreement is entered into by the Member solely to govern the operation of the Company. This Agreement is not intended for the

benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any other agreement between the Company and the Member, with respect to the subject matter hereof.

19. <u>Successors and Assigns</u>. This Agreement shall be binding on and inure to the benefit of the heirs, personal representatives and assigns of the Member and the successors and assigns of the Company.

The undersigned have executed and delivered this Agreement on [_____] ___, 20[__].

MEMBER:

_____

COMPANY:

[_____], a Nevada limited liability company

By:_____
    [_____], its sole member

**Exhibit F**

**Property Documents**

- Title Report Dated April 18, 2017
- H-1 Zoning Declaration
- Real Property Reconveyance Agreement
- Exhibit B to Deed of Reconveyance – Restrictive Covenant and Reservation of Avigation Easement
- Exhibit C to Deed of Reconveyance – Reservation of Drainage/Flood Channel and Access Road Easement
- Grant Bargain Sale Deed – 8.965 Acre Site
- Exhibit B to Deed – Restrictive Covenant & Reservation of Avigation Agreement 8.965 Acre Site
- Phase I Environmental Las Vegas Boulevard South & Mandalay Bay Road & Giles Street & East Ali
  Baba Lane dated April 2014
- Soils Geotechnical Evaluation July 5, 2011
- Soils Geotechnical Evaluation update Feb 23, 2012.
- Phase II Environmental Las Vegas Boulevard South & Mandalay Bay Road Aug. 2003
- Limited Phase II Investigation Soil Screening Giles Street & Ali Baba Lane Aug. 2004
- Geotechnical Evaluation Mandalay Bay Road & Las Vegas Blvd. Aug. 2004
- Geotechnical Evaluation Four Seasons Drive & Las Vegas Blvd. Oct. 2003
- Skyvue Observation Wheel FAA Height Determination May 24, 2011.
- Oasis Site FAA Determination of No Hazard to Air Navigation Feb 2015
- Tower Site FAA Determination of No Hazard to Air Navigation November 2010 Extended 6-22-2012
- Ali Baba FAA Determination of No Hazard to Air Navigation Feb 2015
- Psychic Sessions Lease
- Desert Oasis Motel Service Contracts
- Oasis Apartments Service Contracts
- Real Estate Tax Bills 2015-2016
- 2014 Year End Standard Financial Oasis Apartments
- 2015 Year End Standard Financial Oasis Apartments
- 2016 Year End Standard Financial Desert Oasis Motel
- 2015 Year End Standard Financial Desert Oasis Motel
- Personal Property Inventory Listing for the Desert Oasis Motel & Oasis Apartments
- Oasis Apartments Standard Lease Copy
- Oasis Apartments Lease Copies available for Inspection or Audit
- Oasis Apartments Management Contract with WestCorp Management Group, LLC
- Hospitality Associates Letter as Management Company of the Desert Oasis Motel
- American Ninja Warriors

# EXHIBIT "B"

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (the "Agreement") is made as of September 12, 2018, by and among LVB ACQUISITION LLC, a formed or to be formed Nevada limited liability company, and/or Assigns (the "Buyer"), and DESERT LAND, LLC, Nevada limited liability company ("Seller"), with reference to the following facts and circumstances:

### RECITALS

A.    Seller is and warrants and represents that it is the owner of the following assets (collectively, the "Property"):

(1)    Fee title to approximately 3.11 acres of real property, commonly known as Assessor's Parcel No. 162-28-301-034, and more specifically described in Exhibit A as Parcels 10, 11, 12 and 14 (together with all easements, rights of way, hereditaments and appurtenances thereto, collectively, the "Land");

(2)    All buildings, structures, and other improvements, including such fixtures as shall constitute real property (collectively, the "Improvements") located on the Land (together with the Land, collectively the "Real Property");

(3)    All licenses, permits, authorizations and approvals (collectively, the "Permits") currently held by Seller, or to which Seller is entitled, relating to the ownership or development of the Real Property, including, without limitation, those issued by governmental authorities;

(4)    All plans, specifications, drawings, concessions, warranties, and other items of tangible and intangible personal property owned by Seller and relating solely to the ownership, use and/or development of the Real Property; and

(5)    The leases ("Leases") and the service contracts ("Service Contracts") described on Exhibit B as relating to the Land.

B.    Omitted.

C.    Notwithstanding anything contained in this Agreement to the contrary, the Property does not include (i) any Permits which may not lawfully be transferred, which are identified on Exhibit C hereto as "Excluded Property: (ii) any right, title or interest of any tenant under any Lease (each, a "Tenant") in or to its tenant improvements at the Real Property or any other personal property owned by such Tenant and (iii) any other personal property identified on Exhibit C as "Excluded Property" (collectively, the "Excluded Property").

Seller proposes to form a new Nevada limited liability company (the "Newco") whose only assets will be the Property.

D.    Buyer desires to purchase from Seller one hundred percent (100%) of Seller's interest in the membership and profits interests in Newco (collectively, the "Membership Interests").

E.    Buyer desires to purchase the Membership Interests in connection with its plans for a resort hotel ("Buyer's Project").

F.    Seller is willing to sell the Membership Interests to Buyer on the terms and conditions set forth herein.

G.    In connection with the transaction, the Seller will form a new Nevada limited liability company ("Newco 2") which will receive a five percent (5%) interest in the Buyer, or another entity formed by Buyer to own the Newco, with the Buyer being the ninety-five percent (95%) owner, in the form agreed to by the Parties (the "Venture"), to close concurrently with this Agreement.[1]

H.    Buyer and Seller are each sometimes referred to as a "Party" and sometimes collectively referred to as the "Parties."

I.    The Parties desire that the transactions described in this Agreement be consummated through an escrow (the "Escrow") with First American Title Insurance Company (the "Escrow Holder"), attention Gregg Corlyn, First American Title Insurance Company, National Commercial Services, 2500 Paseo Verde Pkwy, Suite 120, Henderson, NV 89074.

J.    Seller warrants and represents that the Property is presently encumbered by a deed of trust recorded in the Official Records of the Clark County, Nevada Recorder in Book 20070727, as Instrument No. 00992 (the "Lien"), the beneficial interest of which is presently held by numerous persons; that an affiliate of Seller has acquired a majority of the beneficial interests of the Lien and has, or will prior to Close of Escrow, receive the authority to remove the Lien in compliance with all legal requirements and will do so. The Seller will bear the costs of all litigation related to the Lien and the costs to remove the Lien and obtain and furnish Buyer with insurable title for the Property.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Sale.

1.1    Sale; Purchase Price.  Upon the terms and subject to the conditions set forth herein, Seller hereby agrees to sell to Buyer the Membership Interests for the sum of Fourteen Million and No/100 Dollars ($14,000,000.00) (the "Purchase Price").  The Purchase Price, less the

---

[1] Hereafter in this Agreement, in the event that there are any references to "Seller" in a capacity of a 5% owner in Buyer, said reference shall be deemed to mean "Newco 2" as opposed to Seller.

2

Deposit (as defined in Section 1.2) shall be payable by wire transfer or other immediately available funds ("Immediately Available Funds") at the Close of Escrow (as hereinafter defined).

      1.2    Deposit.

        (a)    As a condition to this Agreement, Buyer shall deposit the sum of One Hundred Sixty-Eight Thousand Three Hundred Fifty Dollars in escrow ($168,350.00) (the "Deposit") by wire transfer or other immediately available funds ("Immediately Available Funds"), payable to Escrow Holder within five (5) days after the expiration of the Feasibility Period, as hereinafter defined.

        (b)    If Buyer fails to make the Deposit into Escrow within the time required by this Section 1.2, this Agreement shall automatically terminate and be of no further force or effect, and neither party shall have any rights against the other except as may be otherwise set forth in this Agreement.

        (c)    Non-refundable Portion of Deposit. Upon the later of (i) Escrow Holder's receipt of the Deposit, or (ii) the Bankruptcy Court's approval of the Transaction pursuant to Section 6.3, one-half of the Deposit, or Eighty-Four Thousand One Hundred Seventy-Five and no/100 Dollars ($84,175.00) (the "Non-refundable Portion"), shall become hard and non-refundable except upon the failure of Escrow to close as the result of a material default by Seller or Buyer's election to terminate this Agreement in accordance with the express provisions hereof. Escrow Holder shall not release the Non-refundable Deposit to Seller but shall continue to hold the Non-refundable Portion pending Close of Escrow.

    2.    Additional Closing Payments.

      2.1    Closing Funds. In addition to the balance of the Purchase Price (less the Deposit), Buyer shall deposit Buyer's share of the closing costs and prorations, less any credits due to Buyer hereunder, in Immediately Available Funds with Escrow Holder, payable to Escrow Holder, no later than 2:00 p.m. on the business day prior to the Close of Escrow.

      2.2    Closing Adjustments. Buyer shall also pay Seller at the Close of Escrow any amounts required as a result of the closing adjustments under Section 14.

    3.    Escrow.

      3.1    Opening of Escrow. For the purposes of this Agreement, the Escrow shall be deemed opened on the date Escrow Holder receives a fully executed copy of this Agreement (original, copy or facsimile) ("Opening of Escrow"). Seller shall deliver a fully executed Agreement to Escrow Holder within one (1) business day of mutual execution of this Agreement. Promptly after the Opening of Escrow, Escrow Holder shall notify Buyer and Seller, in writing, of the date Escrow is opened, the date of the expiration of the Feasibility Period (Section 3.3) and the Closing Date. Escrow Holder is hereby directed by Buyer and Seller to take all actions and make

all deliveries, recordings, and disbursements reasonably necessary in order to comply with its obligations contained in this Agreement.

3.2    <u>Investment of the Deposit</u>. Escrow Holder shall invest the Deposit in one or more interest bearing trust accounts with local, federally insured banking institutions; provided, Buyer executes and delivers to Escrow Holder an Internal Revenue Service Form W-9. All interest earned on the Deposit shall constitute part of the Deposit and shall be payable to the Party entitled to receive it under this Agreement.

3.3    <u>Feasibility Period</u>. The "<u>Feasibility Period</u>" shall expire at 5:00 p.m. Pacific time on the twenty-fifth (25th) day after Opening of Escrow. During the Feasibility Period, but subject to the rights of the Tenants under the Leases, Buyer and its agents and designees shall have the right to conduct and complete such tests, inspections, inquiries and examinations of the Property that Buyer deems necessary in its sole discretion, all at Buyer's sole expense; PROVIDED, HOWEVER, that Buyer shall not conduct any invasive testing affecting the Real Property or any Tenant without Seller's and the affected Tenant's prior written consent, which consent by Seller shall not be unreasonably withheld, conditioned or delayed. Buyer shall provide Seller complete copies of all reports so obtained by Buyer. Buyer shall give the Seller reasonable advance notice of Buyer's intent to enter upon the Real Property for such purpose, and shall conduct such activities in a manner which will minimize interference with the existing use and occupancy of the Property and not result in a violation of any of the Leases. Upon completion of such activities Buyer shall, at its sole expense, cause the Property to be restored to substantially the same condition it was in prior thereto, including filling, compaction and re-sodding of all excavations and the repair of any and all other damage to the Property in a manner reasonably satisfactory to Seller, which obligation of Buyer shall survive the termination of this Agreement. Prior to entry on the Property to perform such testing, Buyer will provide Seller an insurance certificate demonstrating liability coverage of at least $1,000,000 per occurrence and aggregate covering Buyer and its consultants, and Seller shall be listed as an additional insured on such policy. Buyer shall also indemnify and hold harmless Seller (including managers, members, officers, directors, employees, agents and representatives) from and against all claims for bodily injury or property damage, claims, expenses and losses (including mechanics' and materialmen's liens) which arise or may be asserted against Seller and/or the Property arising out of or in any way related to any such activities on the Property by or on behalf of Buyer (including any claims by any Tenants), which obligation of Buyer shall survive the closing or the termination of this Agreement.

3.4    <u>Buyer's Termination of Escrow</u>.    Buyer may elect to terminate this transaction for any reason or for no reason at all (and whether or not any conditions under this Agreement have been or will be or can be satisfied by Seller) in Buyer's sole and absolute discretion during the Feasibility Period by delivering a written notice to Seller and Escrow Holder (a "<u>Termination Notice</u>") prior to the expiration of the Feasibility Period. Subject to the provisions of the following paragraph, upon Escrow Holder's timely receipt of Buyer's Termination Notice, in the event that Buyer had previously paid the Deposit Escrow Holder shall return the Deposit to Buyer within three (3) business days thereafter without requiring any consent, approval or other documentation from Seller, the Escrow shall be canceled and the Parties shall thereafter be released

4

from all obligations hereunder, other than those which, by the express terms of this Agreement, survive termination. Seller hereby authorizes Escrow Holder to return the Deposit to Buyer and cancel Escrow upon Escrow Holder's timely receipt of Buyer's Termination Notice.

If Buyer terminates this Agreement pursuant to this Section 3.4 or if for any other reason the transaction contemplated by this Agreement is not completed, Buyer agrees (i) that the copies of the Property Documents (as hereinafter defined) delivered to Buyer by Seller shall promptly be returned to Seller; (ii) Buyer shall deliver to Seller, without representation or warranty, copies of all Buyer Studies (as defined in Section 17.6); and (iii) Buyer shall provide Seller with unconditional lien releases from all persons employed or otherwise acting on behalf of Buyer, who may be entitled to claim any statutory lien rights under Nevada Revised Statutes ("NRS") 108.221 et seq. in connection with Buyer's due diligence or other pre-closing activities on the Real Property. In the event that, as of the date Buyer is entitled to a return of the Deposit, Buyer has not delivered to Seller all of the items required by this paragraph, Escrow Holder or Seller, as applicable, shall withhold the sum of $50,000 until such time as Buyer has delivered to Seller all of the items required by this paragraph.

3.5    Close of Escrow. The term "Close of Escrow" shall mean the date when Seller and Buyer have each performed their respective obligations under this Agreement and all conditions precedent have been satisfied such that Escrow Holder is unconditionally obligated and committed to deliver (i) to Seller in Immediately Available Funds, the unpaid balance of the Purchase Price, (ii) to Buyer, the Membership Interests and (iii) to Buyer, the Owner's Title Policy (as defined herein). Close of Escrow shall occur on the later of (i) the twentieth (20th) day after the expiration of the Feasibility Period, and (ii) five (5) days after Seller has notified Buyer that Seller has obtained bankruptcy court approval as required in Section 12.1(d) (the "Closing Date").

(a)    Seller's Deliveries to Escrow Holder. No later than 2:00 p.m. on the business day prior to the Closing Date, Seller shall execute and acknowledge, where appropriate, and deposit with Escrow Holder for delivery to Buyer upon the Close of Escrow the following documents and instruments, in form and substance reasonably satisfactory to Buyer and its counsel: (1) proof satisfactory to Escrow Holder and Buyer that the parties executing such documents have the power and authority to bind Seller; (2) proof satisfactory to Escrow Holder and Buyer that Newco was duly formed as a Nevada limited liability company, is in good standing under the laws of the State of Nevada, has the authority to own and is (or as of the close of Escrow will be) the owner of the Property free and clear of any liens and has no assets other than the Property and has no liabilities of any kind; (3) an assignment of the Membership Interests in the form attached hereto as Exhibit D (the "Membership Assignment"), duly executed by Seller; (4) any personal property included in the Property, including the originals or, if applicable, copies of all contracts, permits, licenses, maps, reports, correspondence, governmental approvals, surveys and test results relating to the Real Property, not presently located at the Real Property, provided that Seller may cause Newco to deliver such personal property directly to Buyer outside of Escrow; (5) all books and records relating to Newco, including, without limitation, the operating agreement and articles of organization; (6) the written resignations of all managers and officers of Newco; (7) replacement signature cards for any Newco bank or other accounts; and (8) such other instruments or supplemental instructions as Escrow Holder or Buyer may reasonably request in

5

order to consummate the transaction and such other documents required of Seller, under the terms of this Agreement. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

(b)    Buyer's Deliveries to Escrow Holder. No later than 2:00 p.m. on the business day prior to the Closing Date, Buyer will deliver to Escrow Holder (1) proof satisfactory to Escrow Holder and Seller that the parties executing this Agreement and any closing documents have the power and authority to bind Buyer; (2) the Purchase Price in Immediately Available Funds, less the Deposit, plus such additional funds as are required to pay charges payable by Buyer hereunder, less any credit to which Buyer is entitled under the terms hereof; and (3) such other instruments or supplemental instructions as Escrow Holder or Seller may reasonably request in order to consummate the transaction and such other documents required of Buyer under this terms of this Agreement. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

(c)    Extension of Closing Date. Buyer, at its election, may choose to adjourn the Closing Date to a date up to thirty (30) days after the Closing Date. Buyer shall notify Seller and Escrow Holder of its election to adjourn the Closing Date by written notice at least two (2) days prior to the Closing Date. In exchange for the extension, Buyer agrees that the Non-refundable Portion of the Deposit shall increase to 100% of the Deposit.

3.6    Governmental Permits and Approvals. From and after the expiration of the Feasibility Period, each of the Parties shall, upon the reasonable written request of the other, as promptly as practicable prepare, submit and file (or cause to be prepared, submitted and filed) all applications, notices and requests for, and shall use all reasonable efforts to obtain as promptly as practicable, all permits and approvals of any governmental authorities that may be or become necessary on each of their parts, respectively, for the performance of their obligations under, this Agreement, and will cooperate fully with each other (at no out of pocket cost to the cooperating Party) in promptly seeking to obtain all such permits and approvals. Seller, on the one hand, and Buyer, on the other hand, shall, unless otherwise set forth in this Agreement, bear their own costs and expenses incurred or fees paid to governmental authorities to obtain such approvals and permits. In addition, Seller shall, at no cost to Buyer, use its commercially reasonable efforts to arrange meetings or consultations with governmental officials and Seller's consultants, including but not limited to engineers, architects and land use and planning advisers, as may be reasonably requested by Buyer.

4.    Policy of Title Insurance. At the Close of Escrow, Escrow Holder shall cause to be issued an ALTA standard coverage owner's policy of title insurance, insuring Newco as owner of the Real Property, with a liability equal to the Purchase Price (the "Owner's Title Policy"). The Owner's Policy shall, in addition to the pre-printed exceptions, contain the exceptions approved by Buyer pursuant to the terms of this Agreement. The cost of a standard owner's policy ("Standard Policy") shall be paid by Seller and the cost of extended coverage and any endorsements requested by Buyer shall be paid by Buyer.

6

      4.1    <u>ALTA Survey</u>. The Property Documents contain one or more ALTA surveys of the Real Property (collectively, the "<u>ALTA Survey</u>"). Seller shall cooperate with Buyer in having the ALTA Survey certified to Buyer. Any update to the ALTA Survey or additional surveys required by Buyer shall be obtained by Buyer at its own cost and expense and shall not be a condition to the Close of Escrow.

      4.2    <u>Buyer Approval of ALTA Survey</u>. Buyer may object to the ALTA Survey or any matter disclosed thereon by written notice to Escrow Holder as provided in <u>Section 5.1</u>. Buyer shall be deemed to have approved those matters specifically disclosed by the ALTA Survey if Buyer fails to notify Seller and Escrow Holder in writing of Buyer's objections within the Feasibility Period in the manner required by <u>Section 5.1</u>.

      5.    <u>Title Commitment</u>. Buyer acknowledges its prior receipt of a ALTA Title Commitment concerning the Real Property issued by First American Title Insurance Company, dated June 8, 2018 (Order No. NCS-774644-HHLV) (the "<u>Commitment</u>"). Seller shall, at its sole cost and expense furnish Buyer with an update to the Commitment within ten days of the date of this Agreement.

      5.1    <u>Buyer Objections</u>. Buyer may object to any matter contained in the ALTA Survey or the Commitment by notifying Seller and Escrow Holder, in writing, of any objections to the title of the Real Property disclosed by the Commitment on or before September 17, 2018; if any updates to the Commitment or ALTA Survey are provided to Buyer, Buyer may object to same within five (5) days after receipt thereof (in either case, the "<u>Buyer's Title Objection</u>"). If Buyer shall fail to give Seller and Escrow Holder written notice within such period of Buyer's disapproval of the Commitment or the ALTA Survey or updates, as applicable, or any item contained in either or any of them, any items not objected to shall conclusively be deemed approved without any additional consent, approval or documentation required by Buyer. Notwithstanding anything to the contrary contained in this Agreement, but subject to <u>Section 5.5</u>, monetary liens, security interests and encumbrances which can be cured solely by the payment of a liquidated sum of money, other than: (A) current taxes and current special assessments within Special Improvement District No. 114B ("<u>SID 114B</u>"), which shall be prorated as provided in <u>Section 14.4</u> and (B) any such matters created by or with Buyer's consent, (collectively, "<u>Monetary Liens</u>") shall be deemed to be automatically objected to by Buyer, and Seller agrees to cause any such Monetary Liens (other than current taxes, SID 114B special assessments and Buyer matters, as aforesaid) to be removed prior to the Close of Escrow, subject to the provisions of <u>Section 5.4</u>.

      5.2    <u>Seller's Election</u>. If Buyer shall timely disapprove or conditionally approve the Commitment or the ALTA Survey or any part thereof (each as updated) within the time permitted by <u>Section 5.1</u>, Seller shall notify Buyer and Escrow Holder within five (5) days of its receipt of the Buyer's Title Objection whether Seller, in its sole and absolute discretion, elects to cure or correct any disapproved items prior to the Close of Escrow, or to elect not to cure such disapproved items ("<u>Seller's Election</u>" and "<u>Seller's Election Notice</u>"). Seller's failure to give any such notice shall conclusively be deemed Seller's Election <u>not</u> to cure any disapproved items. Without limiting any other provision of this Agreement, Escrow Holder's willingness to issue an

endorsement to the applicable Owner's Title Policy insuring over a Buyer's Title Objection shall constitute an acceptable cure or correction of such Buyer's Title Objection.

5.3    Seller's Election Not to Cure.  If Seller elects not to cure such disapproved item or items (either by giving Seller's Election Notice or by failure to give any notice within the required time period), or any of them, then Buyer shall have the right to either accept title to the Real Property subject to such disapproved item or items or to terminate this transaction by giving notice within five (5) days after receipt of Seller's Election Notice. Buyer's failure to give a timely notice shall conclusively be deemed to be an election by Buyer to accept title subject to the matters set forth in Buyer's Title Objection and any matters which Seller's Election Notice specifically states will be cured or corrected by Seller. If Buyer elects to terminate this Agreement pursuant to this provision, Escrow Holder shall return to Buyer the Deposit, if previously paid, and thereafter the Parties shall have no further obligations under this Agreement except under those provisions which, by their express terms, survive the termination of this Agreement.

5.4    Permitted Exceptions; Amended Commitment.  The matters contained in the Commitment and the ALTA Survey (as same may have been updated) that have been approved or deemed approved pursuant to this Article 5 or are required pursuant to this Agreement are referred to as the "Permitted Exceptions."  If any title commitment or preliminary title report or survey dated after the date of the Commitment (or any update furnished hereunder) discloses any title exception not previously disclosed in the Commitment or the ALTA Survey, that materially and adversely affects the development of the Property or has a material and adverse economic impact on the Property (a "Material New Matter"), each Party shall give notice of disapproval or willingness to cure with respect to such new exception in the same manner as set forth in this Article 5, except that the time periods for notifications and responses shall be reduced to five (5) days.  As used herein, the term "materially and adversely" or "material and adverse" means a title exception having a demonstrated economic impact of greater than $250,000.00 (though if it can be cured monetarily, Seller shall do so prior to Close of Escrow). In the event of a Material New Matter that Seller is unable to cure or correct within a reasonable time after notice thereof, not to exceed thirty (30) days, Buyer's sole remedy shall be to accept an Owner's Title Policy containing such Material New Matter or terminate this Agreement with respect to any Property affected by the Material New Matter. If Buyer is entitled to terminate this Agreement and elects to terminate this Agreement pursuant to this provision, Seller shall return the Deposit and be responsible for the payment of the reasonable charges and cancellation fees of Escrow Holder, and thereafter the Parties shall have no further obligations under this Agreement with respect to the affected Property except under those provisions which, by their express terms, survive the termination of this Agreement.

5.5    Lien Extension Option.  If, by the scheduled Closing Date (the "Original Closing Date"), Seller has not obtained the release of the Lien (the "Release") as evidenced by Escrow Holder's willingness to remove the Lien as an exception to the Owner's Title Policy, Seller shall have the right to extend the Closing Date for up to forty-five (45) days from the Original Closing Date ("Extended Closing Date") by giving written notice to Buyer and Escrow Holder no later than ten (10) days prior to the Original Closing Date.  Following Seller's election to extend the Closing Date, Seller shall use commercially reasonable efforts to obtain and record the Release.

Seller shall notify Escrow Holder and Buyer of the date Seller records the Release (the "Lien Release Date") and provide a copy of the recorded Release within five (5) days following the recording of the Release, in which event the Closing Date shall occur fifteen (15) days after the Release Date. If Seller is unable to obtain the Release Date ten (10) days prior to the Extended Closing Date, Buyer's sole remedy shall be (a) to terminate this Agreement and receive a refund of the Deposit or (b) to proceed to the Close of Escrow, provided that the Lien has been removed as an exception to the Owner's Title Policy. Unless Buyer notifies Escrow Holder and Seller otherwise prior to the Extended Closing Date, Buyer shall be deemed to have elected to proceed to the Close of Escrow in accordance with clause (b) of the preceding sentence. Notwithstanding anything to the contrary contained in this Agreement, in the event that Seller for any reason is unable to close on the Original Closing Date, and prior to any Extended Closing Date or adjourned date (provided such adjourned date is caused by Seller and not consented to by Buyer) and Buyer would lose its financing or have its financing adversely affected by virtue of the delay, Buyer may cancel this transaction and receive back from Escrow Holder any Deposit which Buyer had paid.

6. <u>Seller's and Newcos' Obligations before Close of Escrow</u>.

6.1 <u>Covenants</u>. Seller, and Seller on behalf of Newco, covenants to the extent applicable to such person, that, from the date of this Agreement until the earlier of the termination of this Agreement or each applicable Close of Escrow, except as otherwise provided in this Agreement:

(a) <u>Ordinary Course</u>. Seller and Newco (once formed) will each carry on its respective business and activities in substantially the same manner as they previously have been carried out (or, in the case of Newco, consistent with Seller's past practices) and shall not make or institute any unusual or novel methods of purchase, sale, lease, management, accounting or operation that vary materially from those methods used by Seller during the prior fiscal year. Without limiting the foregoing, without the prior written consent of Buyer in each case, which consent may be withheld by Buyer in its sole discretion, (1) Seller will not sell, assign, convey (absolutely or as security), or grant a security interest in or encumbrance on the Real Property (or any interest or estate therein) other than the conveyance to Newco; (2) (i) neither Seller (with respect to the Property) nor Newco will enter into any new contract or agreement with respect to its assets or its business having a term that extends beyond the Close of Escrow, or that cannot be terminated upon no less than thirty (30) days or one (1) month's notice, (ii) neither Seller nor Newco will enter into any new lease with respect to the Real Property other than pursuant to Lease renewal options of and exercised by the tenant existing as of the date of this Agreement, or (iii) neither Seller nor Newco will enter into any new service contract affecting the Property unless the same can be terminated upon no less than thirty (30) days or one (1) month's notice; and (3) Seller and Newco shall not sell, abandon or dispose of any of the Real Property, fail to comply with any laws or regulations affecting the Property, Seller or Newco, or take any action not provided for herein that would materially and adversely affect the financial condition, liabilities, or the operation of the Real Property or Seller or Newco. As used in this paragraph, the term "materially and adversely" means a matter have a negative adverse effect of more than $100,000.00 (in the aggregate as to the Real Property and all of the parcels referred to in Section 12.1 of this Agreement).

(b)    <u>Articles of Organization</u>.  Newco shall be formed as a Nevada limited liability company in accordance with the articles of organization and operating agreement attached hereto as <u>Exhibit E</u> (the "<u>Newco Organizational Documents</u>").  Once formed and organized, Seller shall deliver to Buyer copies of the Newco Organizational Documents, including articles of organization and good standing certificates file stamped by the Nevada Secretary of State.  Neither Seller nor Newco will (1) amend Newco's articles of organization or operating agreement; (2) issue any additional membership interests; (3) issue or create any warrants, obligations, subscriptions, options, convertible securities, or other commitments under which any additional membership interests of any class might be directly or indirectly authorized, issued, or transferred from treasury; or (4) agree to do any of the acts listed in this paragraph. At or prior to Close of Escrow, Seller shall cause to be furnished to Buyer a deed to the Real Property from Seller to Newco with appropriate documentation evidencing that all real property transfer taxes on such transfers have been paid in full by Seller, and that all real property transfer taxes, if any, on Buyer's purchase of the Membership Interests in Newco have been paid by Seller; and Seller shall hold harmless and indemnify Buyer from any and all claims, damages, liabilities and costs, including but not limited to attorney's fees, in the event that such real property transfer taxes or any other transfer taxes which may be due or payable by virtue of the transactions contemplated by and set forth in this Agreement have not been paid in full by Seller.

(c)    <u>Insurance</u>.  Seller will continue to carry its existing insurance on the Property.  Once the Property has been transferred to Newco, Newco will carry the same levels and types of insurance on the Property.

6.2    <u>Access and Investigations; Confidentiality</u>.    Throughout the Feasibility Period, Buyer and its counsel, accountants, and other representatives shall have full access during normal business hours to all books, accounts, records, contracts, and documents of or relating to Seller and Newco (other than Seller's confidential proformas, projections, internal accounting and financial information, appraisals, and architectural and engineering work relating to the Property, which may be inspected at Seller's offices but not copied by Buyer), and Seller and Newco shall furnish or cause to be furnished to Buyer and its representatives all data and information concerning the Property and the business and finances of Seller and Newco that may reasonably be requested, including, without limitation, to the extent the same relate to the Property or Seller or Newco, operating statements and tax returns for the year immediately prior to the current fiscal year, and operating statements for all reporting periods during the current fiscal year. Prior to the Close of Escrow (but continuing beyond the termination of this Agreement) Buyer will maintain (and will cause its agents, employees and other representatives to maintain) in confidence any written, oral or other information obtained from Seller or Newco relating to the Property, unless (a) such information is already known to Buyer or to others from sources other than Seller or their agents not bound by a duty of confidentiality or such information becomes publicly available through no fault of Buyer or its agents, employees or other representatives, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the contemplated transaction or (c) the furnishing or use of such information is required by legal proceedings.

10

6.3    Bankruptcy Court Approval. Within five (5) business days of the deposit of the Deposit in Escrow, Seller will prepare and file a motion seeking approval of this Agreement and the transactions required by this Agreement with the United States Bankruptcy Court for the District of Nevada in Case Nos. BK-S-18-12454-LEB, BK-S-18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-124548-LEB and shall diligently prosecute said motion.

7.    Representations, Warranties, and Covenants of Seller. As an inducement for Buyer to enter into this Agreement and to purchase the Membership Interests, Seller represents and warrants that each of the following statements is true and correct as of the date of this Agreement and as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations, warranties, and statements constitute a condition precedent to Buyer's obligation to purchase the Membership Interests from Seller:

7.1    Ownership. Upon the formation of Newco, Seller will be the only record and beneficial owner of the Membership Interests in Newco. Seller has full power to transfer the Membership Interests to Buyer, without obtaining the consent or approval of any other person or governmental authority.

7.2    Title; No Encumbrances. After the formation of Newco and prior to the Close of Escrow, Seller will be the beneficial and record owner of all of the Membership Interests in Newco, which will be uncertificated and not evidenced by any instrument or other document (other than Newco's operating agreement), and Seller will have valid and good title thereto free and clear of any and all claims, liens, pledges, charges, restrictions, encumbrances, security interests or other rights or interests of any person whatsoever. On the Close of Escrow, upon the transfer by Seller of the Membership Interests to Buyer pursuant to this Agreement, Buyer will receive valid and good title to the Membership Interests, free and clear of any and all claims, liens, pledges, charges, restrictions, encumbrances, security interests or other rights or interests of any person whatsoever. Prior to the Close of Escrow, Seller have not and will not sell, assign, encumber, dispose of, pledge, or otherwise transfer all or any part of the Membership Interests, except in accordance with this Agreement.

7.3    Valid Existence. Once formed and as of the Close of Escrow, Newco will be a limited liability company duly organized, validly existing and in good standing, in accordance with the Newco Organizational Documents, under the laws of the State of Nevada and will have all necessary limited liability company power to own and operate the Property previously owned by Seller. No later than ten (10) days prior to the end of the Feasibility Period, Seller will deliver to Buyer true, correct and complete copies of the Newco Organizational Documents, in their final form, which documents may not be modified without Buyer's prior written consent.

7.4    Capitalization. The Membership Interests will be issued in compliance with applicable federal and state securities laws or applicable exemptions thereunder. There will be no preemptive rights, options, warrants, conversion rights or other rights outstanding to purchase any other membership interests in Newco or interest in the profits and losses of Newco.

11

7.5  Effect of Agreement.  The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, will not violate the articles of organization or operating agreement of Seller or any judgment, award or decree or any material indenture, agreement or other instrument to which Seller is a party, or by which Seller or any of its properties or assets are bound, including the Newco Organizational Documents, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge, security interest or encumbrance of any nature whatsoever upon the Membership Interests or the Property.

7.6  Governmental Approvals.  Except for the authorization of the bankruptcy court set forth at Section 7.3, no approval, authorization, consent or order or action of or filing with any court, administrative agency or other governmental authority is required to be obtained by Seller for the execution and delivery by Seller (i) of a deed to the Real Property to Newco, (ii) of this Agreement, or (iii) of the consummation by Seller of the transactions contemplated herein.

7.7  Taxes.  Within the times and in the manner prescribed by law, each of the Seller and Newco has filed all federal, state, and local tax returns required by law and has paid all taxes, assessments, and penalties due and payable.  There are no present disputes as to taxes of any nature payable by Seller with respect to Newco.  Any and all real property transfer taxes of whatever kind and description in connection with the transfer of the Real Property from Seller to Newco or in connection with the purchase by Buyer of the Membership Interests in Newco shall be paid in full by Seller prior to Close of Escrow.

7.8  Compliance with Law.  Seller (a) has no notice of any default by Seller with respect to any material order of any court or governmental authority to which Seller is a party or is subject which applies to the Property, and (b) to Seller's actual knowledge Seller is not in violation of any material laws, ordinances, governmental rules or regulations to which it or the Property is subject (collectively, "Laws and Regulations").

7.9  United States Person.  Seller is not a foreign person and is a "United States Person" as defined in the Internal Revenue Code of 1986, as amended ("IRC").  Pursuant to IRC section 1445, Seller shall deliver to Buyer prior to the Close of Escrow an affidavit of Seller on Escrow Holder's usual form, setting forth Seller's United States tax identification number and stating that Seller is not a foreign person and is a United States person as defined in the IRC.

7.10  Hazardous Materials.  Except as may be disclosed in the Property Documents, Seller has received no written notice from any federal, state, county or other governmental authority regarding the violation of any applicable Laws and Regulations relating to Hazardous Materials.  As used herein, "Hazardous Materials" means any substance, water or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety and property, including, but not limited to, petroleum and all of those materials, wastes and substances designated as hazardous or toxic by the U.S. Environmental Protection Agency, the U.S. Department of Labor, the U.S. Department

12

of Transportation and/or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

7.11    **Leases.** The schedule of Leases and Contracts attached hereto as **Exhibit B** is accurate and complete in all material respects. Except as set forth in the Commitment or on **Exhibit B**, there are no Leases or other rights of possession to all or any part of the Real Property held by persons other than Seller or contracts which may not be terminated on thirty (30) days' or one (1) month's notice.

7.12    **Actual Knowledge.** As used in this Agreement, Seller's or Newco's "knowledge," "actual knowledge" or words of like import shall mean the actual knowledge of Howard Bulloch or David Gaffin, without duty of investigation.

7.13    **No Commercial Leases.** The Seller shall deliver the Property free of any commercial leases.

7.14    **Miscellaneous.** Prior to Close of Escrow, or at the Close of Escrow out of the sale proceeds, Seller shall have paid, bonded, or properly reserved for (i) all judgments against Seller, (ii) all obligations and liabilities of Seller, (iii) any and all employees, principals, consultants or agents of Seller, and (iv) all trade and other creditors of Seller.

8.    **Representations, Warranties, and Covenants of Newco.** As of the Close of Escrow, Newco represents and warrants that the representations made in **Sections 7.1 through 7.14,** inclusive, will be true and correct as of the Close of Escrow, and shall survive the Close of Escrow, provided that any representation or warranty made to Seller's knowledge likewise shall be limited to Newco's actual knowledge.

9.    **Representations, Warranties, and Covenants of Buyer.** Buyer represents and warrants that each of the following statements is true and correct as of the date of this Agreement, shall be true and correct as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations, warranties, and statements constitute a condition precedent to Seller's obligation to sell and assign the Membership Interests to Buyer:

9.1    **Valid Existence.** Buyer is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Nevada.

9.2    **Authorization of Agreements.** This Agreement and each of the instruments and agreements required to be executed by Buyer pursuant to this Agreement constitutes (in the case of this Agreement) and will constitute (in the case of any such instruments or agreements to be delivered at the Close of Escrow) the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

9.3    **Buyer's Investigations.** Buyer is a sophisticated owner and/or investor in real property similar to the Property. Buyer acknowledges and agrees that it is purchasing the

13

Membership Interests based on its own due diligence investigations and studies, as further provided in Section 10.1.

        9.4    <u>Indemnity</u>. Buyer shall protect, defend, indemnify and hold Seller and Newco harmless from and against any and all expenses, costs, fees, obligations, liabilities and damages resulting directly or indirectly from such entry, activities, acts and/or omissions upon the Real Property by Buyer and its representatives, including any related claims by any Tenants pertaining directly to actions taken by Buyer or its representatives. Buyer shall not cause or permit in any way any liens or encumbrances upon the Real Property or any interest therein as a result of Buyer's or Buyer's representatives' acts or omissions with regard to the Real Property. The provisions of this Section shall survive the Close of Escrow and the termination of this Agreement.

        9.5    <u>Investment</u>. Buyer is acquiring the Membership Interests from Seller for Buyer's own account, for investment purposes only and not with a view to an immediate resale.

        9.6    <u>Buyer's Financials</u>. Any and all information that has been supplied to Seller by or on behalf of Buyer concerning the financial ability of Buyer to enter into and perform the transactions contemplated by this Agreement and/or Buyer's knowledge and experience is true and correct in all material respects and does not omit to contain any other information necessary to make such information not misleading.

    10.    <u>Condition of Property</u>.

        10.1    <u>As-Is Purchase</u>.

        (a)    Buyer acknowledges that it has or will have, as of the expiration of the Feasibility Period, (i) inspected to its satisfaction the Property, including the physical condition of the Real Property, the Newco Organizational Documents and all information contained in the Property Documents relating to the Membership Interests and the Property; (ii) obtained such surveys, engineering studies, soils and geotechnical reports, hazardous material studies, maps, master plans, height and airport environs studies, feasibility studies and other similar items prepared by or for Buyer relating to Buyer's Project as Buyer deemed necessary or appropriate to its purchase of the Membership Interests and Newco's ownership of the Property (collectively, the "<u>Buyer Studies</u>"); and (iii) investigated the financial feasibility of Buyer's Project and the availability of the necessary land use approvals, utility service, including water and other necessary services (collectively, "<u>Buyer's Investigations</u>"). Buyer is purchasing the Membership Interests in reliance upon Buyer's Investigations and Buyer's investigation of such matters affecting the Property and Newco, as Buyer deems relevant and in reliance upon only those representations and warranties of Seller and Newco set forth in this Agreement. Buyer acknowledges and agrees that neither Seller nor Newco make any representation or warranty concerning the Membership Interests or the Property except as set forth herein, except for any conditions beyond reasonable wear and tear which arise between the date of this Agreement and the Close of Escrow (as to which Seller shall be responsible).

14

(b)      Buyer represents that it or its principals are experienced in the acquisition and ownership of real estate and is purchasing the Membership Interests pursuant to its independent examination, study, and inspection of the Property and Seller's and Newco's books and records.  Buyer acknowledges that the Property to be owned by Newco will remain in its present "AS IS" "WHERE IS" "WITH ALL FAULTS" condition, and that Buyer will have no right of set off or reduction in the Purchase Price by reason of any condition of the Property.  Moreover, Buyer hereby waives every claim, liability, cost, cause of action or damage arising out of or in any manner related to the Property's condition, uses, utility, operation, merchantability, fitness or compliance with Laws and Regulations.

(c)      In addition to, and not by way of limitation of the foregoing, Buyer acknowledges that Buyer will undertake such studies and investigations, conduct such tests and surveys and engage such specialists as Buyer deems appropriate to evaluate fairly the Property and its risks with respect to Hazardous Materials and Laws and Regulations applicable to Hazardous Materials (collectively, "Environmental Laws").  Accordingly, Buyer releases Seller from, and waives all claims and liability against Seller for, any structural, physical or environmental condition at the Property (including subsurface conditions) and further releases Seller from, and waives all liability against Seller attributable to, the structural, physical and environmental condition of the Property, including, without limitation, the presence, discovery or removal of any Hazardous Materials in, at, under, about or from the Property, or for, connected with or arising out of any and all claims or causes of action based upon any Environmental Laws.  Without limiting the foregoing, Buyer also acknowledges that certain materials and substances that were in common use without regulation at and since the original construction of the Improvements may now deemed to be Hazardous Materials or the use, or the method of use, of such items may now be prohibited or regulated, that some of those materials and substances may have been used in the original construction of the Improvements or the subsequent maintenance of the Real Property, that prior owners of the Real Property or adjacent property may have stored, released, transported or otherwise disposed of material on such properties deemed to be Hazardous Materials, and that Buyer will be solely responsible for all investigation or inquiry into such items and all costs of removal and remediation (including consequential damages) of such items, including without limitation asbestos containing materials and lead based paint.

(d)      Buyer hereby acknowledges and agrees that Seller has not and will not make any representation or warranty that the existing zoning classification of the Real Property and other Permits are appropriate or will permit Buyer's intended use of the Property.  Buyer hereby represents that it has made (or will make) its own independent investigation and has determined (or will determine) prior to the expiration of the Feasibility Period, to Buyer's satisfaction, that such zoning classification and Permits are appropriate for Buyer's use of the Property.  Buyer agrees that Seller shall have no obligation whatsoever to pursue any zoning reclassification, use permit, variance, waiver, subdivision, parcel map or land division, or other land use approval or permit (collectively, "Land Use Approvals") with respect to the Real Property.  Notwithstanding the foregoing, Seller agree to cooperate with Buyer for the purpose of assisting Buyer in procuring any necessary or desirable Land Use Approvals, including the execution of any necessary or desirable applications therefor after the expiration of the Feasibility Period, provided

15

that such Land Use Approvals shall be without cost to Seller and, unless Seller otherwise agree in writing, in their sole discretion, shall not be effective prior to the Close of Escrow.

(e) EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES IN ARTICLE 7 AND NEWCO'S REPRESENTATIONS AND WARRANTIES IN ARTICLE 8, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, OR (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY.

10.2 Notice of Inaccuracy.

(a) Promptly upon either Party becoming aware of the occurrence of, or the impending or threatened occurrence of, any event which would cause a breach of any of its own representations or warranties contained in Sections 7, 8, 9 or 10.1, as the case may be, such Party shall disclose each such event, in reasonable detail, by means of a written notice thereof to the other Party or Parties. No disclosure by any Party pursuant to this Section 10.2(a), however, shall be deemed to amend or supplement the representations or warranties contained herein or to prevent or cure any misrepresentations, breach of warranty, or to satisfy any condition to the Close of Escrow.

(b) Each Party shall, promptly upon acquiring knowledge of the occurrence of any event that would cause the conditions to its obligations set forth Section 12 or Section 13, as applicable, to fail to be fulfilled as of the Closing Date, notify in writing the other Party or Parties of such event in reasonable detail.

(c) Each Party shall promptly notify the other Party or Parties of any action, suit or proceeding that shall be instituted or threatened against in writing such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

(d) The representations and warranties of Seller and Newco contained in Section 7 of this Agreement shall be deemed to be qualified by any information contained in the Schedules to this Agreement or in the Property Documents.

11.    <u>Due Diligence Property Documents</u>.    Buyer acknowledges receipt of the due diligence Property documents (collectively, the "<u>Property Documents</u>") identified on <u>Exhibit F</u> attached to this Agreement. Buyer acknowledges that Seller has delivered the Property Documents to Buyer as an accommodation to Buyer, and that Seller has not investigated, evaluated or in any way verified the content, completeness or accuracy of any of the Property Documents.    Buyer understands and agrees that Seller makes no representation or warranty whatsoever, express or implied, with respect to the content, completeness or accuracy of any of the Property Documents, and Buyer hereby releases and agrees to hold harmless Seller and its constituent members and managers, and its and their respective officers, directors, employees, agents and representatives from all loss, cost, liability and expense arising in any way in connection with Buyer's receipt of the Property Documents, including without limitation, any such loss, cost, liability or expense resulting from any reliance by Buyer on the Property Documents. Buyer agrees that Buyer will not attempt to assert any liability against Seller (and/or its members, managers, officers, directors, employees, agents and representatives) for furnishing such information, and Buyer agrees to indemnify and hold Seller and its respective agents free and harmless from any and all such claims of liability. This indemnity shall survive the Close of Escrow or the termination of this Agreement.

Except as otherwise specifically provided in this Agreement, it is expressly understood by Buyer and Seller that all statements and representations made by Seller and Seller's agents and independent contractors (a) are intended by Buyer and Seller to be made only as an accommodation to Buyer and Buyer's investigations of the Property and are not in lieu of such investigations, and (b) are not to be relied and acted on by Buyer.

12.    <u>Buyer's Conditions to Closing</u>.

12.1    <u>Conditions</u>.  The obligation of Buyer to purchase the Membership Interests under this Agreement is subject to the satisfaction or waiver, at or before the Close of Escrow, of all of the following conditions.

(a)    <u>Title</u>. As of the Closing Date, fee title to the Real Property shall be vested in Newco, subject only to the applicable Permitted Exceptions, Leases and Service Contracts, and Escrow Holder shall be prepared to issue the Owner's Title Policy as of the Close of Escrow.

(b)    <u>Representations and Warranties</u>.  Except as otherwise provided by this Agreement, all representations and warranties by Seller and Newco in this Agreement shall be true in all material respects.

(c)    <u>Covenants</u>.  Seller shall have performed, satisfied, and complied in all material respects with all material covenants, agreements, and conditions required by this Agreement to be performed or complied with by them.

(d)    <u>Bankruptcy Court Approval</u>. Entry of orders approving of this Agreement and the transactions required by this Agreement by the United States Bankruptcy Court

17

for the District of Nevada in Case Nos. BK-S-18-12454-LEB, BK-S-18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-124548-LEB free and clear of (i) any and all claims against Seller, the Property, or Newco, or, after the Close of Escrow, any direct or indirect owners of Newco, and (ii) any and all claims of ownership or other rights or interests in the Property or Newco, or, after the Close of Escrow, any direct or indirect owners of Newco. Seller shall use its commercially reasonable efforts to obtain such approval prior to Close of Escrow.

(e)    Related Agreements. The contemporaneous close of escrow (unless the failure to close escrow is solely due to default by the Buyer) pursuant to a separate Membership Interest Purchase Agreement dated as of the date hereof between Buyer and Seller, Desert Oasis Apartments, LLC, and Desert Oasis Investments, LLC with respect to the following adjacent or proximal parcels of land: (i) 20.03 acre parcel of land, (ii) 6.4 acre parcel of land, and (iii) 8.96 acre parcel of land.

12.2    Buyer's Rights If Conditions Not Fulfilled.  The conditions contained in Section 12.1 are intended solely for the benefit of Buyer. If any of such conditions are not satisfied, Buyer shall have the right in its sole discretion either to waive in writing the condition and proceed with the purchase of the Membership Interests, or terminate this Agreement. Any unwaived or unsatisfied conditions which were disclosed in writing by Seller or contained in documentation provided by Seller shall be deemed to have been known by Buyer shall be deemed waived or satisfied upon the occurrence of the Close of Escrow. If the failure of such condition is the result of a default by Seller or Newco, Buyer shall be entitled to exercise any of Buyer's remedies as provided in Section 15.

13.    Seller's Conditions to Closing.

13.1    Conditions.  The obligation of Seller to sell and transfer the Membership Interests under this Agreement are subject to the satisfaction or waiver, at or before the Close of Escrow, of all of the following conditions.

(a)    Purchase Price.  As of the Closing Date, Escrow Holder shall be prepared to deliver to Seller the Purchase Price in Immediately Available Funds, plus such additional funds as are required to pay charges payable by Buyer under and less any credit to which Buyer is entitled under this Agreement.

(b)    Representations and Warranties.  All representations and warranties by Buyer contained in this Agreement shall be true in all material respects.

(c)    Covenants.  Buyer shall have performed and complied with all covenants and agreements and satisfied all conditions that it is required by this Agreement to perform, comply with, or satisfy before or at the Close of Escrow.

13.2    Seller's Rights If Conditions Not Fulfilled.  The conditions contained in Section 13.1 are intended solely for the benefit of Seller. If any of such conditions are not satisfied, Seller shall have the right in its sole discretion either to waive in writing the condition and proceed

18

with the sale of the applicable Membership Interests, or terminate this Agreement, provided, however, that any unwaived or unsatisfied condition with respect to the Close of Escrow shall be deemed waived or satisfied upon the occurrence of the Close of Escrow and provided further, if the failure of such condition is the result of a default by Buyer, Seller shall be entitled to exercise any of Seller's remedies provided in <u>Section 15</u>.

14.    <u>Closing; Closing Costs and Prorations</u>.

14.1    <u>Escrow</u>.  The Seller will be responsible for the fees of Escrow Holder.

14.2    <u>Seller's Costs</u>.  Seller will pay (a) with respect to the Owner's Policy the cost of the Standard Policy and (b) all expenses and charges incurred with the discharge of Monetary Liens as provided in <u>Section 5.2</u>.

14.3    <u>Buyer's Costs</u>.  Buyer shall pay (a) all title insurance premiums and costs associated with obtaining the Owner's Title Policy in excess of the cost of a Standard Policy and (b) all charges and fees in connection with any liens or encumbrances placed on the Property by Buyer.

14.4    <u>Rents and Impositions</u>.  Escrow Holder shall determine the amounts, as of the Closing Date, of (a) all rents and all other sums due and payable or paid under the Leases (including prepaid rents) (collectively, "<u>Rents</u>") for the month in which the Closing Date occurs and (b) all ad valorem property taxes, special assessments and property owner association dues or similar assessments due and payable or paid by Seller or Newco with respect to the Property (collectively ("<u>Impositions</u>") for the month or quarter, as applicable, in which the Closing Date occurs.  At the Close of Escrow, Buyer or Newco (as owned by Buyer) shall receive a credit for any Rents received by Seller or Newco (as owned by Seller) with respect to the period after the Closing Date, and Seller shall receive a credit at the Close of Escrow for any Impositions paid by Seller or Newco (as owned by Seller) with respect to the period after the Closing Date.  In the case of any unpaid Rents due and payable with respect to any period prior to the Closing Date, nothing contained in this paragraph shall require any payment by Newco or Buyer to the Seller after the Closing Date for any payments other than those actually received by Newco after the Closing Date; however, any such sums received by Newco or Buyer after the Closing Date shall be promptly remitted to Seller.

14.5    <u>Payable and Receivables; Utilities</u>.  Seller itself shall cause Newco to cause all utilities and other amounts payable in the ordinary course of owning or operating the Property (other than Impositions) (collectively, "<u>Accounts Payable</u>") to be paid current as of the Closing Date.  Following the Closing Date, Seller and Newco (as owned by Buyer) or Buyer shall make any necessary adjustments between themselves to reflect the Parties' intention that Accounts Payable shall be paid current to the Closing Date.  Accounts receivable (other than Rents) with respect to Leases and Contracts shall be prorated between Seller and Newco (as owned by Buyer) in the same manner as Rents, to reflect the intention of the Parties that the Seller shall be entitled to the benefit of any income relating to the period prior to the Closing Date and Newco (as owned by Buyer) or Buyer shall be entitled to the benefit of any such income on and after the Closing

Date, provided that nothing contained in this paragraph shall require any payment by the Buyer or a Newco to the Seller after the Closing Date for any payments other than those actually received by Newco after the Closing Date; however, any such sums received by a Newco or Buyer after the Closing Date shall be promptly remitted to Seller.

14.6    Insurance.    Buyer acknowledges and agrees that Seller shall be entitled to terminate or to cause Newco to terminate its existing insurance policies as of the Closing Date by written notice to Buyer no later than ten (10) business days prior to the Close of Escrow, and, in such event Buyer shall cause Newco to obtain replacement insurance policies in amounts and with coverages determined by Buyer in its sole discretion.

14.7    Possession.    Seller shall deliver or cause Newco, as applicable, to deliver possession of all keys in Seller's possession to all locks within the Real Property to Buyer at the Close of Escrow.   Delivery of any personal property may be accomplished by leaving the same at the Real Property.

15.    Default and Remedies.

15.1    Seller's Remedies.    Seller, before entering into this transaction, has been concerned with the fact that substantial damages will be suffered by Seller in the event Buyer shall fail to purchase the Membership Interests by reason of its default. Therefore, if Escrow shall fail to close solely by reason of Buyer's default, then, upon the written demand of Seller, the Seller shall be entitled to receive the Non-refundable Portion of the Deposit (as defined in Section 1.2(c), except that if Buyer has exercised its option to adjourn the Closing Date pursuant to Section 3.5(c) of this Agreement, the Non-refundable Portion shall be 100% of the Deposit). The Escrow Holder shall, within two (2) days of receipt of Seller's demand, notify the Buyer of Seller's demand. If Buyer does not object to Seller's demand within five (5) days of receipt of the Escrow Holder's notice, the Escrow Holder shall release the Non-refundable Portion to Seller. If Buyer objects to the release of the Non-refundable Portion to Seller, the Parties shall resolve the dispute as set forth in Section 15.4. THE PARTIES AGREE THAT THE AMOUNT OF THE NON-REFUNDABLE PORTION OF THE DEPOSIT IS A REASONABLE ESTIMATE OF THE EXTENT TO WHICH SELLER WOULD BE DAMAGED BY BUYER'S FAILURE TO CONSUMMATE THIS PURCHASE.   Buyer acknowledges that the provisions of this Section 15.1 are an integral part of the transaction contemplated by this Agreement, and that without these provisions, Seller would not enter into this Agreement.

Buyer's Initials: _____

20

15.2 <u>Buyer's Remedies</u>. If the Close of Escrow fails to occur by reason of a Seller's default, (a) Buyer may elect to treat this Agreement as cancelled, in which case the Deposit shall be returned to Buyer and Buyer may recover payment from Seller of an amount equal to (i) Buyer's actual out of pocket costs to unrelated and independent third party vendors, and (ii) reasonable attorneys' fees, all of which shall not exceed One Hundred Thousand and no/100 Dollars ($100,000.00), and the Parties shall have no further obligations hereunder, except for any provisions which expressly survive termination, or (b) Buyer may elect within sixty (60) days from the date of such default to treat this Agreement as being in full force and effect, and Buyer shall have the right to seek specific performance of Seller's obligations under this Agreement. Buyer shall have no right to recover damages except as expressly set forth in this Section 15.2.

Buyer and Seller, and others, have entered into an agreement contemporaneously herewith involving, indirectly the transfer of an additional approximately 35 acres of real property (the "Second Agreement"). It is understood and agreed that Buyer is not required to proceed with this transaction to Close of Escrow unless the Second Agreement proceeds to Close of Escrow; therefore in the event that after the Feasibility Period, Buyer has the right to cancel and does cancel the Second Agreement, then this Agreement shall be deemed cancelled by the cancellation of the Second Agreement.

15.3 <u>Obstruction of Payment of Liquidated Damages or Release of Deposit</u>. If Buyer or Seller wrongfully withholds payment or wrongly obstructs payment of any amounts in Escrow due the other, and Seller or Buyer thereafter seeks to enforce its rights to collect such amounts, by court proceedings or arbitration or otherwise, then Buyer and Seller agree to pay, in addition to any other sums to which Buyer or Seller may be entitled, all reasonable costs and expenses of Buyer or Seller incurred in connection with the enforcement of its rights against the other under this <u>Section 15.3</u>, including, without limitation, court costs, reasonable attorney's fees, witness fees and expenses, and interest on said amounts at 10% per annum or the maximum interest rate allowed by applicable state and federal law, whichever is less. Such remedies and damages shall also be available to Buyer in the event that Buyer sues Seller for specific performance pursuant to Section 15.2 of this Agreement. The Parties specifically agree that any dispute arising out of Sections 15.1 and 15.2(a) only may, at the option of either Party, be determined by final and binding arbitration administered by the American Arbitration Association ("<u>AAA</u>") under its Commercial Arbitration Rules and Mediation Procedures ("<u>Commercial Rules</u>") using the AAA Expedited Procedures. The Parties agree to use a single arbitrator with experience in commercial real estate matters, and the place of arbitration shall be Las Vegas, Nevada. The award rendered by the arbitrator shall be final, non-reviewable, non-appealable, and binding on the Parties and may be entered and enforced in any court having jurisdiction.

15.4 <u>WAIVER OF JURY TRIAL</u>. SELLER AND BUYER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.

THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, SELLER AND BUYER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK CONSEQUENTIAL AND PUNITIVE DAMAGES FROM THE OTHER WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY ONE PARTY AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY SELLER AND BUYER OF ANY RIGHT THEY MAY HAVE TO SEEK CONSEQUENTIAL AND PUNITIVE DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

16.     <u>Commissions and Fees</u>.

16.1    <u>Brokers' Commission</u>. At Close of Escrow, Seller shall pay through Escrow a total combined commission of one and one-half percent (1.5%) of the Purchase Price and the joint venture investment, for a total commission of Two Hundred Ten Thousand Dollars ($210,000.00 USD) to BVB Real Estate Partners LLC, a Delaware limited liability company, for its services in connection with this Agreement.

16.2    <u>No Other Commissions</u>. Buyer and Seller each represent and warrant to the other that, with the exception of BVB Real Estate Partners LLC as set forth in Section 16.1, neither has had any dealings with any person, firm, broker, finder, or consultant in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated hereby. No other person, firm, or entity is entitled to any broker's commissions, finder's fees, or consulting fees in connection with this transaction. Buyer and Seller do each hereby indemnify and hold the other and Newco harmless from and against any costs, expenses, or liability for compensation, commission, fees, or charges (collectively "Expenses") that may be claimed by any other broker, finder, consultant, or the like, by reason of any dealings or actions of the indemnifying party; and Seller further specifically indemnifies and hold harmless Buyer from and against any Expenses by virtue of Seller's relation with and or agreement with Colliers Nevada, LLC d/b/a Colliers International (or any affiliated entities).

17.     <u>Miscellaneous</u>.

17.1    <u>Further Assurances</u>. Subject to the terms and conditions of this Agreement, each of the Parties agrees to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and Regulations to consummate and make effective all of the transactions contemplated by this Agreement. In case at any time after the Close of Escrow any further action is necessary to carry out the purposes of this Agreement, to vest Buyer with full title to the Membership Interests, or to transfer record and beneficial ownership of the Membership Interests to Buyer, Seller shall take all such necessary action as may be reasonably requested by Buyer.

22

17.2    <u>Governing Law; Severability</u>.    This Agreement has been negotiated and entered into in the State of Nevada and all questions with respect to this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of Nevada, regardless of the choice of law provisions of Nevada or of any other jurisdiction.    Buyer and Seller agree that the proper forum for the hearing of any matters concerning this transaction and the rights and remedies of the Parties hereunder is the County of Clark, State of Nevada.    In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Agreement shall become illegal, null or void, or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void, or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in force and effect to the full extent permitted by law.

17.3    <u>Limitation of Waiver</u>.    No waiver of any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit of such provision.    A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other Party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.    The delay or forbearance by Buyer or Seller in exercising any remedy or right, the time for the exercise of which is not specifically and expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right.    The waiver by any Party of the performance of any covenant, condition, or promise shall not invalidate this Agreement, nor shall it be considered a waiver of any other covenant, condition, or promise.    The waiver by any Party of the time for performing any act shall not constitute a waiver of time for performing any other act or an identical act required to be performed at a later time.    The delay or forbearance by any Party in exercising any remedy or right, the time for the exercise of which is not specifically and expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right.    The exercise of any remedy provided in this Agreement shall not be a waiver of any remedy provided by law, and the provisions in this Agreement for any remedy shall not exclude any other remedy unless it is expressly excluded.

17.4    <u>Nevada Real Estate Broker</u>.    Under Nevada law, when a buyer or seller of real property is a licensed Nevada real estate broker, that person is obligated to make certain disclosures to each party to the transaction.    In accordance with Nevada Revised Statutes Chapter 645, Seller hereby notifies Buyer that Howard Bulloch and David Gaffin have been licensed Nevada real estate brokers, have an interest in Seller, and are not acting on behalf of Buyer.

17.5    <u>1031 Exchange</u>.    Buyer and/or Seller reserve the right to accomplish this transaction as a 1031 exchange (the "<u>Exchange</u>") sufficient to meet the IRC requirements, and both parties agree to cooperate with each other to accomplish the same.    However, no Party shall be obligated to assume any liability nor incur any costs or expenses, including attorney's fees, in connection with such Exchange.    Further, said Exchange shall not delay the Close of Escrow and in the event that the Exchange shall not be ready to close when the sale and purchase of the applicable Membership Interests pursuant to this Agreement is scheduled to close, then the sale and purchase of such Membership Interests shall close without the Exchange.

23

**17.6** <u>Return of Property Documents</u>. If this Agreement terminates for any reason prior to the Close of Escrow, Buyer will return to Seller all Property Documents and all other written or tangible information pertaining to the Property or Newco, including all copies or extracts thereof within five (5) business days of such termination. In addition, if this Agreement terminates for any reason other than Seller's breach or default, then, at Seller's request, Buyer shall deliver to Seller, at no charge to Seller, all surveys, engineering studies, soils reports, maps, master plans, feasibility studies, and other similar items prepared by or for Buyer, other than Buyer's confidential proformas, projections, internal accounting and financial information and architectural and engineering work relating to Buyer's proposed development project on the Property (collectively, the "<u>Buyer Studies</u>") The obligations of Buyer set forth in this paragraph shall survive the Close of Escrow and the termination of this Agreement.

**17.7** <u>Survival of Representations, Warranties, and Agreements</u>. Notwithstanding anything to the contrary set forth anywhere in this Agreement, all covenants, representations, warranties, and agreements contained in this Agreement and not deemed to have been waived or satisfied by Buyer at Close of Escrow pursuant to Section 12.2 shall survive the Close of Escrow, the delivery of documents, and any performance on account of the obligations set forth herein for one (1) year following the Close of Escrow.

**17.8** <u>Amendments</u>. All amendments and supplements to this Agreement must be in writing and be executed by each party hereto.

**17.9** <u>Successors and Assigns</u>. Subject to <u>Section 17.10</u>, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

**17.10** <u>Assignment</u>. Buyer may assign or transfer any of its rights and/or obligations under this Agreement with the prior written consent of Seller, which consent shall not be unreasonably withheld. Any assignment in violation of this provision shall be void.

**17.11** <u>Attorney's Fees</u>. If either party becomes involved in any legal proceeding or arbitration arising out of this Agreement or the performance thereof, attorney's fees shall be awarded to the prevailing party. The attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorneys' fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate for all the attorney's fees paid or incurred in good faith.

**17.12** <u>Time of the Essence</u>. Time is of the essence for this Agreement.

**17.13** <u>Computation of Time Periods</u>. All periods of time referred to in this Agreement shall include all Saturdays, Sundays, and Nevada or national holidays, unless the period of time specifies business days, provided that if the date or last date to perform any act or give a notice with respect to this Agreement shall fall on a Saturday, Sunday or a Nevada or

national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or a Nevada or national holiday.

17.14 <u>Headings</u>.  The article and section headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, extend or interpret the scope of this Agreement or of any particular article or section.

17.15 <u>Counterparts</u>.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument. Copies of signatures shall be as valid as if executed in original.

17.16 <u>Authority</u>.  Each person signing this Agreement on behalf of the respective parties represents and warrants that he or she is authorized to execute and deliver this Agreement and that this Agreement will thereby become binding upon Seller and Buyer, respectively.  In the event that Seller and Buyer is made up of more than one person, the signature of any one of the persons making up the group shall be binding upon the other members of the group.

17.17 <u>Entire Agreement</u>.  This Agreement, including all exhibits, schedules, and attachments, contains the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any prior agreements, negotiations, and other dealings between the parties, including, without limitation, that certain Letter of Intent dated on or about August 29, 2018.

17.18 <u>No Offer</u>.  Buyer acknowledges that Seller's preparation of this Agreement is not an offer.

17.19 <u>Exhibits</u>.  All exhibits referenced herein are incorporated herein by such reference.

17.20 <u>Recitals</u>. All recitals referenced herein above are incorporated as if fully set forth herein.

17.21 <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of Seller and Buyer and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party (including, without limitation, Buyer's Broker) or the general public.

17.22 <u>Notices</u>.  Whenever Escrow Holder or any party hereto shall desire to give or serve upon the other any notice, demand, request, or other communication, each notice, demand, request, or other communication shall be in writing and shall be given or served personally or by fed ex or by confirmed telecopy, or by mail, postage prepaid (any first class mailing service shall also require service by telecopy) shall also, addressed as follows:

To Seller:                          Desert Land, LLC
c/o Howard Bulloch & David Gaffin
10181 Park Run Drive, Suite 200
Las Vegas, Nevada 89145
Phone: (702) 948-3344
Fax: (702) 948-3355

With a copy to:             Ballard Rawson Jorgensen
10181 Park Run Drive, Suite 110
Las Vegas, Nevada 89145
Attn: Kris T. Ballard, Esq.
Phone: (702) 452-3555
Fax: (702) 722-5525

To Buyer:                       LVB Acquisition Holdings LLC
c/o *HANS. H. HERTELL*
*BANCO POPULAR BLDG., 206 TETUAN ST. 509*
*SAN JUAN, PR (USA) 00901*
Attn: *JUAN SAAVEDRA ESQ.*
Phone: *(787) 722-2540*
Fax: *(914) 761-2196*

With a copy to:             Dahan & Nowick LLP
123 Main Street, 9th Floor
White Plains, New York 10601
Attn: David R. Taxin, Esq.
Phone: (914) 461-1650
Fax: (914) 761-2196

To Escrow Holder:        First American Title Company
2500 Paseo Verde Pkwy, Suite 120
Henderson, NV 89144
Attn: Gregg Corlyn
Phone: (702) 254-1418
Fax: (702) 433-2252

     Service of any such notice, demand, or request so made by mail shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or at the expiration of the third (3rd) business day after the date of mailing, whichever is earlier in time. Any party hereto may, from time to time, by notice in writing served upon the other party as aforesaid, designate a different mailing address or additional persons to which all such notices, demands, or requests are thereafter to be addressed.

17.23 <u>Exclusivity; Limitations on the Seller's Right to Market the Property</u>. During the Feasibility Period and until the Non-refundable Deposit has been released to Seller, Seller shall have the right to market the Property and to receive backup offers for the Membership Interests. Upon Seller's receipt of the Non-refundable Deposit, the Seller will not (i) actively market the Property, (ii) will inform callers that the Property is in escrow, and (iii) will not accept backup offers.

18.    <u>Condemnation and Casualty</u>.

18.1    <u>Condemnation</u>. In the event of the actual or threatened taking by exercise of right of eminent domain, of all or any part of the Real Property, of which Seller has actual knowledge, Seller will give Buyer prompt notice of such event. If prior to the Closing Date any part of the Real Property shall be taken or threatened to be taken by exercise by right of eminent domain, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Newco shall be entitled to retain all proceeds and awards payable on account of such taking other than compensation relating to ownership, use or occupancy of the affected Property prior to the Close of Escrow; in the alternative, if more than ten percent (10%) of the Real Property is taken or threatened to be taken, Buyer may terminate this Agreement and receive back its Deposit in which event neither party shall thereafter have any obligations to the other.

18.2    <u>Casualty Loss</u>. All risk of loss concerning the Property shall be borne by Seller until the Close of Escrow. In the event of damage or destruction of all or a material part of the Property, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Newco shall be entitled to retain all insurance proceeds payable on account of such damage or destruction other than compensation of Seller for loss of income at the Property prior to the Close of Escrow.

*[Signature Page Follows]*

27

This Agreement is executed as of the dates appearing immediately below each party's signature.

"**Seller**"

Desert Land, LLC,
a Nevada limited liability company

By: _Howard Bulloch._
Howard Bulloch, Its Manager

By: _David Gaffin_
David Gaffin, Its Manager
Dated: 10 SEPT 2018

"**Buyer**"

LVB Acquisition LLC,
a Nevada limited liability company

By: _____
Its: MEMBER
Dated: 9-12-2018

By: _____
Its: _____
Dated: _____

## ESCROW HOLDER ACKNOWLEDGMENT

The undersigned Escrow Holder (a) accepts the Escrow created by the foregoing Membership Interest Purchase Agreement ("Agreement"), (b) agrees to act in accordance with the terms of this Agreement, and (c) confirms that the Opening of Escrow occurred on September ___, 2018.

FIRST AMERICAN TITLE INSURANCE COMPANY


By: _____

Print Name: _____

Title: _____

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Description of Land |
| Exhibit B | Leases and Service Contracts |
| Exhibit C | Excluded Property |
| Exhibit D | Assignment of Membership Interests |
| Exhibit E | Newco Organizational Documents |
| Exhibit F | Property Documents |

## Exhibit A

## Legal Description of the Real Property

**PARCEL 10:**

GOVERNMENT LOT 34 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED JULY 10, 1978 IN BOOK 913 AS INSTRUMENT NO. 872053 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

**PARCEL 11:**

**PARCEL 11A:**

GOVERNMENT LOTS 36 AND 128 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310408 OF OFFICIAL RECORDS.

**PARCEL 11B:**

BEING A PORTION OF THE N 1/2 OF THE SOUTHWEST QUARTER SW 1/4 OF SECTION 28, T. 21 S., R. 61 E., M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 128 OF SAID SECTION 28 WHICH LIES EASTERLY AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N. 0°17'00" W., ALONG SAID CENTERLINE, A DISTANCE OF 4140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T.

SAID CENTERLINE IS PERTINENT TO BUT NOT LIMITED TO THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED AUGUST 26, 1985 IN BOOK 2173 AS INSTRUMENT NO. 2132667.

**PARCEL 12:**

GOVERNMENT LOT 37 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED SEPTEMBER 22, 1970 IN BOOK 65 AS INSTRUMENT NO. 51666 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553

OF OFFICIAL RECORDS.

**PARCEL 14:**

GOVERNMENT LOT 38 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED MARCH 23, 1970 IN BOOK 19 AS INSTRUMENT NO. 15103 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

**Exhibit B**

**Leases and Service Contracts**

1.    Desert Oasis Motel Service Contracts

2.    Hospitality Associates Letter as Management Company of the Desert Oasis Motel

**Exhibit C**

**Excluded Property**

**Exhibit D**

## ASSIGNMENT OF MEMBERSHIP INTEREST

For good and valuable consideration, the receipt of which is hereby acknowledged, DESERT LAND, LLC, a Nevada limited liability company (collectively, the "Assignor") hereby sells, transfers, conveys and delivers to _____, a _____ ("Assignee"), all of Assignor's right, title, and interest in and to the membership interests and profits interests in and to [Newco], a Nevada limited liability company ("Newco"), together with all rights and benefits appurtenant thereto, pursuant to that certain Membership Interest Purchase Agreement dated as of _____, 201__. The assignment shall be effective as of the date of this Assignment.

DATED this ___ day of _____, 201__.

ASSIGNOR:

DESERT LAND, LLC, a Nevada limited liability company

By: _____

Its: _____

**Exhibit E**

**Newco Organizational Documents**

1.    Nevada Secretary of State form Articles of Organization Limited-Liability Company.  See: http://nvsos.gov/sos/home/showdocument?id=1005

2.    Operating Agreement.  [Attached]

OPERATING AGREEMENT

OF

[_____], LLC,
a Nevada limited liability company


This OPERATING AGREEMENT, dated as of the ___ day of [_____], 20[__], by [_____], as the sole member (the "Member") and [_____], a Nevada limited liability company (the "Company").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

      1.     <u>Purpose</u>. The object and purpose of, and the nature of the business to be conducted and promoted by the Company is [_____], and engaging in any and all lawful activities necessary or incidental to the foregoing.

      2.     <u>Member</u>. The name and address of the Member is:

[_____]
[_____]
[_____]

      3.     <u>Term</u>. The term of existence of the Company commenced on [_____], the effective date of the filing with the Secretary of State of the State of Nevada of the Articles of Organization of the Company and shall thereafter continue unless earlier dissolved in accordance with the provisions of this Agreement.

      4.     <u>Management</u>.

          (a)     The business and affairs of the Company shall be managed by the Member. The Member shall have, to the fullest extent permitted by the Nevada Limited Liability Company Act (the "Act"), full and complete authority, power and discretion to direct, manage and control the business, affairs and properties of the Company, to make all decisions regarding such matters and to perform any and all acts and to engage in any and all activities necessary, customary or incident to the management of the business, affairs and properties of the Company. The Member shall have authority to execute on behalf of the Company all contracts, deeds, mortgages, bonds, contracts, leases and all other documents, agreements and instruments.

          (b)     The Member may, by written instrument executed by the Member, appoint a board of directors, officers and agents of the Company to which the Member may delegate such duties, responsibilities and authority as shall be provided in such instrument. Any director or officer may be removed at any time by written instrument executed by the Member. Only the Member and directors, officers and agents of the Company authorized by the Member to bind the

Company by written instrument executed by the Member shall have the authority to bind the Company.

5.    <u>Title to Company Property</u>.  All real and personal property shall be acquired in the name of the Company and title to any property so acquired shall vest in the Company itself rather than in the Member.

6.    <u>Compensation of Member</u>.  The Member shall be reimbursed for all expenses incurred in managing the Company and shall, at the election of the Member, be entitled to compensation for its management services, in an amount to be determined from time to time by the Member.

7.    <u>Distributions</u>.  Distributions shall be made to the Member (in cash or in kind) at the times and in the amounts determined by the Member and as permitted by applicable law.

8.    <u>Tax Elections</u>.  The Member may make any tax elections for the Company allowed under the Internal Revenue Code of 1986, as amended, or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company.

9.    <u>Transferability of Membership Interest</u>.  All or a portion of the membership interest of the Member in the Company may be sold, assigned, exchanged, mortgaged, pledged, granted, hypothecated, encumbered or otherwise transferred (whether absolutely or as security).  Upon the transfer of the entire membership interest of the Member in the Company, the transferee shall be admitted as a member at the time of the transfer and shall obtain all of the rights appurtenant to being a member of the Company.

10.    <u>Admission of Additional Members</u>.  Additional members of the Company may be admitted to the Company at the direction of the Member.  In the event that any additional members are added, this Agreement shall be construed to apply to all of the members, and the additional members shall be required to either: (i) enter into, ratify and approve this Agreement; or (ii) execute a new operating agreement after the Member has terminated this Agreement.  Unless otherwise required by the Act (or any other law or regulation to which the Company is subject), if additional members have been added to the Company and this Agreement has not been terminated or modified, the decisions of the members owning at least a majority of the membership interests in the Company shall constitute the decisions of the Member for all purposes.

11.    <u>Liability of the Member</u>.  The Member shall not have any liability for any debt, obligation or liability of the Company or for the acts or omissions of any other member, director, officer, agent or employee of the Company except to the extent expressly provided in the Act.  The failure of the Member to observe any formalities or requirements relating to the exercise of the powers of the Member or the management of the business and affairs of the Company under this Agreement or the Act shall not, by itself, be grounds for imposing personal liability on the Member for liabilities of the Company.

12.    <u>Indemnification</u>.  The Company shall indemnify the Member and such other persons as are identified by the Member by written instrument executed by the Member as entitled to be indemnified under this Section 12 for all costs, losses, liabilities and damages paid or accrued

by the Member or any such other person in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Nevada. In addition, the Company may advance costs of defense of any proceeding to the Member or any such other person upon receipt by the Company of an undertaking by or on behalf of the Member or such other person to repay such amount if it shall ultimately be determined that the Member or such other person is not entitled to be indemnified by the Company.

13.    Dissolution.

(a)    The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (i) the written direction of the Member, or (ii) the entry of a decree of judicial dissolution under the Act. The death, dissolution, retirement, resignation, expulsion or bankruptcy of the Member or the occurrence of any other event that terminates the continued membership of the Member shall not cause a dissolution of the Company.

(b)    Upon dissolution, the Company shall cease carrying on any and all activities other than the winding up of its business, but the Company is not terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of cancellation has been filed pursuant to the Act. Upon the winding up of the Company, the assets of the Company shall be distributed: (i) first to creditors, including the Member if the Member is a creditor, to the extent permitted by law, in satisfaction of the liabilities of the Company, whether by payment or the making of reasonable provision for payment thereof; and (ii) then to the Member. Such distributions shall be in cash or property or partly in both, as determined by the Member.

14.    Conflicts of Interest. Nothing in this Agreement shall be construed to limit the right of the Member to enter into any transaction that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company. The Member does not violate a duty or obligation to the Company merely because the conduct of the Member furthers the interests of the Member. The Member may lend money to and transact other business with the Company. The rights and obligations of the Member upon lending money to or transacting business with the Company are the same as those of a person who is not the Member, subject to other applicable law. No transaction with the Company shall be void or voidable solely because the Member has a direct or indirect interest in the transaction.

15.    Governing Law. This Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Nevada, without reference to its choice-of-law rules or those or any other jurisdiction.

16.    Entire Agreement. This Agreement represents the entire agreement between the Member and the Company.

17.    Amendment. This Agreement may be amended or modified from time to time only by a written instrument executed by the Member.

18.    Rights of Creditors and Third Parties. This Agreement is entered into by the Member solely to govern the operation of the Company. This Agreement is not intended for the

benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any other agreement between the Company and the Member, with respect to the subject matter hereof.

19.    Successors and Assigns. This Agreement shall be binding on and inure to the benefit of the heirs, personal representatives and assigns of the Member and the successors and assigns of the Company.

The undersigned have executed and delivered this Agreement on [_____] ___, 20[__].

MEMBER:

_____

COMPANY:

[_____], a Nevada limited liability company

By:_____
      [_____], its sole member

**Exhibit F**

**Property Documents**

- Title Report Dated April 12, 2017 (Order No. NCS-774644-HHLV)
- Desert Oasis Motel Service Contracts
- 2016 Year End Standard Financial Desert Oasis Motel
- 2015 Year End Standard Financial Desert Oasis Motel
- Personal Property Inventory Listing for the Desert Oasis Motel
- Hospitality Associates Letter as Management Company of the Desert Oasis Motel

# EXHIBIT "C"

## NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

THIS NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT ("Agreement") is entered into this___ day of September, 2018, by and between the following parties: George Villar, individually and Atelier Real Estate Partners LLC, a Delaware limited liability company, and LVB Acquisition LLC or LVB Acquisition Holdings LLC, a Nevada limited liability company to be formed (or under other name if such name is unavailable) each c/o Dahan & Nowick LLP, 123 Main Street, 9th Floor, White Plains, New York 10601, (collectively, the **"Discloser"**) and Desert Land, LLC, Desert Oasis Apartments, LLC, Desert Oasis Investments, LLC, each a Nevada limited liability company (collectively, the "Landowners") and Howard Bulloch and David Gaffin and four (4) Nevada limited liability companies to be formed for the purpose of obtaining title from each of the Landowners to the Property as defined below (collectively the Landowners, Bulloch and Gaffin and such 4 entities to be formed are hereinafter collectively referred to as the **"Receiver"**, and for purposes hereof said term shall apply to any individuals acting as an agent for or on behalf of Receiver), located at 10181 Park Run Drive, Suite 200, Las Vegas, Nevada 89145.

Re:  Potential Acquisition and/or development of four (4) parcels of land consisting of 3.11 acres, 20.03 acres, 6.4 acres and 8.96 acres in Las Vegas Nevada on or adjacent to the Las Vegas strip in relative proximity to the McCarran Airport owned as to various parcels by Landowners, and as is more particularly described on Schedule A to an Amended Letter of Intent dated August 29, 2018 ("Amended Letter of Intent") by and among the Landowners and LVB Acquisition Holdings LLC  (the "Property" and the potential acquisition or development thereof, including but not limited to construction thereon, the "Project").

The party disclosing Confidential Information pursuant to this Agreement shall be referred to as "Discloser" and the   party receiving Confidential Information pursuant to this Agreement shall be referred to as "Receiver".

1.  Purpose. The purpose of this Agreement is to set forth the rights and obligations of the parties with respect   to the use, handling, protection, and safeguarding of information(including but not limited to documents) which is to be disclosed by and/or has been disclosed by   Discloser to Receiver in connection with the Property and the Project. The parties or various parties hereto entered into said Amended Letter of Intent and are about to enter into Membership Interest Purchase Agreements ("MIPAS") (and an Operating Agreement), pursuant to which MIPAS Discloser shall become the indirect owner of the Property. Prior to Receiver's executing the MIPAS Discloser is required to show Receiver proof of funding for the Project. Discloser has advised Receiver that Discloser has obtained proof of funding for the Property and the Project which is required to be shown to Receiver as a predicate to Receiver's being required to proceed to execute the MIPAS pursuant to the amended letter of intent. Receiver has requested that Discloser provide such information to Receiver for its evaluation and in connection with execution of the MIPAS but Discloser is unwilling to do so without execution of a confidentiality, non-disclosure and non-circumvention agreement in the form hereof, and Receiver has advised Discloser that in consideration for Discloser's providing the information to Receiver, Receiver is willing to execute this document.

2.  Confidential Information.

/Users/krisballard/Desktop/Desert Land/nda LV v3docx.docx



a.  <u>General Definition.</u> The following information concerning the Property and the Project is confidential and shall be treated as confidential by Receiver: all information provided by Discloser to Receiver concerning any lenders or potential lenders of financing in connection with the Property or the Project, including but not limited to the names of such lenders and the proposed or potential terms of any financing, or any financial modeling, market or Property or Project forecasts and pro forma, organizational structure, financial data and cash-flow statements, costs, prices, names, business or marketing plans,  development processes, business opportunities, sensitivity analysis data, Excel or computer program files, intellectual property, social media and domain information, proprietary information, legal documents, bank and loan documents, price lists, research and development data, vendor and contractor and sub-contractor identities and all other materials of a proprietary nature which are not generally known to the public (collectively, the "Confidential  Information"). Confidential information shall include information in written, oral or machine  readable form, of every kind and description, and shall be deemed confidential hereunder regardless of the presence or absence of any stamp or other designation of confidentiality accompanying such information.

b.  <u>Non-Solicitation.</u> The Receiver may not:

i.  Contact or otherwise engage in any communication or negotiation with any persons, entities, or any agents or representatives of persons or entities, whose name(s) is provided by Discloser to Receiver (any or all a "Potential Project Party") in any way with respect to the Property or the Project <u>or for any other purpose whatsoever</u>, except through the  Discloser. Any and all communications d e s i r e d  t o  b e  m a d e  b y  R e c e i v e r shall be conducted exclusively through the Discloser.

ii.  Solicit any Potential Project Party or any agents or representatives or have any discussions with any such persons or entities; all communications shall be solely with and or through the Discloser..

iii.  Circumvent or interfere with the Discloser's negotiations and/or contract with any Potential Project Party or pursue any transaction similar to the Project with any Potential Project Party <u>in either case other than with the prior written consent of Discloser</u>.

iv.  Disclose any of the Confidential Information furnished by Discloser to Receiver to any of the direct or indirect owners of the Property, including but not limited to any of their agents or representatives.

v.  Receiver acknowledges that direct damages may not be a suitable remedy for a breach of any of the foregoing obligations of Receiver, and Receiver therefore agrees that Discloser shall be entitled to consequential or indirect damages for any breach thereof.



c. <u>Non-Circumvention.</u> The Receiver hereby irrevocably agrees and guarantees it shall not:

　　i. Directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, bypass, or adversely affect in any way Discloser's interest in the Confidential Information or the interest or relationship between the Discloser and any and all owners, managers, brokers, lenders, financial institutions, or other persons or entities, concerning the Property or the Project.

d. <u>Exclusions.</u> Confidential Information shall be deemed to exclude information that:

　　i. Is in, or becomes in, the public domain without violation of this Agreement by Receiver, or,

　　ii. Was known to Receiver prior to disclosure thereof to Receiver by Discloser;

　　iii. Is disclosed to Receiver by a third party under no obligation of confidentiality to Discloser and without violation of this Agreement by Receiver (provided that Receiver shall promptly disclose the circumstances and content of same to Discloser), or

3. <u>Term.</u> This Agreement shall remain in full force and effect for a period of two (2) years from the date of this Agreement.

4. <u>Disclosure; Copies.</u> Receiver shall not, without the prior written consent of Discloser, (a) disclose any Confidential Information to any person, company or entity (including any parent, subsidiary or affiliate firm or corporation or any court or other adjudicative body), other than Receiver's directors, officers, employees, advisors, attorneys, agents and representatives (collectively "Representatives") who need to know the Confidential Information for the purpose contemplated here, of evaluating such information in connection with the Property and the Project, and have been informed of the confidential nature of the Confidential Information, or (b) copy, photograph or make other copies or drawings of the Confidential Information unless reasonably required for the purpose contemplated hereby. In the event that Receiver should request permission to disclose Confidential Information to any person not permitted herein, same shall be in the sole and absolute discretion of Discloser who may, if he consents, require that any such company or person execute this Agreement, or if submission is requested to a Court, that same, if permitted by Discloser in its sole and absolute discretion, may only be submitted for in camera inspection.

5. <u>Use.</u> Receiver will not sell, utilize, implement, appropriate or otherwise use the Confidential Information for any purpose whatsoever, or permit the use of the Confidential Information by others for any purpose whatsoever, without the express written permission of



Discloser, except to secure the advice and recommendations of licensed professional business advisors (accountants, attorneys, etc.) in connection with the Property or the Project.

6. <u>Forced Disclosure.</u> Notwithstanding any other provisions in this Agreement, Receiver may disclose   Confidential Information to the extent required by any applicable law, regulation, or court or governmental   order; provided that Receiver gives Discloser reasonable advance written notice of any such disclosure or   any request or demand for such disclosure and provided that Receiver shall cooperate, at Discloser's   expense, with any request by Discloser to seek confidential treatment, protective orders or other similar   protections for the Confidential Information.

7. <u>Safeguards Against Unauthorized Disclosure.</u> Receiver agrees to treat the Confidential Information with the   same degree of care (and in any case no less than reasonable care) Receiver exercises for the protection of   its own confidential information of like nature. Receiver shall direct all its Representatives to whom   Confidential Information is disclosed to take all reasonable precautions to safeguard and preserve the   confidential status of said Confidential Information, and the Receiver shall be responsible for any breach of any of the provisions hereof by any of its Representatives as through such Representatives were the Receiver.

8. <u>Return of Information.</u> Receiver acknowledges and agrees that all Confidential Information furnished   hereunder shall be and remain the property of Discloser. Upon demand, any and all Confidential   Information and copies thereof must be returned to Discloser or destroyed by methods reasonably   acceptable to Discloser.

9. <u>NO WARRANTY.</u> Discloser makes no warranty, guarantee or representation, either express or implied,   with respect to any information disclosed hereunder. DISCLOSER SHALL NOT BE LIABLE, IN ANY   MANNER, AS A RESULT OF RECEIVER'S USE OF OR RELIANCE ON SUCH INFORMATION.

10. <u>Enforcement.</u> Receiver acknowledges and agrees that disclosure or misappropriation of Confidential   Information in violation of this Agreement may cause Discloser irreparable harm, the effect of which may   be difficult to ascertain, and agrees therefore that Discloser shall be entitled to injunction and/or specific   performance in addition to all other remedies otherwise available to Discloser at law and/or equity. In this regard, Receiver also acknowledges that consequential or indirect damages, such as but not limited to loss of profits or loss of a business opportunity shall be recoverable by Discloser, subject to proof; however, in any action or proceeding Receiver shall not object on a legal basis (as opposed to a factual evidentiary basis) for the recovery of such types of damages. In the event of any dispute arising hereunder, the prevailing party of a final, non-appealable judgment of a court of competent jurisdiction shall be entitled to recover its actual and reasonable external attorneys' fees.

11. <u>Breach.</u> In the event of a breach of this agreement, the aggrieved party is entitled to seek a court order   without notice, to bar disclosure in violation of this agreement or circumvention.   This agreement shall be governed by and construed in accordance with the



laws of the State of New York  and may not be modified except by written agreement.

12. <u>Waiver.</u> The failure of any party in any one or more instances to insist upon strict performance of any of the  terms or provisions of this Agreement, or to exercise any option herein conferred, shall not be construed as a  waiver or relinquishment, to any extent, of the right to assert or rely upon any such terms, provisions or  options on any future occasion.

13. <u>Severability.</u> Any provision of this Agreement which is rendered unenforceable by a court of competent  jurisdiction shall be ineffective only to the extent of such prohibition or invalidity and shall not invalidate  or otherwise render ineffective any or all of the remaining provisions of this Agreement.

14. <u>Choice of Law; Venue.</u> This Agreement shall be governed by the laws of the State of New York, and the  parties hereto agree that the venue of any action arising in regard to this Agreement shall be the County of  Manhattan, State of New York, and the parties hereto agree to the jurisdiction and venue of the courts of  said state and county to the exclusion of any other courts which otherwise may have had jurisdiction. To the extent permitted by any applicable conventions or treaties, Receiver agrees to accept service of process by registered mail return receipt requested or federal express delivery, as establishing personal jurisdiction over Receiver.

15. <u>Successors; Assignment.</u> This Agreement shall be binding upon the successors, executors, heirs,   representatives, administrators and assigns of the parties hereto, but neither of the parties hereto shall assign   this Agreement without the prior written consent of the other party.

16. <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the parties in regard to the  confidentiality of matters disclosed pursuant to this Agreement, supersedes any prior oral or written  representations in regard to said matters and may not be modified, except in writing, signed by all parties   hereto.

17. <u>Authority:</u> The undersigned represents and warrants that he has the authority to sign on behalf of the   respective parties.



/Users/krisballard/Desktop/Desert Land/nda LV v3docx.docx

IN WITNESS WHEREOF, Discloser and Receiver have entered into this Agreement as of the date written above.

Desert Land, LLC

By: _Howard Bulloch_

Desert Oasis Apartments, LLC

By: _Howard Bulloch_

Desert Oasis Investments, LLC

By: _David Gaffin_

_Howard Bulloch_
Howard Bulloch, individually and on behalf of the
4 Nevada limited liability companies to be formed

_David Gaffin_
David Gaffin, individually and on behalf of the 4
Nevada limited liability companies to be formed

Atelier Real Estate Partners LLC

By: George Villar

George Villar, individually and on behalf of LVB
Acquisition LLC and or LVB Acquisition Holdings
LLC

# EXHIBIT "D"

# OPERATING AGREEMENT

## OF

## LVB ACQUISITION LLC

CONTENTS

PREAMBLE AND ARTICLES

PREAMBLE ...................................................................................................................... 1

I.     Name, Principal Office and Term ............................................................................ 3

       SECTION 1.01  Name ................................................................................................ 3
       SECTION 1.02  Principal Office and Registered Agent ........................................ 3
       SECTION 1.03  Term ................................................................................................ 3

II.    Purposes and Powers ................................................................................................ 3

       SECTION 2.01  Purposes .......................................................................................... 3
       SECTION 2.02  Powers ............................................................................................ 4

III.   Articles of Organization and Other Documents .................................................... 4

       SECTION 3.01  Articles of Organization ............................................................... 4
       SECTION 3.02  Filings ............................................................................................. 4
       SECTION 3.03  Power of Attorney ......................................................................... 4
       SECTION 3.04  Duration of Power of Attorney .................................................... 4

IV.    Capital Contributions, Member Percentages and Capital Accounts .................... 5

       SECTION 4.01  Contributions and Member Percentages ..................................... 5
       SECTION 4.02  Maintenance of Capital Accounts ............................................... 5
       SECTION 4.03  No Further Capital Contributions ............................................... 5
       SECTION 4.04  Return of Capital Contributions ................................................. 5
       SECTION 4.05  Liability for Return of Capital ..................................................... 5

V.     Rights, Powers and Obligations of Manager ......................................................... 6

       SECTION 5.01  Manager .......................................................................................... 6
       SECTION 5.02  Term of Office of Manager .......................................................... 6
       SECTION 5.03  Authority of Manager to Bind the Company ............................. 6
       SECTION 5.04  Manager's Standard of Care ........................................................ 6
       SECTION 5.05  Resignation; Removal of Manager; Appointment of New Manager ........ 7

VI.    Members' Rights ...................................................................................................... 8

       SECTION 6.01  Limitation on Management Rights .............................................. 8
       SECTION 6.02  Liability of Members ..................................................................... 8
       SECTION 6.03  Other Activities ............................................................................. 8
       SECTION 6.04  Title to Property ............................................................................ 9




SECTION 6.05  Member's Consent.................................................................9
SECTION 6.06  Meetings of Members ...........................................................9

VII.   Distributions, Profits and Losses.............................................................9

SECTION 7.01  Cash Available for Distribution...........................................9
SECTION 7.02  Definition and Allocation of Profits and Losses .................10

VIII.  Transfer of Interests..............................................................................11

SECTION 8.01  Prohibition on Transfer .....................................................10
SECTION 8.02  Transfer of Beneficial Interests .........................................11

IX.    Books and Records ...............................................................................12

SECTION 9.01  Books of Account and Required Records ...........................12
SECTION 9.02  Inspection ..........................................................................12
SECTION 9.03  Fiscal Year..........................................................................12
SECTION 9.04  Bank Accounts....................................................................12

X.     Dissolution and Termination.................................................................13

SECTION  10.01  Events of Termination.....................................................13
SECTION  10.02  Winding Up .....................................................................13
SECTION  10.03  Liquidation Proceeds ......................................................13

XI.    Miscellaneous.......................................................................................13

SECTION 11.01  Address and Notice ..........................................................13
SECTION 11.02  Partition............................................................................14
SECTION 11.03  Withdrawal.......................................................................14
SECTION 11.04  Amendments and Waiver..................................................14
SECTION 11.05  Severability.......................................................................14
SECTION 11.06  Captions............................................................................15
SECTION 11.07  Further Assurances ..........................................................15
SECTION 11.08  Entire Agreement..............................................................15
SECTION 11.09  Governing Law .................................................................15
SECTION 11.10  Counterparts ....................................................................15

SCHEDULE 1...................................................................................................17




# OPERATING AGREEMENT

## OF

## LVB ACQUISITION LLC

THIS OPERATING AGREEMENT (this "Agreement") of LVB Acquisition LLC*, a Nevada limited liability company (the "Company") is made and entered into as of [the close of escrow for the Transactions referred to in the Preamble _____ ], 2018 by and between LVB Holdings I, LLC*1, a Nevada limited liability company residing at _____ ("LVB Holdings"), and Desert LAI, LLC*, a Nevada limited liability company residing at 10181 Park Run Drive, Suite 200, Las Vegas, Nevada 89145 ("DLAI"). LVB Holdings, DLAI, and each other person hereinafter admitted to the Company are, collectively, the "Members".

## PREAMBLE

LVB Holdings owns 95% of the membership interest in the Company ("Membership Interest"), and DLAI owns 5% of the Membership Interest. The Company has been or is being formed under the Nevada Revised Statutes ("NRS"). This Agreement shall become effective upon the later of (i) the filing of the Articles of Organization of the Company (the "Articles") with the Office of the Nevada Secretary of State (the "Secretary") and (ii) the closing of the transactions which are set forth in the Preamble (the "Transactions").

THE TRANSACTIONS:

(1)    Desert Land, LLC, a Nevada limited liability company ("Desert Land") owns fee title to approximately 3.11 acres of real property in Clark County, Nevada (the "3.11 Acre Parcel"), which property is being transferred to Desert Land Newco LLC*, a Nevada limited

---

1 Each asterisk means that the company either has been, is being, or will be formed at or prior to the close of escrow of the Transactions referred to in the Preamble. Each blank in this document will be filled in by the applicable party at or prior to such close of escrow.

liability ("DL Newco"), and 100% of the membership interest in DL Newco is being purchased by the Company (who will thereby become the sole Member of DL Newco) pursuant to a Membership Interest Purchase Agreement ("MIPA I"), a copy of which MIPA I is annexed as Exhibit A hereto.

(2)    Desert Land owns fee title to approximately 20.03 acres of real property in Clark County, Nevada (the "20.03 Acre Parcel"), which property is being transferred to Desert Land Newco 2, LLC*, a Nevada limited liability company ("DL Newco 2"), and 100% of the membership interest in DL Newco 2 is being purchased by the Company (who will thereby become the sole Member of DL Newco 2) pursuant to a Membership Interest Purchase Agreement ("MIPA II"), a copy of which MIPA II is annexed as Exhibit B hereto.

(3)    Desert Oasis Apartments, LLC, a Nevada limited liability company ("Desert Apartments") owns fee title to approximately 6.4 acres of real property in Clark County, Nevada (the "6.4 Acre Parcel"), which property is being transferred to DOA Newco LLC*, a Nevada limited liability company ("DOA Newco"), and 100% of the membership interest in DOA Newco is being purchased by the Company (who will thereby become the sole Member of DOA Newco) pursuant to a Membership Interest Purchase Agreement ("MIPA III"), a copy of which MIPA III is annexed as Exhibit C hereto.

(4)    Desert Oasis Investments, LLC, a Nevada limited liability company ("Desert Investments") owns fee title to approximately 8.96 acres of real property in Clark County, Nevada (the "8.96 Acre Parcel", and together with the 3.11 Acre Parcel, the 20.03 Acre Parcel and the 6.4 Acre Parcel, collectively, the "Parcels"), which property is being transferred to DOI Newco LLC*,a Nevada limited liability company ("DOI Newco"), and 100% of the membership interest in DOI Newco is being purchased by the Company (who will thereby become the sole

2



Member of DOI Newco) pursuant to a Membership Interest Purchase Agreement ("MIPA IV",
and together with MIPA I, MIPA II and MIPA III, the "MIPAS"), a copy of which MIPA IV is
annexed as Exhibit D hereto.

(5)     Pursuant to the above transactions, the Company shall be the sole owner of each
of DL Newco, DL Newco 2, DOA Newco and DOI Newco, and therefore through such
ownership is the indirect and beneficial owner of each of the Parcels which together comprise
38.5 acres of land in Clark County, Nevada (all Parcels, collectively, the "Property").

WHEREAS, the Members desire to cause the Company to own, hold, improve, develop,
operate, lease and or sell the Property, directly or indirectly.

WHEREAS, the Members desire to set forth their understanding with respect to the
operation of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements
contained herein and other good and valuable consideration, the receipt and sufficiency of which
are hereby acknowledged by each Member hereto, the Members hereto, intending to be legally
bound, do hereby agree as follows:

## ARTICLE I

## NAME, PRINCIPAL OFFICE AND TERM

Section 1.01  Name.  The name of the Company shall be LVB Acquisition LLC.  The
Manager (as hereinafter defined) may, upon prior written notice to the Members and the filing of
the appropriate certificate, change the name of the Company.

Section 1.02  Principal Office and Registered Agent.  The principal office and place of
business of the Company shall be at BANCO POPULAR BLDG, 206 TETUAN ST.   c/o AMBASSADOR HANS H. HERTELL  # 509,  PR (USA)00901.   or at such other place
as shall be determined by the Manager.  The Manager shall designate a registered agent, in

3

conformity with the provisions of the NRS upon whom process against the Company may be served, and may change any designated agent from time to time in its discretion.

Section 1.03    Term.  The existence of the Company commenced upon the filing of the Articles or the effective date set forth therein, and its existence shall be perpetual unless the Company is dissolved and its affairs wound up in accordance with the NRS or this Agreement.

## ARTICLE II

### PURPOSES AND POWERS

Section 2.01. Purposes.        The Company is formed for the purpose of owning, holding, improving, developing, operating, leasing and selling the Property, and engaging in any lawful activity incident or ancillary thereto; and the Company may also engage in any and all activities of any kind or nature permitted under the NRS.

Section 2.02. Powers.  The Company shall have all powers of a limited liability company specified in Chapter 86 of the NRS.

## ARTICLE III

### ARTICLES OF ORGANIZATION AND OTHER DOCUMENTS

Section 3.01.  Articles of Organization.  The organizer of the Company executed the Articles in conformity with the provisions of Section 86.161 of the NRS.  The Articles designate _____ as agent of the Company upon whom process against it may be served and state the post office address to which _____ shall mail a copy of any process against the Company served upon him. Manager may cause such address to be changed.

Section 3.02. Filings.  The Manager caused the Articles to be filed and will make such filings as required under Chapter 86 of the NRS.

Section 3.03.  Amendment of Articles.  Except as provided in Section 11.04, the Manager may amend the Articles in any manner consistent with this Agreement and in compliance with the

4

NRS with the vote or consent of the Members holding a majority interest, except that any amendment which would materially affect any ownership or economic interests shall require the vote of at least seventy-five percent of the Membership Interest (a "Super Majority").

## ARTICLE IV

## CAPITAL CONTRIBUTIONS, MEMBER PERCENTAGES AND CAPITAL ACCOUNTS

Section 4.01. Contributions and Member Percentages. Concurrently herewith, each Member has contributed to the capital of the Company the amount set forth opposite his name on Schedule 1 hereto under the column "Capital Contribution". The membership interest in the Company of each Member shall be the percentage interest set forth opposite his name on Schedule 1 under the column "Member Percentage."

Section 4.02. Maintenance of Capital Accounts. (a) A separate capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder (the "Regulations"), as the same may be amended.

Section 4.03 Limitation on Liability. The debts, obligations and liabilities of the Company (whether arising in contract, tort, or otherwise) shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation, or liability solely by reason of being a Member of the Company. The liability of each Member shall be limited to the amount of Capital Contributions required to be made by such Member in accordance with the provisions of this Agreement, and only when and to the extent that the same shall become due pursuant to the provisions of this Agreement. Members shall not be required to make additional capital contributions, but notwithstanding that the Manager may, at any time or from time to time request Members to make a capital contribution ("Capital Call") in accordance with their percentage membership interest. Any members who wish to comply with a Capital Call

5

shall contribute the funds requested of them by the Manager at such time(s) requested by the Manager. If any Members fail to timely contribute (the "Defaulting Members"), then other Members may contribute in which event such contributions shall constitute a loan (the "Loan") to the Company at an interest rate of 12% per annum, and such Loan shall receive priority of payment prior to an payment of a developers fee or distributions to any Members.  Nothing contained in this Section 4.03 shall limit, affect, or impair any agreement, guaranty, or other document entered into by, between, among, or in favor of any of the Members or their respective affiliates.

Section 4.04 Return of Capital Contributions. No Member shall be entitled to (a) demand a refund or return of a capital contribution, (b) interest on a capital contribution, or (c) priority over any other Member with respect to the return of a capital contribution.

Section 4.05 Liability for Return of Capital. The Manager shall not be liable for the return of any portion of the capital contributions of the Members.

## ARTICLE V

## RIGHTS, POWERS AND OBLIGATIONS OF MANAGER

Section 5.01.  Manager.  Except as otherwise provided in this Agreement, the management of the Company and all decisions of any and every kind whatsoever concerning the business affairs of the Company shall be made by the Company's Manager. The initial Manager shall be Frank Orenstein (for purposes of this Agreement, the Manager is referred to in this Agreement as the "Manager")

Section 5.02. Term of Office of Manager.  The Manager shall serve until he resigns or is removed pursuant to Section 5.05.

Section 5.03. Authority of Manager to Bind the Company.  Only the Manager and authorized agents of the Company (to the extent that such agents may have been so authorized by the Manager) shall have the authority to bind the Company. The Manager has the power, on behalf

6

of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company.

Section 5.04.  <u>Manager's Standard of Care</u>.  Notwithstanding any other provision to the contrary contained in this Agreement, the Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member or assignee of a Member for any loss, damage, cost, liability, or expense incurred by reason of or caused by any act or omission performed or omitted by such Manager, whether alleged to be based upon or arising from errors in judgment, negligence, or breach of duty (including alleged breach of any duty of care or duty of loyalty or other fiduciary duty), except for (a) acts or omissions the Manager knew at the time of the acts or omissions were clearly in conflict with the best interest of the Company, (b) any transaction from which the Manager derived an improper personal benefit, (c) a willful breach of any of the material terms of this Agreement, (d) gross negligence, recklessness, willful misconduct, or knowing violation of law or (e) such matters as to which the Manager may not be relieved from liability pursuant to Chapter 86 of the NRS. Without limiting the foregoing, the Manager shall not in any event be liable for (i) the failure to take any action not specifically required to be taken by the Manager under the terms of this Agreement, (ii) any action or omission taken or suffered by any other Member, or (iii) any mistake, misconduct, negligence, dishonesty or bad faith on the part of any employee or other agent of the Company appointed in good faith by such Manager.  The Company will indemnify and hold harmless the Manager against any loss, damage or expense (including attorneys' fees) incurred by the Manager as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests, other than any impermissible acts or omissions alleged above.

Section 5.05.  <u>Resignation; Removal of Manager; Appointment of New Manager</u>.  The Manager may resign by giving each Member written notice of such resignation, which notice shall

7

specify an effective date for such resignation, which shall be no earlier than thirty (30) days after such notice of resignation is delivered or mailed. The Manager may only be removed by the affirmative vote of a Super Majority. Upon the effective date of the Manager's resignation or removal, the Manager shall immediately cease to be the Manager hereunder, and the former Manager shall have no authority to act on behalf of or bind the Company. In the event the Manager resigns or is removed, a successor Manager shall be appointed by the holders of a majority of the Membership Interests.

Section 5.06. Reports. The Manager shall provide reports to the Members at such time and in such manner as the Manager may determine to be reasonable, but in no case shall such reports be provided less than semi-annually.

### ARTICLE VI

### MEMBERS' RIGHTS

Section 6.01 Limitation on Management Rights. Except as specifically directed in writing by the Manager, the Members shall not act in the name of or as the representative of the Company, shall not deal with the Company's assets in any way, shall not incur any obligation for which the Company or the Manager will or may be liable, and shall not otherwise bind the Company, except as otherwise provided herein. Each Member shall indemnify the Company and the Manager for any costs or damages incurred by the Company or Manager as a result of any such unauthorized actions by such Member.

Section 6.02. Liability of Members. No Member shall be liable as such for the liabilities of the Company. The failure of the Manager or the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the NRS shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

8

Section 6.03. <u>Other Activities</u>.  A Member may conduct other businesses or activities not related to the Company without accounting to the Company or the other Members, provided that no such other businesses or activities compete with the business of the Company in Las Vegas, Nevada.  No Member shall be liable or accountable to the Company or the other Members for failure to disclose or make available to the Company any business opportunity that such Member becomes aware of in his capacity as a Member or otherwise, unless such business opportunity competes with the business of the Company (in which event such business opportunity shall first be provided by the Member to the Company, which shall have the right to proceed with the opportunity, and if the Company fails to do so, the Member shall have the right to proceed with the opportunity even though it may compete with the business of the Company).

Section 6.04. <u>Title to Property</u>.  All property, tangible and intangible, real and personal, owned by the Company, shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in such property in his individual name or right, and each Member's Membership Interest shall be personal property for all purposes.

Section 6.05. <u>Member's Consent</u>.  Except as otherwise provided in this Agreement, with respect to any matter, if any, requiring the consent of any Member or of the holders of a majority of the Membership Interest, the Manager shall send a written notice (by certified mail or by overnight mail, and in either case by email to ensure prompt notice) requesting the consent of such Member(s).  The failure of a Member to respond to any such notice within twenty (20) days of receipt of such solicitation shall be deemed conclusively to constitute the granting of consent or approval by the Member in question to the matter described in the solicitation.

Section 6.06. <u>Meetings of Members</u>. No meetings of the Members shall be required.  The Manager may call meetings of the Members from time to time in his discretion, giving notice of any such meetings if and as required by law. In addition, meetings of the Members may be called

9

by a Member or Members holding at least a ten percent (10%) Membership Interest in the Company.  Meetings of the Members shall be held at such place within or without the State of Nevada as the Manager may determine, and the Manager shall make provision for the Members to attend telephonically or through other electronic or digital means.

## ARTICLE VII

## DISTRIBUTIONS, PROFITS AND LOSSES

Section 7.01. <u>Cash Available for Distribution</u>. The Manager shall determine the amount of cash available for distribution to the Members ("<u>Available Cash</u>"), taking into consideration, current obligations and the financial condition of the Company, anticipated operating income and expenses, projected expenditures, and such reasonable reserves as shall be determined in the reasonable discretion of the Manager.

(a)  After such determination has been made, Available Cash shall be distributed among the Members first to repay Loans to the Company, if any, pursuant to Section 4.03, second to pay any developers fee which shall, subject to Section 7.03 and 8.01 be payable 75% to LVB Holdings and 25% to DLAI, and then, subject to Section 7.03, to the Members in proportion to their Membership Interest.

(b)  In the event the aggregate federal tax liability of the Members with respect to the net income of the Company for such taxable year, using the Marginal Tax Rate, as defined below, exceeds the aggregate cash distributions made by the Company with respect to such taxable year, then, and to the extent that sufficient funds exist, the Company shall distribute to each Member not later than ninety (90) days after close of each taxable year, and in accordance with Section 7.01 hereof, no less than the Tax Distribution Amount. The "<u>Tax Distribution Amount</u>" shall be determined for each taxable year by: (A) multiplying the Marginal Tax Rate for that taxable year by the taxable income of the Company (as determined under Code Section 703(a))

10

which is allocable to such Member for that taxable year, and subtracting (B) the sum of all other distributions made to such Member with respect to such taxable year. The "Marginal Tax Rate" for any particular taxable year shall be the highest tax rate that would be imposed on any Member under either Section 1 or 11 of the Code, whichever is higher, for that taxable year.

Section 7.02 Definition and Allocation of Profits and Losses. (a) For the purposes of this Agreement, the terms "profits and losses" and "gains and losses" shall mean the Company's taxable income and losses as determined for Federal income tax purposes.

(b)  For each fiscal year of the Company or portion thereof, profits shall be allocated among the Members in proportion to their Member Percentages, as adjusted to reflect the portion of the year during which each Member is a Member in the Company and to reflect any changes in their Member Percentages during such year.

(c)  For each fiscal year of the Company or portion thereof, losses shall be allocated among the Members in proportion to their Member Percentages, adjusted as described above.

(d)  If profits or losses allocable pursuant to this Section 7.02 consists of more than one kind of gain or loss in any instance (e.g., long-term gain, short-term gain, Code Section 1231 gain or ordinary income), then the aggregate amounts allocated to each Member under this Section 7.02 shall, in each such instance, include a pro rata portion of each kind of gain or loss so allocable.

## ARTICLE VIII

## TRANSFER OF INTERESTS

Section 8.01. Prohibition on Transfer.  No Member shall sell, assign, or otherwise dispose of or encumber (collectively, "dispose") all or any part of his membership interest, without the prior written consent of all of the Members, and no purported disposition or encumbrance of all or any part of a Member's membership interest without such prior written consent shall be binding upon the Company, except as follows: (i) LVB Holdings may dispose of its membership interest

at any time or from time to time to any persons or entities provided that at no time shall the percentage interest of LVB Holdings in the Company be less than 11%, and (ii) on or after January 1, 2020, DLAI may dispose of all or any portion of its Membership Interest, and provided that DLAI shall have first received a bona fide arms-length offer in writing ("BF Offer") for such interest (all or portion as applicable) which DLAI wishes to accept and furnishes to LVB Holdings a notice of intent to accept the BF Offer together with a copy of such BF Offer and any and all documents obtained by DLAI in support of the BF Offer (the "Offer Notice"). LVB Holdings shall have a right of first refusal ("ROFR") to purchase such interest (all or a portion as applicable) on the same terms provided in the BF Offer, provided that LVB Holdings shall exercise its ROFR by furnishing an acceptance notice to DLAI within thirty (30) days after receipt of the Offer Notice. LVB Holdings shall close on its purchase within 60 days of LVB Holdings' acceptance notice. If LVB fails to timely furnish an acceptance notice or fails to timely close, then DLAI may sell such interest (all or a portion as applicable) to the offeror set forth in the BF Offer and pursuant to the terms of the BF Offer; in the event that such transaction does not close within 90 days after LVB Holdings fails to timely furnish an acceptance notice or fails to timely close, then DLAI shall not sell any such interest pursuant to the BF Offer, and the process shall commence anew as to any new (or modified) BF Offer. Any transfer by DLAI to an offeror set forth in a BF Offer shall not include any transfer of DLAI's right(s) to receive a developers fee; and upon any such transfer, DLAI's rights to receive any developers fee in the future shall be deemed to be rescinded.

Section 8.02. Permitted Transfers. Notwithstanding the provisions of Section 8.01, each of the following shall constitute a "Permitted Transfer:"

(a)      A Member's disposition of all or any part of that Member's Membership Interest in trust for the benefit of that Member, or that Member's spouse, children, grandchildren, parents or siblings, or any combination thereof, provided (a) the Member is a trustee or co-trustee of the trust

and provides the Manager with a copy of the trust instrument (or a certification thereof which satisfies the provisions of NRS 164.410); and (b) such Member, as trustee or co-trustee, agrees in writing to be bound by the provisions of this Agreement; and

(b)    A disposition of all or part of a Membership Interest between any existing Members.

## ARTICLE IX

## BOOKS AND RECORDS

Section 9.01. <u>Books of Account and Required Records</u>.  The Company shall keep books and records at its principal place of business, which shall set forth an accurate account of all transactions of the Company.

Section 9.02. <u>Inspection</u>.  The books and records of the Company shall be open to the inspection of, and may be copied by, Members or their representatives during normal business hours, at such Member's own expense, for any purpose reasonably related to the Member's interest as a member of the Company.

Section 9.03. <u>Fiscal Year</u>.  The fiscal year of the Company shall end on December 31 in each year or on such other date as may be reasonably determined by the Manager.

Section 9.04. <u>Bank Accounts</u>.  The funds of the Company shall be deposited in the name of the Company in such bank accounts as shall be designated by the Manager, and withdrawals therefrom shall be made by such persons as the Manager may designate.  All deposits, including security deposits, funds required to be escrowed, and other funds not currently needed in the operation of the Company's business may be deposited in such accounts or invested in such obligations as shall be designated by the Manager.



## ARTICLE X

## DISSOLUTION AND TERMINATION

Section 10.01. Events of Termination. The Company shall dissolve and its affairs shall be wound up upon the occurrence of any of the grounds for dissolution set forth in Section 86.491 of the NRS.

Section 10.02. Winding Up. Upon the dissolution of the Company, the Manager (which term, for purposes of this Section 10.02, shall include its successor) shall wind up the Company's affairs. If the Manager determines that an immediate sale of part or all of such assets would result in unnecessary loss to the Company or is otherwise undesirable, then the Manager may, after giving written notice of his intention to do so to the Members, and to the extent not then prohibited by the Company, either defer liquidation of such assets for a reasonable time, or pay or distribute assets in kind to creditors of the Company and/or to Members, or distribute such assets to himself, as liquidating trustee, to hold such assets in trust and administer the same for the benefit of the Members.

Section 10.03. Liquidation Proceeds. The proceeds from the liquidation of the Company's assets (including any payments or distributions of assets in kind) shall be applied and distributed in the following order:

(a)     First, to the payment of the expenses of liquidation and the debts and obligations of the Company;

(b)     Second, to the establishing of such reserves as the Manager may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.

(c)     Third, to the Members in accordance with Section 7.01(a).

## ARTICLE XI

## MISCELLANEOUS

Section 11.01. Address and Notice. The address of each Member for all purposes shall be

14

as set forth at the beginning of this Agreement, or such other address of which the Manager has received notice. Any notice, demand or request required or permitted to be given or made to a Member under this Agreement shall be in writing and, except for routine financial reports, shall be deemed given or made when delivered in person or by overnight courier, or on the third business day after mailing by certified or registered mail, postage prepaid and return receipt requested, to such Member at such address; or alternatively notices may be sent by email provided that the reference line states the word NOTICE in bold letters, to the following addressees: [to be inserted prior to effective date]_____.

Section 11.02. Partition. The property of the Company shall not be subject to partition, and each Member irrevocably waives any and all rights that he may otherwise have, if any, under the NRS or any other applicable law, to maintain any action for partition of any such property.

Section 11.03. Withdrawal. No Member shall be entitled to withdraw from the Company prior to the dissolution and winding up of the Company, without the prior written consent of the Manager and a Super Majority of the Members. In the event that any Member withdraws or resigns from the Company in contravention of this Agreement, the same shall not affect such Member's liability hereunder or, to the extent provided in the Act, for the obligations of the Company. No such withdrawal or resignation shall constitute, or afford any Member the right to cause, the dissolution of the Company.

Section 11.04. Amendments and Waiver. The Manager may amend this Agreement and/or the Articles without the consent of the Members in accordance with the provisions of this Agreement to change the name and/or principal place of business of the Company. Except as provided herein, no modification, waiver, or termination of this Agreement shall be effective unless made in writing and signed by the Manager and a Super Majority (which may include the Manager); provided, however, that, except as may be set forth herein, no modification (i) requiring

15



or allowing for additional capital contributions by DLAI, (ii) providing for a dilution of DLAI's Membership Interest, or (iii) modifying DLAI's rights to transfer its Membership Interest, shall be effective against DLAI without DLAI's prior written consent. No failure to pursue or elect any remedy or waiver with respect to any default under or breach of any provision of this Agreement shall be deemed to be a waiver of any other subsequent similar or different default or breach or any election of available remedies.

Section 11.05. <u>Severability</u>. If any provision of this Agreement, or the application of a provision under any circumstances, is determined to be invalid, unlawful, or unenforceable to any extent, then to such extent such provision shall be deemed severed from this Agreement, but the application of such provision under any circumstances other than those as to which it is determined to be invalid, unlawful, or unenforceable, and every remaining provision of this Agreement, shall continue in full force and effect.

Section 11.06. <u>Captions</u>. Article and Section headings in this Agreement are for convenience of reference only and shall not be used in any way to interpret or construe this Agreement.

Section 11.07. <u>Further Assurances</u>. Each Member shall execute, acknowledge, and deliver any and all further instruments and other documents that the Manager or counsel to the Company may determine to be necessary or desirable for the achievement of the purposes of this Agreement, provided that such instrument or other document does not adversely affect the rights and obligations of such Member in any material respect.

Section 11.08. <u>Entire Agreement</u>. This Agreement contains the entire understanding and agreement between the Members with respect to the subject matter of this Agreement, and there are no other agreements, understandings, representations, or warranties between the Members other than those set forth in this Agreement. This Agreement shall be binding upon, and inure to

16



the benefit of, each of the Members and his permitted heirs, legal representatives, successors, and assigns.

Section 11.09. <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, without regard to conflict-of-laws principles and any legal actions or proceedings concerning the Company or its Members shall be brought only in the State or Federal District Court sitting in Nevada.

Section 11.10. <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Copies of signatures shall be as valid as if executed in original.

**IN WITNESS WHEREOF**, the Members have executed this Agreement as of the date set forth at the beginning of this Agreement.

LVB Holdings I, LLC

By: Name: *Member* , *GEORGE VULAR*
Title:

Desert LAI, LLC *(to BE FORMED)*

By: Name: *HOWARD BULLOCH*
Title: *MANAGER.*



17

## SCHEDULE 1

| Name and Address | Capital Contribution | Member Percentage |
|---|---|---|
| LVB Holdings I, LLC<br>Address: | $415,800,000.00 | 95% |
| Desert LAI, LLC<br>Address:<br>10181 Park Run Drive, Suite 110<br>Las Vegas, Nevada 89145 | $46,200,000.00 | 5% |

Note: The Membership Interest and Member Percentages were negotiated and agreed upon between the Members notwithstanding the amounts of their respective initial capital contributions to the Company.



# EXHIBIT "E"

August 29, 2018

Desert Land, LLC
Desert Oasis Investments, LLC
Desert Oasis Apartments, LLC
10181 Park Run Drive, #200
Las Vegas, Nevada 89145
Attention: Howard Bulloch, David Gaffin
 and Clyde Turner

**Re: Amended Letter of Intent for Branded Hotel, Resort & Casino Development Project**

Gentlemen:

This letter shall serve as our letter of intent ("LOI") for the acquisition of and proposed joint venture with Desert Land LLC, a Nevada limited liability company, Desert Oasis Investments, LLC, a Nevada limited liability company, and Desert Oasis Apartments, LLC, a Nevada limited liability company (collectively, the "Seller") for development of the thirty eight and one-half (38.5) acres of land located in Las Vegas, Clark County, Nevada described fully in Schedule A into a "branded" hotel, resort and casino including retail and other revenue centers described below (the "Property").

The undersigned, LVB Acquisition Holdings LLC ("Buyer"), an affiliate of Atelier Real Estate Partners LLC, a Delaware limited liability company, submits this LOI for the purchase of all of the membership interest from Seller in a to-be-formed limited liability company or companies ("Newco") which will own, at closing, the Property. Seller proposes to transfer the Property into Newco (which would be formed just prior to the transaction and will have no other assets or liabilities) and immediately after recording such transfer sell 100% of the membership interest of Newco to Buyer (the "Membership Interests"). The Buyer shall be a 95% owner in Newco and the Seller shall be a 5% owner in Newco or a new special purpose entity to be formed as the project sponsor, hereinafter referred to as the "Venture". If one party fails to make its capital contribution or fails to make a future Capital Call, then the non-defaulting member can make a loan to the Company at a premium interest rate of 12%, the repayment of which Member Loan has a higher priority on the distribution waterfall to avoid dilution of the minority member. The Members shall share in the Developer's Fee on the basis of 75% to majority shareholder and 25% to Seller.

1. <u>Property</u>.  38.5 acres as fully described in SCHEDULE A herein.

2. <u>Purchase Price</u>.  The Property shall be valued by Venture at $462,000,000.00 USD (Four Hundred Sixty-Two Million Dollars) ("Purchase Price"). The Purchase Price, less the ten percent (10%) of contributed equity of Seller amounting to $46,200,000.00 USD (Forty-Six Million Two Hundred Thousand Dollars) (the "JV Investment"), leaves a balance due at closing of $415,800,000.00 (Four Hundred Fifteen Million Eight Hundred Thousand Dollars). A separate joint venture agreement (the "JV Agreement") shall be entered into between the parties in connection with the execution of the definitive purchase and sale agreement (the "P&S Agreement", and together with the JV Agreement, the "Agreements" and the "Transaction"). The JV Agreement shall be contingent upon and not effective until the Closing. Approximately $200,000,000.00 USD shall be used at Closing to pay all of the Seller's creditors.

3. <u>Payment of Purchase Price</u>.  Buyer shall pay the Purchase Price, less the JV Investment, for a total of $415,800,000.00 (Four Hundred Fifteen Million Eight Hundred Thousand Dollars) at Closing, which shall occur within thirty (30) business days of the mutual execution of the P&S Agreement.

4. <u>Escrow</u>.  The Closing will be effected through an escrow with First American Title – National Commercial Services, 2500 Paseo Verde Parkway, Suite 120, Henderson, Nevada 89074, Attention: Anastasia Dion ("Escrow Agent").

5. <u>Feasibility Period</u>.

    a.  Buyer shall have twenty-five (25) days from the mutual execution of the P&S Agreement to conduct its feasibility studies and satisfy all the conditions in Paragraph 6.0 below (the

**Atelier Real Estate Partners LLC, 11 Broadway, New York NY 10003.**



"Feasibility Period"). The Buyer may determine, during the Feasibility Period, for any reason or no reason, and whether or not the conditions in paragraph 6.0 have been satisfied, in Buyer's sole and absolute discretion, not to proceed with the Transaction. If the Buyer decides not to proceed with the Transaction during the Feasibility Period, then the Buyer shall so notify Seller in writing before the end of expiration of the Feasibility Period, and the P&S Agreement shall terminate without further action of the parties.

b.    At the close of the Feasibility, if Buyer has not elected to terminate the Transaction, the Buyer shall deposit Five Million Dollars ($5,000,000) with Escrow Agent as an earnest money deposit ("Deposit"). If the Buyer fails to make the Deposit within five (5) days of the expiration of the Feasibility Period, the P&S Agreement shall terminate without further action of the parties.

6. Closing, Closing Conditions. "Closing" shall occur no later than twenty (20) days after the expiration of the Feasibility Period. To facilitate a timely Closing, Buyer shall deposit the balance of the Purchase Price (less the JV Investment and Deposit) with Escrow Agent at least one (1) day before the scheduled Closing. The following are the conditions to the consummation of the Transaction and the Closing, and Buyer shall have until the end of the Feasibility Period to approve the following:

a.    Approval of the Title documents. Seller shall order and deliver a title report on the Property to Buyer within three (3) business days after the mutual execution of this LOI. The Property must be delivered free of encumbrances and free of any other restrictions (other than those accepted by Buyer); and the title report shall be subject to approval by Buyer in Buyer's sole and absolute discretion. Buyer shall have ten (10) days from receipt of the title report to object to title exceptions. If Buyer does not object to an exception, it is deemed accepted by Buyer. Seller shall have five (5) days to respond to Buyer's list of disapproved title exceptions by identifying which disapproved items that Seller will agree to remove. If Seller does not agree to remove all of the disapproved exceptions, then Buyer will have the right to terminate the Transaction.

b.    Seller shall furnish to Buyer such information, reports, studies, environmental, zoning and FAA documentation, CC&R's, maps and plans and other information concerning the Property in Seller's possession, as may be reasonably requested by Buyer. All of the information and documents furnished by Seller to Buyer, or obtained by Buyer through its relationship with Seller, shall be subject to review and approval by Buyer, who shall have sole and absolute discretion as to approval.

c.    Seller shall, at no cost to Buyer, use its commercially reasonable efforts to arrange meetings or consultations with governmental officials and Seller's consultants, including but not limited to engineers, architects and land-use and planning advisers, as may be reasonably requested by Buyer.

d.    Buyer shall have the right to conduct a feasibility study, at its sole cost and expense, to determine, in Buyer's sole and absolute discretion, the feasibility of the zoning for highest and best use.

7. Real Property Tax, Other Closing Costs. Seller will be responsible for Clark County Real Property Transfer Tax to be paid at closing, if any, and for all other closing costs and expenses and the costs and fees of the real estate broker's fee. Rents, property taxes, utilities, and other expenses shall be pro-rated in accordance with the custom in Clark County, Nevada.

8. Title Insurance. Seller, at its sole expense, will provide Buyer with an ALTA standard coverage policy of title insurance in the amount of the Purchase Price. The cost of extended coverage and endorsements will be at Buyer's sole expense.

9. Right of Entry. During the Feasibility Period and upon reasonable notice to Seller, Buyer will have the right to enter the Property for the purpose of inspections and testing, including but not limited to geotechnical testing and soil/land bearing tests; provided, however, that the Buyer is not authorized to perform any destructive testing without Seller's prior written consent. Buyer will keep the Property free and clear of any mechanic's liens arising out of such entry and indemnify Seller for liens and any

Atelier Real Estate Partners LLC, 11 Broadway, New York NY 10003.



damage resulting from Buyer's entry and testing. Prior to entry on the Property, Buyer will provide Seller an insurance certificate demonstrating liability coverage of at least $1,000,000 per occurrence and aggregate covering Buyer and its consultants, and Seller shall be listed as an additional insured on such policy.

10. Brokerage Commission. The only broker's commission due will be a one and one-half percent (1.5%) commission on the Purchase Price, or the sum of $6,930,000.000 USD (Six Million Nine Hundred Thirty Thousand Dollars) payable by Seller to BVB REAL ESTATE PARTNERS LLC, contingent upon and at the Closing.

11. Maintenance, Possession of Property.

    a.   Prior to Closing, Seller will maintain the Property in its current condition and repair and will not create or permit the creation of any title exceptions, such as easements or liens to encumber the Property.

    b.   The Property must be delivered vacant and free of all commercial tenants. The Parties acknowledge that the Property will not be delivered free of residential tenants. The Seller shall agree to a holdback of $10,000,000 at Closing to ensure that the residential units will be fully vacated, which sum Escrow Agent shall pay to Seller when Buyer or Buyer's counsel notifies Escrow Agent in writing (i) that all residential units have been fully vacated and (ii) that Seller or Seller's counsel has furnished Buyer or Buyer's counsel with documentation (if any) reasonably requested by counsel for Buyer that such tenant(s) no longer have any rights in any of the premises. If all residential units have not been fully vacated (with no rights of any tenants to re-occupy the premises) within six (6) months after the Closing, then for each thirty (30) day period (commencing on the day following 6 months after Close of Escrow) in which any residential units have not been Fully Vacated, Seller shall forfeit its right to $500,000 of the holdback.

12. Buyer's Default. In the event of default by Buyer under the P&S Agreement (after electing to proceed with the Transaction after the Feasibility Period), Seller shall be entitled to receive the amount of $2,000,000 from the total Deposit as liquidated damages and as Seller's sole and exclusive remedy against Buyer for its default.

13. Nominee. Buyer shall have the right to nominate another entity to take title to the property as a Holdco for the Venture by written notice thereof to Seller and with Seller's prior written consent, which consent shall not be unreasonably withheld.

14. Purchase Agreement. Within five (5) calendar days of the execution and delivery of this offer by Seller to Buyer, a mutually acceptable form of JV Agreement and P&S Agreement shall be executed by the parties. Prior to Seller's execution of the P&S Agreement, Buyer shall provide Seller full details of its plan of finance and evidence of funding commitments sufficient to close the Transaction. If (1) the Parties do not execute the P&S Agreement and the JV Agreement within five (5) calendar days of execution and delivery of this LOI, or (2) Buyer's plan of finance is not adequate and its funding not satisfactory, Seller may terminate this LOI in its sole discretion, and the Parties shall have no further obligation to each other.

15. Exclusivity. With regard to exclusivity, the Parties agrees as follows:

    a.   Following the release of fifty percent (50%) of the Buyer's Deposit, the Seller shall cease to actively market the property.

16. Termination. This LOI is not binding except as expressly provided in this paragraph 16 and will automatically terminate and be of no further force and effect (and neither party shall have any rights hereunder except as set forth in the following sentence) upon the earlier of (i) execution of the P&S Agreement by Buyer and Seller, (ii) mutual agreement of Buyer and Seller, and (iii) the date that is five (5) days from the date hereof unless the LOI is executed by Seller.



Atelier Real Estate Partners LLC, 11 Broadway, New York NY 10003.

Upon termination of the LOI, notwithstanding anything in the previous sentence, paragraphs 15a,17 and 18 shall survive the termination of this LOI and each party shall continue to be bound by such paragraphs.

17. GOVERNING LAW. THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF NEVADA, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEVADA OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF NEVADA.

18 Confidentiality. This LOI is confidential to the Parties and their representatives and is subject to the confidentiality agreement entered into between Buyer and Seller, which continues in full force and effect.

If this offer is acceptable, please have Seller execute a copy hereof in the space provided and return it within three (3) days of date hereof; otherwise this offer shall expire.

Sincerely,

LVB Acquisition Holdings LLC

By: George Villar, Authorized Signature

Accepted:

DESERT LAND, LLC

Howard Bulloch, Manager

DESERT OASIS INVESTMENTS, LLC

Howard Bulloch, Manager

DESERT OASIS APARTMENTS, LLC

Howard Bulloch, Manager

Date: AUGUST 29, 2018

SCHEDULE A

The estate or interest in the land described in this LOI is Fee as to Parcels 1 through 25 Easement as to Parcel 26 is described as follows:

PARCEL 1: PARCEL 1A:

GOVERNMENT LOTS 24 AND 122 OF SECTION 28. TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M.. CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED NOVEMBER 28, 1962 IN BOOK 402 AS INSTRUMENT NO. 324194 OF OFFICIAL RECORDS. FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED SEPTEMBER 19, 1972 IN BOOK 264 AS INSTRUMENT NO. 223960 OF OFFICIAL RECORDS.

PARCEL 1B:

THAT PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28. TOWNSHIP 21 SOUTH. RANGE 61 EAST, M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 122 OF SAID SECTION 28 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF SR-604 (FORMER US-91). SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS. TO WIT: BEGINNING AT A POINT ON THE CENTERLINE OF SR-604 (FORMER US-91). AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N 0°17'00" W, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. EXCEPTING THEREFROM THE NORTHERLY FORTY (40.00) FEET OF THE WESTERLY EIGHTY (80.00) FEET OF GOVERNMENT LOT 122 OF SECTION 28, T.21 S., R. 61 E., M.D.M.. LYING EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE ABOVE DESCRIBED CENTERLINE, RELINQUISHED TO THE COUNTY OF CLARK BY RESOLUTION OF RELINQUISHMENT RECORDED ON JANUARY 21, 1982 IN THE OFFICIAL RECORDS OF CLARK COUNTY, NEVADA, IN BOOK 1513 AS INSTRUMENT NO. 1472121. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED DECEMBER 27, 1995 IN BOOK 951227 AS INSTRUMENT NO. 01170.

PARCEL 2:

GOVERNMENT LOT 25 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED DECEMBER 22, 1972 IN BOOK 288 AS INSTRUMENT NO. 247802 OF OFFICIAL RECORDS. TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

PARCEL 3:

GOVERNMENT LOTS 26, 27, 28, 29, 123 AND 124 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THOSE PORTIONS OF GOVERNMENT LOTS 123 AND 124, AS

CONVEYED TO CLARK COUNTY BY DEEDS RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310411 AND OCTOBER 22, 1962 IN BOOK 394 AS INSTRUMENT NO. 318023 OF OFFICIAL RECORDS.

PARCEL 4: PARCEL 4A:

GOVERNMENT LOTS 31 AND 125 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310410 OF OFFICIAL RECORDS.

PARCEL 4B:

THAT PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 125 OF SAID SECTION 28 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT: BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N 0°17'00" W, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL. NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED FEBRUARY 13, 1986 IN BOOK 860213 AS INSTRUMENT NO. 00972.

PARCEL 5:

GOVERNMENT LOT 30 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED APRIL 10, 1959 IN BOOK 193 AS INSTRUMENT NO. 157472 OF OFFICIAL RECORDS. TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

PARCEL 6:

GOVERNMENT LOTS 98 AND 99 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN GRANT, BARGAIN, SALE DEEDS RECORDED NOVEMBER 5, 1981 IN BOOK 1484 AS INSTRUMENT NOS. 1443019 AND 1443020 OF OFFICIAL RECORDS. FURTHER EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED JULY 25, 1989 IN BOOK 890725 AS INSTRUMENT NO. 00757 AND RE-RECORDED AUGUST 31, 1989 IN BOOK 890831 AS INSTRUMENT NO. 01307 OF OFFICIAL RECORDS. TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OFFICIAL RECORDS.

PARCEL 7: PARCEL 7A: A PORTION OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST (SW) CORNER OF GOVERNMENT LOT 126 AND GOING SOUTH 89°55'10" EAST A DISTANCE OF 80.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BLVD. SOUTH WHICH IS THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL AND MARKED WITH A CHISEL MARK ON A CONCRETE SLAB; THENCE CONTINUING SOUTH 89°55'10" EAST ON THE SOUTH LINE OF GOVERNMENT LOTS 126 AND 32 A DISTANCE OF 119.00 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002;

THENCE NORTH 0°22'07" WEST A DISTANCE OF 62.68 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002; THENCE NORTH 89°55'16" WEST A DISTANCE OF 119.00 FEET TO A POINT MARKED BY A 1/2" REBAR WITH CAP #2002; THENCE SOUTH 0°22'00" EAST ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BLVD. SOUTH A DISTANCE OF 62.67 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 7B:

THAT PORTION OF VACATED US HIGHWAY 91, DESCRIBED AS FOLLOWS: THE SOUTH 62.67 FEET OF GOVERNMENT LOT 126 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT: BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE NORTH 0°17'00" WEST, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED

TO, THE ABOVE DESCRIBED PARCEL. NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED DECEMBER 30, 1988 IN BOOK 881230 AS INSTRUMENT NO. 01399.

PARCEL 8: PARCEL 8A:

ALL OF THAT REAL PROPERTY SITUATED IN THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF GOVERNMENT LOT 126 AND GOING SOUTH 89°55'23" EAST, A DISTANCE OF 80.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BOULEVARD SOUTH WHICH IS THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE CONTINUING SOUTH 89°55'23" EAST ON THE NORTH LINE OF GOVERNMENT LOTS 126 AND 32, A DISTANCE OF 348.54 FEET TO THE NORTH-EAST CORNER OF GOVERNMENT LOT 32 MARKED BY A 2-1/2" IRON PIPE; THENCE SOUTH 0°22'21" EAST ALONG THE EAST LINE OF GOVERNMENT LOT 32, A DISTANCE OF 125.37 FEET TO THE SOUTHEAST CORNER OF GOVERNMENT LOT 32 MARKED BY A 2-1/2" IRON PIPE; THENCE NORTH 89°55'10" WEST ON THE SOUTH LINE OF GOVERNMENT LOT 32, A DISTANCE OF 229.54 FEET TO A POINT MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 0°22'07" WEST, A DISTANCE OF 62.68 FEET TO A POINT MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 89°55'16" WEST, A DISTANCE OF 119.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF LAS VEGAS BOULEVARD SOUTH MARKED WITH A 1/2" REBAR WITH CAP NO. 2002; THENCE NORTH 0°22'00" WEST, A DISTANCE OF 62.67 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 8B:

BEING A PORTION OF THE NORTH HALF (N 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B & M. BEING THE NORTH 62.67+/- FEET OF GOVERNMENT LOT 126 WHICH LIES EASTERLY OF AND OUTSIDE OF A LINE 37 FEET OF AND PARALLEL WITH THE CENTERLINE OF US 91 (STATE ROUTE 604). SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT: BEGINNING AT A POINT ON THE CENTERLINE OF US 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE NORTH 0°17'00" WEST, ALONG SAID CENTERLINE, A DISTANCE OF 4,140.50 FEET TO HIGHWAY ENGINEER STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO, BUT NOT LIMITED TO, THE ABOVE DESCRIBED PARCEL. NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED JUNE 6, 2003 IN BOOK 20030606 AS INSTRUMENT NO. 00734.

PARCEL 9:

GOVERNMENT LOT 33 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

PARCEL 10:

GOVERNMENT LOT 34 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE-DEED RECORDED JULY 10, 1978 IN BOOK 913 AS INSTRUMENT NO. 872053 OF OFFICIAL RECORDS. TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

PARCEL 11: PARCEL 11A:

GOVERNMENT LOTS 36 AND 128 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO THE STATE OF NEVADA BY THAT CERTAIN DEED RECORDED SEPTEMBER 6, 1962 IN BOOK 385 AS INSTRUMENT NO. 310408 OF OFFICIAL RECORDS.

PARCEL 11B:

BEING A PORTION OF THE N 1/2 OF THE SOUTHWEST QUARTER SW 1/4 OF SECTION 28, T. 21 S., R. 61 E., M.D.M., BEING ALL THAT PART OF GOVERNMENT LOT 128 OF SAID

SECTION 28 WHICH LIES EASTERLY AND OUTSIDE OF A LINE 37 FEET RIGHT OF AND PARALLEL WITH THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), SAID CENTERLINE MORE FULLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF U.S. 91 (STATE ROUTE 604), AT HIGHWAY ENGINEER'S STATION "A" 829 + 59.50 P.O.T.; THENCE N. 0°17'00" W., ALONG SAID CENTERLINE, A DISTANCE OF 4140.50 FEET TO HIGHWAY ENGINEER'S STATION "A" 871 + 00.00 P.O.T. SAID CENTERLINE IS PERTINENT TO BUT NOT LIMITED TO THE ABOVE DESCRIBED PARCEL. NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED AUGUST 26, 1985 IN BOOK 2173, AS INSTRUMENT NO. 2132667.

PARCEL 12:

GOVERNMENT LOT 37 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED SEPTEMBER 22, 1970 IN BOOK 65 AS INSTRUMENT NO. 51666 OF OFFICIAL RECORDS. TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

PARCEL 13:

GOVERNMENT LOT 106 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA.

PARCEL 14:

GOVERNMENT LOT 38 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED MARCH 23, 1970 IN BOOK 19 AS INSTRUMENT NO. 15103 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GILES STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED AUGUST 10, 2004 IN BOOK 20040810 AS INSTRUMENT NO. 04553 OF OFFICIAL RECORDS.

PARCEL 15:

LOCATED IN THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION 28; THENCE SOUTH 00°37'40" EAST ALONG THE CENTERLINE OF HAVEN STREET (WIDTH VARIES) A DISTANCE OF 689.55 FEET; THENCE SOUTH 89°49'19" WEST A DISTANCE OF 15.00 FEET TO A POINT ON THE WESTERLY RIGHT- OF- WAY LINE OF SAID HAVEN STREET, SAID POINT ALSO BEING THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 89°49'19" WEST ALONG THE MOST NORTHERLY LINE OF GOVERNMENT LOTS 103 AND 104 A DISTANCE OF 314.57 FEET TO THE NORTHWEST CORNER OF GOVERNMENT LOT 104; THENCE SOUTH 00°37'17" EAST ALONG THE WEST LINE OF GOVERNMENT LOT 104 A DISTANCE OF 344.78 FEET TO THE NORTHEAST CORNER OF GOVERNMENT LOT 108; THENCE SOUTH 89°49'13" WEST ALONG THE NORTH LINE OF GOVERNMENT LOT 108 A DISTANCE OF 152.41 FEET TO A POINT 12.26 FEET EAST OF THE NORTHEAST CORNER OF GOVERNMENT LOT 107; THENCE SOUTH 00°35'51" EAST ALONG A LINE PARALLEL WITH AND 12.26 FEET EAST OF THE EAST LINE OF GOVERNMENT LOT 107 A DISTANCE OF 314.78 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF FOUR SEASONS DRIVE (60.00 FEET WIDE); THENCE NORTH 89°49'07" EAST ALONG SAID RIGHT-OF- WAY LINE A DISTANCE OF 437.06 FEET TO A POINT ON A TANGENT CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 15.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 90°26'47" AN ARC LENGTH OF 23.68 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF THE AFOREMENTIONED HAVEN STREET SAID POINT ALSO BEING A POINT ON A REVERSE CURVE CONCAVE TO THE

SOUTHEAST AND HAVING A RADIUS OF 660.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 08°50'59" AN ARC LENGTH OF 101.94 FEET TO A POINT ON A REVERSE CURVE CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 600.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 08°50'59" AN ARC LENGTH OF 92.67 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF THE AFOREMENTIONED HAVEN STREET; THENCE NORTH 00°37'40" WEST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 450.47 FEET TO THE POINT OF BEGINNING. NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION APPEARED PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED JULY 6, 2001 IN BOOK 20010706 AS INSTRUMENT NO. 02494.

PARCEL 16:

GOVERNMENT LOTS 95 AND 102 OF SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN DEEDS RECORDED MAY 6, 1964 IN BOOK 535 AS INSTRUMENT NO. 431059 AND JULY 13, 1988 IN BOOK 880713 AS INSTRUMENT NO. 00715 OF OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF GOVERNMENT LOT 102 AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED MARCH 7, 2001 IN BOOK 20010307 AS INSTRUMENT NO. 00643 OF OFFICIAL RECORDS.

PARCEL 17:

ALL OF THAT PROPERTY AS SHOWN ON THE RECORDED AMENDED PLAT OF THE OASIS, A CONDOMINIUM SUBDIVISION, ON FILE IN BOOK 31 OF PLATS, PAGE 72, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

PARCEL 18:

GOVERNMENT LOT SEVENTY-NINE (79) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. TOGETHER WITH THAT PORTION OF ALI BABA LANE AND HAVEN STREET AS VACATED BY CLARK COUNTY IN AN ORDER OF VACATION RECORDED SEPTEMBER 7, 1988, IN BOOK 880907 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00489. EXCEPTING THEREFROM THOSE PORTIONS AS CONVEYED TO CLARK COUNTY BY THOSE CERTAIN DEEDS RECORDED APRIL 10, 1959, IN BOOK 193 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 157468 AND JULY 15, 1988, IN BOOK 880715 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00874.

PARCEL 19:

GOVERNMENT LOT EIGHTY (80) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA.

PARCEL 20:

GOVERNMENT LOT EIGHTY-ONE (81) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT DEED RECORDED APRIL 10, 1959, IN BOOK 193 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 157471.

PARCEL 21:

GOVERNMENT LOT EIGHT-TWO (82) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS DEDICATED BY CLARK COUNTY BY THAT CERTAIN DEDICATION RECORDED MAY 16, 1995, IN BOOK 950516 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 01164.

PARCEL 22:

GOVERNMENT LOT EIGHT-THREE (83) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED

RECORDED MAY 21, 1980, IN BOOK 1230 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1189739. FURTHER EXCEPTING THEREFROM THAT PORTION AS DEDICATED BY CLARK COUNTY BY THAT CERTAIN DEDICATION RECORDED MAY 16, 1995, IN BOOK 950516 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 01164.

PARCEL 23:

GOVERNMENT LOT EIGHT-FOUR (84) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

PARCEL 24:

GOVERNMENT LOT EIGHT-FIVE (85) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

PARCEL 25:

GOVERNMENT LOT EIGHT-SIX (86) IN SECTION 28, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY BY THAT CERTAIN GRANT, BARGAIN, SALE DEED RECORDED OCTOBER 13, 1983, IN BOOK 1819 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 1778250.

PARCEL 26:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS INVOLVING PORTIONS OF PARCEL 3 AND ALL OF PARCELS 4, 5, 7, 8 AND 9 AS SET FORTH IN THAT CERTAIN DOCUMENT ENTITLED "RECIPROCAL EASEMENT AGREEMENT", RECORDED JUNE 23, 2009 IN BOOK 20090623 AS INSTRUMENT NO. 02688 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

# EXHIBIT "F"

## ASSIGNMENT AND ASSUMPTION OF CONTRACT

LVB Acquisition LLC ("Assignor"), in consideration of Ten Dollars ($10) and other good and valuable consideration, receipt of which is hereby acknowledged, paid by LVB Acquisition Holdings I, LLC, a Nevada limited liability company ("Assignee"), hereby assigns unto Assignee, absolutely and forever, all of Assignor's right, title and interest in and to that certain Membership Interest Purchase Agreement between LVB Acquisition LLC and Desert Land, LLC dated September 12, 2018 (the "MIPA") with respect to approximately 3.11 acres of real property in Las Vegas, Nevada.

Assignor fully authorizes and empowers Assignee to exercise all rights of the Assignor under the terms, covenants and conditions of the MIPA in the same manner and to all intents and purposes as the Assignor might or could do under said MIPA.

Assignee hereby accepts the foregoing assignment and assumes from and after the date hereof the timely and true performance of all of the terms, covenants, conditions and provisions of the MIPA. From and after the date hereof, Assignor is relieved of any and all liabilities or obligations under the MIPA.

**IN WITNESS WHEREOF**, Assignor and Assignee, intending to be legally bound, have caused these presents to be duly executed as of the 26th day of September, 2018.

We Consent:

Desert Land, LLC

By: _____
Howard Bulloch

By: _____
David Gaffin

LVB Acquisition LLC

By: _____
George Villar

LVB Acquisition Holdings I, LLC

By: _____
Angela K. Hong

## ASSIGNMENT AND ASSUMPTION OF CONTRACT

LVB Acquisition LLC ("Assignor"), in consideration of Ten Dollars ($10) and other good and valuable consideration, receipt of which is hereby acknowledged, paid by LVB Acquisition Holdings I, LLC, a Nevada limited liability company ("Assignee"), hereby assigns unto Assignee, absolutely and forever, all of Assignor's right, title and interest in and to that certain Membership Interest Purchase Agreement between LVB Acquisition LLC and Desert Land, LLC, Desert Oasis Investments, LLC and Desert Oasis Apartments, LLC (collectively, the "Desert Entities") dated September 12, 2018 (the "MIPA") with respect to approximately 20.03, 8.96 and 6.4 acres of real property in Las Vegas, Nevada owned by the Desert Entities, respectively.

Assignor fully authorizes and empowers Assignee to exercise all rights of the Assignor under the terms, covenants and conditions of the MIPA in the same manner and to all intents and purposes as the Assignor might or could do under said MIPA.

Assignee hereby accepts the foregoing assignment and assumes from and after the date hereof the timely and true performance of all of the terms, covenants, conditions and provisions of the MIPA. From and after the date hereof, Assignor is relieved of any and all liabilities or obligations under the MIPA.

**IN WITNESS WHEREOF**, Assignor and Assignee, intending to be legally bound, have caused these presents to be duly executed as of the 26th day of September, 2018.

We Consent:

Desert Land, LLC
Desert Oasis Investments, LLC
Desert Oasis Apartments, LLC

Each By: _____
Howard Bulloch

Each By: _____
David Gaffin

LVB Acquisition LLC

By: _____
George Villar

LVB Acquisition Holdings I, LLC

By: _____
Angela K. Hong

Untitled 1:Users:georgevillar:Desktop:LVB:LVB MIPA Assigns:Assignment and Assumption of MIPA DL DO DA.docx

# EXHIBIT "G"

1

2

3

4

5

6   Lenard E. Schwartzer, Esq., NV Bar No. 399
    Schwartzer & McPherson Law Firm
7   2850 South Jones Blvd., Suite 1
    Las Vegas NV  89146-5308
8   Telephone:    (702) 228-7590
    Facsimile:    (702) 892-0122
9   E-Mail:        bkfilings@s-mlaw.com

10  *Attorneys for Debtors and Debtors In Possession*

11              **UNITED STATES BANKRUPTCY COURT**

12                    **DISTRICT OF NEVADA**

| 13 | In re | BK-S- 18-12454 LEB |
|----|-------|--------------------|
| 14 | DESERT LAND, LLC, | Chapter 11 |
| 15 | Debtor. | (Jointly Administered with BK-S- 18-12456-LEB, BK-S-18-12457-LEB and BK-S-18-12458-LEB) |
| 16 | In re | |
| 17 | DESERT OASIS APARTMENTS, LLC, | **[PROPOSED] ORDER GRANTING MOTION TO SELL SUBSTANTIALLY ALL OF THE** |
| 18 | Debtor. | **DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND** |
| 19 | In re | **ENCUMBRANCES AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND** |
| 20 | DESERT OASIS INVESTMENTS, LLC, | **UNEXPIRED LEASES, PAY SECURED CREDITORS AT CLOSING, PAY** |
| 21 | Debtor. | **COMMISSION AND INVEST PROCEEDS IN BUYER** |
| 22 | In re | |
| 23 | SKYVUE LAS VEGAS, LLC, | Date:  October 30, 2018 |
| 24 | Debtor. | Time:  9:30 a.m. |

25         The Motion To Sell Substantially All Of The Debtor's Assets Free And Clear Of All

26  Liens, Claims And Encumbrances  And Assign Certain Executory Contracts And Unexpired

27  Leases, Pay Secured Creditors At Closing And Invest Proceeds In Buyer (the "Motion")

28  having come before this Court; Desert Land, LLC ("Desert Land"), Desert Oasis Apartments, LLC

("Desert Apartments"), Desert Oasis Investments, LLC ("Desert Investments") and SkyVue Las Vegas, LLC ("SkyVue") (collectively, the "Desert Entities" or "Debtors") appearing by and through their attorney, Lenard Schwartzer, Esq., of Schwartzer & McPherson Law Firm; all other appearances having been made on the record; the Court having reviewed the Motion, the supporting Declaration of David Gaffin, any oppositions, the comments of counsel, and making its findings of fact and conclusions of law on the record pursuant to FRCP Rule 52 and Bankruptcy Rule 7052, it is

ORDERED that the Motion[1] is granted; and it is further

ORDERED that the Debtors authorized to sell, and shall sell the Real Property and the Assets to LVB Acquisition Holdings I, LLC pursuant to the terms of the MIPAs, free and clear of all liens, claims and encumbrances and in compliance with each and every one of the terms and conditions specified in paragraph 16(c) (i)-(iii) and 17(c)(i)-(iii) of the Motion; and it is further

ORDERED that the Debtors, through a closing escrow, are authorized to pay and shall pay all undisputed secured creditors and the undisputed portions of debts owed to secured creditors; and it is further

ORDERED that the Debtors, at their discretion as to secured claims, are authorized to leave the disputed portion of a secured claim on deposit with Escrow or post a supersedeas bond in the amount required to pay the disputed portion of the secured claim, including any disputed interest, costs and attorney's fees, so long as the Escrow Holder will exclude all such claims from its title insurance policy; and it is further

ORDERED that the Debtors are authorized to pay, and shall pay, any undisputed priority or unsecured creditor; and it is further

ORDERED that the Debtors shall retain in a Debtor In Possession bank account any amounts withheld from a disputed priority or unsecured creditor pending a final order determining the validity of any such claim; and it is further

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Motion or, if not described in the Motion, in the MIPAs.

1    ORDERED, that upon a final determination of any and all disputed claims, that the claims

2    be paid out of the proceeds of the sale; and it is further

3    ORDERED that the Debtors and their Managers are authorized to execute, and shall

4    execute, any documents necessary to effectuate the sale to LVB Acquisition Holdings I, LLC; and

5    it is further

6    ORDERED that the Sellers, through an entity to be formed, are authorized to invest

7    $46,200,000 in LVB Acquisition Holdings I, LLC in exchange for a 5% interest in LVB

8    Acquisition Holdings I, LLC by such entity; and it is further

9    ORDERED that the 14-day stay pursuant to Bankruptcy Rule 6004(h) is waived and the

10   sale may be consummated on or after 5 days of entry of this Sale Order; and it is further

11   ORDERED that LVB Acquisition Holdings I, LLC is determined to be a good faith buyer

12   entitled to the protection of Bankruptcy Code §363(m); and it is further

13   ORDERED that the Debtors are authorized to pay, and shall pay, all closing costs of this

14   sale including but not limited to commissions to BVB Real Estate Partners, LLC and Colliers

15   International as set forth in the Motion, and any and all transfer taxes, if any, in connection with

16   this sale; and it is further

17   ORDERED that the Debtors are authorized to assume and assign, and shall assume and

18   assign, the Contracts to LVB Acquisition Holdings I, LLC.

19   Submitted by:

20   /s/ Lenard E. Schwartzer
21   Lenard E. Schwartzer, Esq.
     Schwartzer & McPherson Law Firm
22   2850 South Jones Boulevard, Suite 1
     Las Vegas, Nevada 89146
23   *Attorneys for Debtors and Debtors In*
24   *Possession*

25

26

27

28

1

## RULE 9021 CERTIFICATION

2  In accordance with LR 9021, counsel submitting this document certifies that the Order accurately

3  reflects the court's ruling and that (check one):

4  ☐    The court has waived the requirement set forth in LR 9021 (b)(1).

5  ☐    No party appeared at the hearing or filed an objection to the motion.

6  ☒    I have delivered a copy of this proposed order to all counsel who appeared at the hearing,

7       and any unrepresented parties who appeared at the hearing, and each has approved or

       disapproved the order, or failed to respond, as indicated above.

8  ☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order

9       with the motion pursuant to LR 9014(g), and that no party has objected to the form or

10      content of the order.

11

12  _____

13  Lenard E. Schwartzer, Esq.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Re Motion To Sell Draft 20180927 V1            - 4 -