Kevin W. Coleman (CA SB 168538)
Kimberly S. Fineman (CA SB 184433)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: kcoleman@nutihart.com

Counsel for Kavita Gupta,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: BK-S-18-12454 LEB |
| DESERT LAND, LLC | Chapter 11 |
| Debtor. | |
| In re: | Case No.: BK-S-18-12456 LEB |
| DESERT OASIS APARTMENTS, LLC, | Chapter 11 |
| Debtor. | |
| In re: | Case No.: BK-S-18-12457 LEB |
| DESERT OASIS INVESTMENTS, LLC, | Chapter 11 |
| Debtor. | **DECLARATION OF BIDDER IN SUPPORT OF SALE MOTION AND FINDING OF GOOD FAITH UNDER 11 U.S.C. § 363(m)** |
| | *Sale Hearing Commences* |
| | Date: June 5, 2020 |
| | Time: 9:30 a.m. |
| | Judge: Hon. Gary Spraker |
| | *Auction Commences* |
| | Date: June 5, 2020 |
| | Time: 10:30 a.m. |

I, Edward Kim, declare as follows:

1.    I am Managing Member of ED-DEN Investment Co., LLC ("Bidder"). I am Bidder's authorized representative and make this declaration on its behalf in support of *Chapter 11 Trustee Kavita Gupta's Motion to Approve Sale of Debtors' Assets Free and Clear of Liens and Grant Related Relief* (the "Sale Motion"). Specifically, I provide this declaration in support

*NUTI HART LLP*
*411 30TH STREET, SUITE 408*
*OAKLAND, CA 94609-3311*
*TELEPHONE: 510-506-7152*

of a finding by the Court, pursuant to 11 U.S.C. § 363(m), that Bidder is a good faith purchaser. All statements in this declaration are based on my own personal knowledge and if called to testify on this matter, I can and would competently testify to the matters set forth herein.

2.    <u>Bid Procedures Order</u>.  Bidder acknowledges that a copy of the *Order (A) Approving Bidding Procedures and Sale Agreement, (B) Setting Auction Date and Sale Hearing; and (C) Granting Related Relief* entered by the Court on January 3, 2020 (the "Bid Procedures Order") is posted in the confidential due diligence database maintained by the advisors for the Chapter 11 Trustee Kavita Gupta.  Bidder has reviewed the Bid Procedures Order, agrees to abide by and honor the terms of the Bid Procedures Order, and consents to the jurisdiction of this Court.

3.    <u>Purchase and Sale Agreement</u>.  Bidder has submitted a bid ("Bid") on certain real property assets of the Bankruptcy Estate(s) as set forth in the Purchase and Sale Agreement dated 04/30/2020 (the "PSA"), a true and correct copy of which is attached hereto as Exhibit A. [ADD AMENDMENT, IF APPLICABLE.]  There is no agreement with the Seller(s) (as defined in the PSA) except the PSA.

4.    <u>Due Diligence</u>.  Bidder has conducted its own due diligence prior to submitting its Bid and understands that the sale in accordance with the Bid Procedures Order is for the property "as is" and with any representations or warranties.  Bidder formulated its Bid based upon its own internal evaluation of the property, and there are no outstanding contingencies to the Bid.

5.    <u>Bid Made in Good Faith</u>.  The Bid represents a good faith offer, after arms' length negotiations, of what Bidder believes to be the fair value of the property subject to the Bid. Bidder intends to timely consummate the sale proposed in its bid if selected as the successful bidder. Bidder's intent in acquiring the property subject to its bid is solely to own and/or develop the property itself or through its approved assignee.  The Bid is not motivated by an intent to gain an unfair advantage over or otherwise be harmful to the Debtors, their creditors or any components thereof.

6.    <u>No Relationship with Seller-Related Parties</u>.  To the best of my knowledge after reasonable inquiry, Bidder has no pre or post-petition relationships with (i) the above-captioned

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

debtors or debtors' current or former officers, directors, agents or employees, including but not limited to Howard Bulloch and David Gaffin, (ii) the Trustee Kavita Gupta, (iii) Trustee's counsel Nuti Hart LLP and Garman Turner Gordon LLP or (iv) the real estate advisors representing the Trustee in this matter, Colliers Nevada, LLC dba Colliers International or Keen-Summit Capital Partners LLC (collectively, the "Seller-Related Parties") except as follows: N/A

7.    No Anticipated Future Relationship.  Bidder does not anticipate having a relationship after the sale with any of the Seller-Related Parties.  No offers of employment or compensation have been or will be made to any of the Seller-Related Parties.

8.    No Consideration Except the Purchase Price.  Bidder has not paid nor will pay consideration in connection with the sale to any person other that the bankruptcy estate except for the following professionals, if any, advising Bidder: Nevada Land Commercial Real Estate, Inc., Alberto Jauregui; President and Kenneth Long, ESQ.

9.    No Contact or Agreement with Other Bidders. Except as set forth in the PSA, Bidder has had no contact or agreement with any other bidder or potential purchaser of the property subject to the Bid.

I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct, and that this Declaration is executed this 4th day of June 2020.

_____
ED-DEN Investment Co., LLC
Edward Kim; Managing Member

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**Exhibit A**

**PSA**

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

THE BANKRUPTCY ESTATE OF
DESERT OASIS APARTMENTS, LLC

SELLER

AND

ED-DEN Investment Co., LLC, A
California Limited Liability Company

BUYER

DATED: April 30, 2020.



PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement"), dated  as of April 30, 2020 (the "Effective Date"), is by and among the bankruptcy estates of Desert Land, LLC ("Land"), Desert Oasis Investments, LLC ("Investments"), and Desert Oasis Apartments, LLC ("Apartments," and, together with Land and Investments, "Debtors," or "Sellers" and each a "Debtor"), each a Nevada limited liability company, **ED-DEN Investment Co., LLC, A California Limited Liability Company** by and through Kavita Gupta ("Trustee"), solely in her capacity as the Chapter 11 Trustee for the Debtors, not individually, on the one hand,  and **ED-DEN Investment Co., LLC,** ("Buyer"), a California Limited Liability Company. The Debtors, Seller, and Buyer may be referred to herein as a "Party," and, collectively, as the "Parties."

In consideration of the mutual undertakings and covenants herein contained, the receipt and sufficiency of which are hereby acknowledged, the Sellers and Buyer hereby covenant and agree as follows:

RECITALS

A.      Each of the Debtors was the subject of an involuntary petition under Chapter 7 of title 11, United States Code (the "Bankruptcy Code") filed on April 30, 2018 in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division (the "Bankruptcy Court").

B.      On June 28, 2018, the Bankruptcy Court entered its order converting the Debtors' cases to Chapter 11 and entering an order for relief under the Bankruptcy Code. On July 6, 2018, the Bankruptcy Court entered an order jointly administering the Debtors' cases under the lead case number 18-12454-gs (the "Bankruptcy Case").

C.      On March 21, 2019, the Bankruptcy Court entered its order appointing a trustee in the Debtors' cases. On March 27, 2019, the Trustee was appointed, and her appointment was confirmed by order entered April 2, 2019. Pursuant to Sections 1108 and 363 of the Bankruptcy Code, the Trustee is authorized and empowered to operate the Debtors' businesses and to sell the Debtors' assets.

**[RECITALS D, E, AND F SHALL BE DRAFTED AS NECESSARY TO DESCRIBE THE LOT(S) TO BE PURCHASED]**

D.      Apartments is the owner of the following assets (collectively, the "Apartments Property"):

    1. Fee title to approximately 6.4 acres of real property more specifically described in Exhibit A-2 as Parcel 17 (APN 162-28-310-001) (together with all easements, rights of way, hereditaments and appurtenances thereto, collectively, the "Apartments Parcel");

    2. All improvements located on the Apartments Parcel (together with the Apartments Parcel, collectively the "Apartments Real Property");

2



3. Certain Permits currently held by Apartments, or to which Apartments is entitled, relating to the ownership or development of the Apartments Real Property, including those issued by governmental authorities;

4. Certain plans, specifications, drawings, concessions, warranties, and other items of tangible and intangible personal property owned by Apartments and relating solely to the ownership, use and/or development of the Apartments Real Property; and

5. The Leases and the Service Contracts described on <u>Exhibit B-2</u> that relate to the Apartments Parcel.

E.     The Apartments Property is referred to herein collectively as the "Purchased Assets." All of the Leases and Service Contracts described in Exhibit B for all of the Debtors shall be referred to herein as the "Assumed Contracts." Any other capitalized terms shall have the meanings ascribed to them in this Agreement.

F.     Buyer and Sellers have been engaged in negotiations regarding the terms and conditions upon which Buyer is prepared to acquire all of the Debtors' right, title and interest in the Real Property, subject to the provisions of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and based upon the Recitals above, which the Parties agree are true and correct, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I<br>SALE OF PROPERTY

1.     <u>Agreement to Purchase Property</u>. The Sellers shall sell to Buyer, and Buyer shall purchase from Sellers, at the price and upon the terms and conditions set forth in this Agreement, all of the Purchased Assets and assign to Buyer all of the Assumed Contracts. Specifically, Buyer offers to buy Parcel 17 (APN 162-28-310-001). At the Closing, the Purchased Assets shall be sold, transferred and conveyed to Buyer, on an "as is where is" basis and together with all faults in its present physical condition without any representations or warranties, free and clear of all Liens except for the Permitted Exceptions as defined in Article V(3), and Buyer will purchase, acquire and accept for the Purchase Price, the Purchased Assets, free and clear of all Liens except for the Permitted Exceptions. For purposes of this Agreement, "Lien" or "Liens" means any security interests, mortgages, interests, liens, pledges, charges, encumbrances and other rights or claims of third parties.

///

///

3



2.    Purchase Price. Upon the terms and conditions set forth herein, Sellers hereby agree to sell to Buyer all of the Purchased Assets for the aggregate sum of eight million five hundred thousand dollars and No/100 Dollars ($8,500,000.00) (the "Purchase Price"). After application of the Deposit (as defined below), any remaining portion of the Purchase Price shall be payable by wire transfer or other immediately available funds ("Immediately Available Funds") no later than 2:00 p.m. on the business day prior to Close of Escrow (as defined below).

a.    Deposit. On or before April 30, 2020, Buyer shall deposit the sum of Five Million and No/100 Dollars ($5,000,000.00) (the "Deposit") **[IF BID IS FOR LOT 1, OR 3% OF THE PURCHASE PRICE IF THE BID IS FOR LOTS, 2, 3, 4, 5, OR 6]** by wire transfer or other Immediately Available Funds into that certain escrow account (the "Escrow") established with Bank of Nevada, 1115 S. Hualapai Way, Las Vegas, NV 89117, ABA Number 122401778, Account Name: Fidelity National Title Group, Account No. 8607988521, Attention Michele Seibold, Phone: 702-932-0779. The amount of Buyer's deposit two-hundred and fifty-five thousand dollars ($255,000.00), which is 3% of eight million five hundred thousand dollars ($8,500,000.00). The Deposit shall become non-refundable if Buyer does not have cause to terminate this Agreement in accordance with Article XII(2).

b.    Failure to Make the Deposit. If Buyer fails to make the Deposit into Escrow within the time period required herein, this Agreement shall automatically terminate and be of no further force or effect, and neither party shall have any rights against the other except as may be otherwise set forth in this Agreement.

3.    Assumed Liabilities. At the Closing, Buyer shall assume and agree to perform and discharge, or take subject to, the following Liabilities of the Debtors to the extent not previously performed or discharged (collectively, the "Assumed Liabilities"), and no others: (i) all Liabilities of any Debtor with respect to the Purchased Assets which accrue and are to be performed from and after the Closing under the Assumed Contracts which relate to time periods or goods or services provided to or by Buyer after the Closing; and (ii) all Liabilities of each of the Debtors to the extent required pursuant to the Bankruptcy Code as a precondition in order to allow a Debtor to assign the Assumed Contracts to Buyer in accordance with the terms of this Agreement (including cure payments). As used herein, "liability" or "liabilities" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, secured or unsecured, pre-petition or administrative.

4.    Liabilities Other Than Assumed Liabilities. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible to pay, perform or discharge any Liability other than the Assumed Liabilities.

5.    Balance Due Prior to Closing. In addition to the balance of the Purchase Price (less the Deposit and any interest accrued thereon, Buyer shall deposit Buyer's share of the closing costs and prorations, less any credits due to Buyer hereunder, in Immediately Available Funds with Escrow Holder no later than 2:00 p.m. on the business day prior to the Close of Escrow.

4

6.     Allocation of Purchase Price. The Purchase Price shall be allocated between and among the Purchased Assets in a manner agreed to by Trustee and Purchaser prior to the Closing.

7.     Closing Adjustments. Buyer shall also pay to Sellers at the Close of Escrow any amounts required as a result of the closing adjustments under Article IV(4).

ARTICLE II
ESCROW

1.     Opening of Escrow. For the purposes of this Agreement, the Escrow shall be deemed opened on the date Escrow Holder receives a fully executed copy of this Agreement (original, copy or facsimile) and the Deposit ("Opening of Escrow"). Sellers shall deliver a fully executed Agreement to Escrow Holder within one (1) business day of mutual execution of this Agreement. Promptly after the Opening of Escrow, Escrow Holder shall notify Buyer and Sellers, in writing, of the date Escrow is opened. Escrow Holder is hereby directed by Buyer and Sellers to take all actions and make all deliveries, recordings, and disbursements reasonably necessary in order to comply with its obligations contained in this Agreement.

2.     Investment of the Deposit. Escrow Holder shall invest the Deposit in one or more interest bearing trust accounts with local, federally insured banking institutions; provided, Buyer executes and delivers to Escrow Holder an Internal Revenue Service Form W-9. All interest earned on the Deposit shall constitute part of the Deposit and shall be payable to the Party entitled to receive it under this Agreement.

3.     Close of Escrow. The term "Close of Escrow" shall mean the date when Sellers and Buyer have each performed their respective obligations under this Agreement and all conditions precedent have been satisfied such that Escrow Holder is unconditionally obligated and committed to deliver (i) to Sellers in Immediately Available Funds, any unpaid balance of the Purchase Price, (ii) to Buyer, the Purchased Assets and (iii) to Buyer, the Owner's Title Policy (as defined herein). Close of Escrow shall occur on or before fifteen (15) days after the entry of the Sale Order (as defined below) by the Bankruptcy Court (in either event, the "Closing Date").

ARTICLE III
PROCEDURES AND APPROVALS

1.     Sale Motion. Sellers shall have filed and scheduled for hearing a motion pursuant to Section 363(f) of the Bankruptcy Code to approve the sale of the Purchased Assets according to the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Exceptions (the "Sale Motion"). The Sale Motion shall also ask the Bankruptcy Court to waive the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h).

2.     Applicable Deadlines. The hearing on the Sale Motion shall occur no later than May 19, 2020. The order granting the Sale Motion, in a form acceptable to the Buyer in its reasonable discretion, must be entered by not later than May 26, 2020 (the "Sale Order").

3.    _Disputes Regarding Assumed Contracts_. With respect to any Assumed Contract any disputes with respect to any alleged default or the amount of a cure payment or other obligation under such Assumed Contract shall be determined at the hearing on the Sale Motion.

4.    _Notice_. Sellers shall provide notice of any hearing on the Sale Motion, or any other matter before the Bankruptcy Court relating to this Agreement, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the District of Nevada or as otherwise ordered by the Bankruptcy Court.

5.    _Cooperation With Respect to Sale Motion_. Buyer and Sellers will use their commercially reasonable efforts to take all actions and do all things necessary or appropriate to comply with and satisfy the terms and conditions of this Agreement and consummate the transactions contemplated by this Agreement. Buyer will bear the burden of providing the evidence to establish that Buyer is a good faith purchaser under Section 363(m) of the Bankruptcy Code, and cooperate with Sellers to comply with the terms and conditions of and consummate the transactions contemplated by this Agreement, and Buyer will not interfere, directly or indirectly, with such efforts by Sellers.

6.    _Trustee's Continued Marketing of the Property_. No provision of this Agreement, shall preclude Sellers or the Trustee from continuing to market the property for sale or enter into any other agreements for sale of the Purchased Assets to third parties (each, a "Back-Up Offer").

7.    _Appeal_. If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect to such an appeal), and, as a result thereof, Buyer elects not to proceed with a Closing and Buyer provides written notice to Sellers within two (2) business days following the filing of such appeal, petition for certiorari or motion for rehearing or reargument that (i) Buyer elects not to proceed with a Closing under the circumstances, and (ii) Buyer desires for Sellers to contest any such appeal, petition for certiorari or motion for rehearing or reargument, Sellers shall, contingent upon the cooperation and financial support of Buyer, which cooperation and financial support shall include, without limitation, payment of all reasonable attorneys' fees and expenses incurred by Sellers in opposing any such appeal, petition for certiorari, motion for rehearing or reargument or any motion for a stay or in providing any bond or similar assurance with respect thereto, take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution thereof.

8.      Assumption of Contracts. Attached hereto as Exhibit B 1-3 is a list of contracts listed in the Debtors respective Schedule G of Executory Contracts that one or more of the Debtors is a party and as to which Buyer has advised Sellers of its desire for Sellers to assume and assign such Assumed Contracts to Buyer at the Closing in accordance with Section 365 of the Bankruptcy Code. Any and all contracts which are not expressly identified as Assumed Contracts shall not be assumed by, nor shall they be the responsibility of, Buyer, and Buyer shall have no obligation or responsibility to pay, perform or discharge any Liabilities thereunder.

9.      Requirements to Assume and Assign Assumed Contracts. To the extent Buyer has identified any contract or other agreement as an Assumed Contract under this Agreement, Buyer shall be responsible, separate and apart from the payment of the Purchase Price, to (a) perform and discharge any and all Liabilities (including cure or other payments) to the extent required pursuant to the Bankruptcy Code as a precondition in order to allow Sellers to assume and assign such Assumed Contract to Buyer in accordance with the terms of this Agreement; and (b) provide adequate assurance of future performance and otherwise satisfy the obligations under Section 365(b)(1) of the Bankruptcy Code.  Sellers are required to obtain any necessary consents to assume and assign such specified Assumed Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code.

ARTICLE IV
CLOSING

1.      Sellers' Deliveries to Escrow Holder. No later than 2:00 p.m. on the business day prior to the Closing Date, Sellers shall execute and acknowledge, where appropriate, and deposit with Escrow Holder for delivery to Buyer upon the Close of Escrow the following documents and instruments, in form and substance reasonably satisfactory to Buyer and its counsel: (1) a certified copy of the Sale Order; (2) a grant deed substantially in the form attached as Exhibit C; (3) a bill of sale substantially in the form attached as Exhibit D conveying all of the Debtors' estates' right, title, and interest in any personal property included in the Purchased Assets, including the originals or, if available, copies of all permits, licenses, maps, reports, correspondence, governmental approvals, surveys and test results relating to the Real Property, not presently located at the Real Property; (4) an assignment and assumption of contracts ("Assignment and Assumption") assigning the Assumed Contracts to Buyer; (5) an instrument assigning all rights to materials maintained by Colliers International in connection with its efforts to market the Purchased Assets; and (6) such other instruments or supplemental instructions as Escrow Holder or Buyer may reasonably request in order to consummate the transaction and such other documents required of Sellers, under the terms of this Agreement. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

2.    <u>Buyer's Deliveries to Escrow Holder</u>. No later than 2:00 p.m. on the business day prior to the Closing Date, Buyer will deliver to Escrow Holder (l) proof satisfactory to Escrow Holder and Sellers that the parties executing this Agreement and any closing documents have the power and authority to bind Buyer; (2) the Purchase Price in Immediately Available Funds, less the Deposit (together with all interest accrued thereon), plus such additional funds as are required to pay all costs of Closing, including, without limitation, any transfer taxes, payable by Buyer hereunder, costs to cure defaults and any other expenses related to assumption and assignment of Assumed Contracts under Article III, less any credit to which Buyer is entitled under the terms hereof; and (3) such other instruments or supplemental instructions as Escrow Holder or Sellers may reasonably request in order to consummate the transaction and such other documents required of Buyer under this terms of this Agreement, duly executed by Buyer, including, without limitation the Bill of Sale and Assignment and Assumption. Any such supplemental instructions shall not amend or supersede this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

3.    <u>Costs and Prorations</u>.

a.    <u>Escrow Fees</u>.  The fees of Escrow Holder shall be borne by Buyer.

b.    <u>Title Policy</u>. Sellers shall be responsible for payment of all costs with respect to obtaining a Standard Policy of an Owner's Title Policy.

c.    <u>Buyer's Costs</u>. Buyer shall pay (a) all title insurance premiums and costs associated with obtaining the Owner's Title Policy in excess of the cost of a Standard Policy, and (b) all other costs and fees, including, without limitation, all applicable transfer taxes, payable upon Closing as a condition to transferring title to the Purchased Assets.

d.    <u>Rents and Impositions</u>. Escrow Holder shall determine the amounts, as of the Closing Date, of (a) all rents and all other sums due and payable or paid under any and all leases (including prepaid rents) (collectively, "Rents") for the month in which the Closing occurs **[AS APPLICABLE]** and (b) all ad valorem property taxes, and special assessments due and payable or paid by Sellers with respect to the Property (collectively ("Impositions") for the month or quarter, as applicable, in which the Closing occurs. At the Close of Escrow, Buyer shall receive a credit for any Rents received by Sellers with respect to the period after the Closing Date, and Sellers shall receive a credit at the Close of Escrow for any Impositions paid by Sellers with respect to the period after the Closing Date. In the case of any unpaid Rents due and payable with respect to any period prior to the Closing Date, nothing contained in this paragraph shall require any payment by Buyer to Sellers after the Closing Date for any payments other than those actually received by Buyer after the Closing Date; however, any such sums received by Buyer after the Closing Date shall be promptly remitted to Sellers.

e.      <u>Allocation of Receivables</u>. Accounts receivable (other than Rents) with respect to Assumed Contracts shall be prorated between Sellers and Buyer in the same manner as Rents, to reflect the intention of the Parties that Sellers shall be entitled to the benefit of any income relating to the period prior to the Closing Date and Buyer shall be entitled to the benefit of any such income on and after the Closing Date, provided that nothing contained in this paragraph shall require any payment by Buyer to Sellers after the Closing Date for any payments other than those actually received by Buyer after the Closing Date; however, any such sums received by Buyer after the Closing Date shall be promptly remitted to Sellers.

f.      <u>Insurance</u>. Buyer acknowledges and agrees that Sellers shall be entitled to terminate the Debtors' existing insurance policies as of the Closing Date and Buyer shall obtain replacement insurance policies in amounts and with coverages determined by Buyer in its sole discretion.

g.      <u>Possession</u>. Sellers shall deliver possession of all keys in Trustee's possession, if any, to all locks within the Real Property to Buyer at the Close of Escrow. Delivery of the keys may be accomplished by leaving the same at the Real Property.

ARTICLE V<br>TITLE INSURANCE

1.      <u>Policies of Title Insurance</u>. At the Close of Escrow, Escrow Holder shall cause to be issued an ALTA extended coverage owner's policy of title insurance, insuring the Buyer as owner of the Real Property, with a liability equal to the Purchase Price (the "Owner's Title Policy"). The Owner's Title Policy shall, in addition to the pre-printed exceptions, contain the exceptions approved by Buyer pursuant to the terms of this Agreement. The cost of a standard owner's policy shall be paid by Sellers and the cost of extended coverage and any endorsements requested by Buyer shall be paid by Buyer.

2.      <u>Title Commitment</u>. Buyer acknowledges receipt of a Title Report from First American Title dated June 11, 2018, document no. NCS-717594-HHLV and a subsequent report dated January 3, 2020 produced by Fidelity National Title Group, Order No. 4245703F/4204503. The two aforementioned reports have discrepancies, escrow will be opened at Old Republic Title, 4730 S. Forth Apache Road, Suite 100, Las Vegas, NV 89147, telephone no. 702-804-7720, facsimile 702-991-1005. To date, no Title Commitment has been received by Buyer for Parcel No. 162-28-310-001.

3.      <u>Permitted Exceptions; Amended Commitment</u>. The matters contained in the Commitment that have been approved are referred to as the "Permitted Exceptions."

9

## ARTICLE VI
## SELLERS COVENANTS, REPRESENTATIONS AND WARRANTIES

1.    <u>Representations and Warranties</u>. As an inducement for Buyer to enter into this Agreement and to purchase the Purchased Assets, Sellers represent and warrant that to the best of their knowledge and belief, each of the following statements is true and correct as of the date of this Agreement and as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations warranties, and statements constitute a condition precedent to Buyer's obligation to purchase the Purchased Assets from Trustee:

a.    <u>Sellers' Authority</u>. Sellers have all necessary power and authority to own and operate the Debtors' properties and to carry on their businesses consistent with current practice, and, subject only to obtaining Bankruptcy Court approval as contemplated herein, Sellers have the power and authority to execute and deliver and, subject to entry of the Sale Order, perform the obligations under this Agreement, and to undertake the transactions contemplated hereby.

b.    <u>Authorization, Execution and Delivery of Agreement and Related Documents</u>. Subject to obtaining the Sale Order, (a) Sellers will have full power, right and authority to sell and convey to Buyer the Purchased Assets and (b) this Agreement is, and as of the Closing Date, the other related documents will be, the legal, valid and binding obligations of the Debtors' respective bankruptcy estates, enforceable in accordance with their respective terms.

c.    <u>Title to and Condition of Assets</u>. All of the Purchased Assets constitute property of the Debtors' respective bankruptcy estates as provided in Section 541 of the Bankruptcy Code, and, subject to the entry of the Sale Order, Sellers have the valid and enforceable right to transfer, sell and assign to Buyer the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions).

d.    <u>Brokers</u>. Except as disclosed in the retention agreements between Sellers and Colliers Nevada LLC dba Colliers International and Keen-Summit Capital Partners LLC that have been filed with and approved by the Bankruptcy Court, Sellers have not engaged any agent, broker or other person acting pursuant to the express or implied authority of Sellers which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets. Sellers shall be solely responsible for the payment of any commission, broker or finder's fee due upon sale of the Purchased Assets to any person or entity retained by Sellers. Seller shall pay Buyer's Broker .25% from the total sales price.

e.    <u>Approvals</u>. Other than entry of the Sale Order, there are no third party, court, governmental authority or other approvals required as a precondition to Sellers' consummation of the transactions contemplated by this Agreement.

f.    <u>United States Person</u>. None of the Debtors is a foreign person, and each is a "United States Person" as defined in the Internal Revenue Code of 1986, as amended ("IRC").

10



Pursuant to IRC section 1445, Sellers shall deliver to Buyer prior to the Close of Escrow an affidavit of Sellers on Escrow Holder's usual form, setting forth the applicable United States tax identification number of each Debtor, and stating that none of the Debtors is a foreign person and is a United States person as defined in the IRC.

      g.    Sellers make no representation or warranty to Buyer, express or implied, with respect to the Purchased Assets or the Assumed Liabilities or any other matter related to this Agreement other than as expressly stated in this Article VI(2). As provided in Article IX, any and all other representations or warranties are disclaimed.

### ARTICLE VII
### BUYER'S REPRESENTATIONS AND WARRANTIES

      1.    <u>Representations and Warranties</u>. As an inducement for Sellers to enter into this Agreement and to sell the Purchased Assets, Buyer represents and warrants that each of the following statements is true and correct as of the date of this Agreement and as of the Close of Escrow, and shall survive the Close of Escrow, and the truth and accuracy of such representations, warranties, and statements constitute a condition precedent to Trustee's obligation to sell the Purchased Assets to Buyer:

      a.    <u>Organization; Qualification and Corporate Power</u>.  Buyer ED-DEN Investment Co., LLC is a California Limited Liability Company, duly organized, validly existing and in good standing under the Laws of California.

      b.    <u>Governmental Approvals</u>. Other than entry of the Sale Order, there are no governmental approvals required as a precondition to Buyer's consummation of the transactions contemplated by this Agreement.

      c.    <u>Authorization, Execution and Delivery of Agreement and Related Documents</u>. The execution, delivery and performance by Buyer of this Agreement and the other documents to which it is a party in accordance with their respective terms has been duly and validly authorized and approved by all necessary corporate action of Buyer. Subject to obtaining the Sale Order, this Agreement is, and each of the other documents necessary to implement the transactions described herein, when so executed and delivered will be, its valid and binding obligation, enforceable against it in accordance with its terms.

      d.    <u>Brokers</u>.  Except for NEVADA LAND COMMERCIAL REAL ESTATE INC., Buyer has not engaged any agent, broker or other person acting pursuant to the express or implied authority of Buyer which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets. Seller shall pay Buyer's Broker .25% from the total sales price.

      e.    <u>Funding</u>. As of the date of entry of the Sale Order, Buyer shall have available to it all of the required cash or financing to pay the balance of the Purchase Price. Buyer's ability to consummate the transactions contemplated by this Agreement is not subject to any financing contingency.

f.    Arm's Length Transaction. To the best of Buyer's knowledge, information and belief, no officers, directors, shareholders or members of Buyer or any of its affiliates are "insiders" of the Debtors as defined in Section 101(31)(B) of the Bankruptcy Code.

g.    Indemnity. Buyer shall protect, defend, indemnify and hold Trustee and the Sellers harmless from and against any and all expenses, costs, fees, obligations, liabilities and damages resulting directly or indirectly from entry, activities, acts and/or omissions upon the Real Property by Buyer and its representatives, including any related claims by any existing tenants. Buyer shall not cause or permit in any way any liens or encumbrances upon the Real Property or any interest therein as a result of Buyer's or Buyer's representatives' acts or omissions with regard to the Real Property. The provisions of this Section shall survive the Close of Escrow and the termination of this Agreement.

h.    Buyer's Financials. Any and all information that has been supplied to Sellers by or on behalf of Buyer concerning the financial ability of Buyer to enter into and perform the transactions contemplated by this Agreement and/or Buyer's knowledge and experience is true and correct in all material respects and does not omit to contain any other information necessary to make such information not misleading.

i.    Confidentiality. Buyer shall keep this Agreement and its terms strictly confidential and not disclose such to any third parties prior to May 14, 2020, except to the extent permitted by Article VIII(1)(d).

ARTICLE VIII
MUTUAL COVENANTS

1.    Mutual Covenants. The Parties mutually covenant (and subject to the other terms of this Agreement):

a.    from the date of this Agreement to the Closing Date, to advise the other Party promptly if such Party determines that any condition precedent to its obligations hereunder is not reasonably likely to be satisfied in a timely manner;

b.    to use its commercially reasonable efforts to satisfy expeditiously the conditions precedent to the Closing set herein imposed on each respective Party;

c.    promptly upon either Party becoming aware of the occurrence of, or the impending or threatened occurrence of, any event which would cause a breach of any of its own representations or warranties contained in this Agreement, such Party shall disclose each such event, in reasonable detail, by means of a written notice thereof to the other Party or Parties. No disclosure by any Party pursuant to this section, however, shall be deemed to amend or supplement the representations or warranties contained herein or to prevent or cure any misrepresentations, breach of warranty, or to satisfy any condition to the Close of Escrow; and

d.       to keep this Agreement strictly confidential and to not disclose directly or indirectly the existence of or any terms of this Agreement to any third-party prior to May 14, 2020. Notwithstanding the foregoing, Buyer may provide a copy of this Agreement and disclose its terms to its investors and such investor's attorneys, accountants, agents or representatives provided that any person or entity to whom a disclosure is made by Buyer agrees to keep this Agreement and its terms confidential. Without limiting the generality of the foregoing, prior to May 14, 2020, neither Buyer nor any of its investors and such investor's attorneys, accountants, agents or representatives shall disclose directly or indirectly the existence and terms of this Agreement by: (i) issuing a press release, (ii) publishing (on its website or otherwise), or (iii) communicating to any real estate professional not retained by Buyer. Buyer shall be deemed in breach of its obligations under this Article VIII(1)(d) in the event that either it or any person to whom it discloses the existence or terms of this Agreement violates the terms hereof. The Trustee may disclose the terms of this Agreement to any Notice Parties, as that term is defined in paragraph 14 of the Bidding Procedures approved by the Bankruptcy Court on January 3, 2020.

2.       <u>Tax Matters</u>.

a.       Sellers shall be responsible for all taxes in connection with, relating to or arising out of the ownership of the Purchased Assets and Assumed Contracts attributable to taxable periods, or portions thereof, ending on or before the Closing (or for any tax period beginning before and ending after the Closing to the extent allocable to the portion of such period beginning before and ending on the Closing), which taxes shall not be an Assumed Liability. Buyer shall be responsible for all taxes in connection with, relating to or arising out of the Purchased Assets and Assumed Contracts attributable to taxable periods, or portions thereof, beginning after the Closing (or for any tax period beginning before and ending after the Closing to the extent allocable to the portion of such period ending after the Closing). All state and local sales and use taxes, to the extent attributable or allocable to periods prior to the Closing, shall be paid or otherwise discharged by Sellers. For avoidance of doubt, the Assumed Liabilities shall not include (i) any Liability of Sellers for taxes of any kind to the extent attributable or allocable to periods prior to the Closing, (ii) any Liability of Sellers for income, sales, use, and other taxes arising in connection with the consummation of the transactions contemplated hereby, or (iii) any Liability of Sellers for the unpaid taxes of any person under any provision of state, local, or non-U.S. law as a transferee or successor, by contract, or otherwise.

b.       Notwithstanding anything in this Agreement to the contrary, all transfer and documentary taxes and recording fees and taxes applicable to the transactions contemplated hereby shall be borne and paid by Buyer.

c.       Until entry of a final decree closing the Bankruptcy Case or order discharging the Trustee, Sellers and Buyer shall use commercially reasonable efforts to (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any return, report, information return or other document (including any related or supporting information) ("Tax Return"), any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

3.    <u>Consents</u>. Each Party hereto will use its commercially reasonable efforts and will cooperate with the other Party hereto to obtain all consents required from third persons, whose consent or approval is required pursuant to any Assumed Contract, or otherwise, in order to consummate the transaction contemplated hereby; <u>provided</u>, however, that Sellers shall not be required to obtain any consent the need for which is obviated by the entry of the Sale Order or otherwise by any provision of the Bankruptcy Code.

4.    <u>Good Faith Efforts</u>. Without limiting the specific obligations of any Party hereto under any covenant or agreement hereunder, each Party hereto shall use its commercially reasonable efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement.

5.    <u>Further Assurances</u>.  From time to time after the Closing until entry of a final decree closing the Bankruptcy Case or order discharging the Trustee, and without further consideration, Buyer or Sellers, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement. Notwithstanding anything herein to the contrary, neither Buyer nor Sellers shall be required to execute any document or take any action that would (i) materially increase the liability or obligation of the Party of whom such document or action is requested beyond that such Party would have pursuant to the other provisions of this Agreement, (ii) require or cause the Party of whom such action or document is requested to initiate, join in or otherwise become a Party to any litigation, action or other proceeding, or (iii) cause such Party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

ARTICLE IX
DISCLAIMER OF WARRANTIES

1.    <u>Disclaimer of Warranties</u>. BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS AND THE TRUSTEE HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION: (A) THE VALUE OF THE PROPERTY; (B) THE INCOME TO BE DERIVED FROM THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, VALIDITY, COLLECTIBILITY OR ENFORCEABILITY OF ANY ASSUMED CONTRACT); (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (D) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (E) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (F) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY,    INCLUDING,

WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (G) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR THEIR OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE AUTHORITY; (H) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (I) COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR LAND USE LAWS, RULES, REGULATION, ORDERS OR REQUIREMENTS; (J) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC MATERIALS AT, ON, UNDER OR ADJACENT TO THE PROPERTY; (K) THE CONTENT, COMPLETENESS OR ACCURACY OF ANY DUE DILIGENCE MATERIALS; (L) THE CONFORMITY OF THE PURCHASED ASSETS TO PAST, CURRENT OR FUTURE APPLICABLE ZONING OR BUILDING REQUIREMENTS; OR (M) THAT FACT THAT ALL OR A PORTION OF THE PURCHASED ASSETS MAY BE LOCATED ON OR NEAR AN EARTHQUAKE FAULT LINE, FLOOD PLAIN OR FLOOD HAZARD BOUNDARY OR SIMILAR AREA.

BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PURCHASED ASSETS AND REVIEW INFORMATION AND DOCUMENTATION AFFECTING THE PROPERTY, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PURCHASED ASSETS AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY TRUSTEE, OTHER THAN AS SET FORTH HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION MADE AVAILABLE TO BUYER OR PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF TRUSTEE WITH RESPECT TO THE PURCHASED ASSETS WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT TRUSTEE HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THE PARTIES ARE NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PURCHASED ASSETS AS PROVIDED FOR HEREIN IS MADE ON AN AS- IS-WHERE-IS CONDITION AND BASIS WITH ALL FAULTS, AND THAT TRUSTEE HAS NO OBLIGATIONS TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS.

2.    <u>Waiver and Release</u>.  Buyer hereby expressly and unconditionally waives, releases, acquits, and forever discharges Sellers, the Trustee and the Debtors, and each of their members, partners, managers, officers, directors, shareholders, affiliates, predecessors, successors, heirs and assigns, employees, representatives, attorneys and agents (individually and collectively, the "Released Parties") from and against any and all rights, claims, third party claims, losses, damages, actions, demands, liabilities, costs and expenses, including, but not limited to, attorneys' fees,

expert fees and court costs (collectively, "Claims") which have arisen or may arise in the future with respect to the Purchased Assets, regardless of whether Buyer or any Released Party is presently aware of any such matters, including, without limitation, any contribution claims, indemnity rights and other rights and claims of Buyer under common law and the Environmental Laws (except for the Excluded Claims as defined below). Without limiting the generality of the foregoing, Buyer hereby expressly and unconditionally waives, releases, acquits, and forever discharges the Released Parties from (a) all remediation, cleanup, removal, mitigation, restoration, response, investigation, monitoring and all other types of costs and expenses (including, but not limited to, attorneys' fees, expert fees and court costs) arising for any reason whatsoever, including, but not limited to, those arising under common law and the Environmental Laws, or otherwise at law or in equity, relating to the existence at any time of any Hazardous Materials in, on, under, or about the Purchased Assets, including, but not limited to, any Hazardous Materials referenced in the Property Documents, (b) all contribution and indemnity rights and claims that Buyer has or may have under common law and the Environmental Laws or that are otherwise available to Buyer at law or in equity against any of the Released Parties relating to any Hazardous Materials in, on, under, or about the Purchased Assets, including, but not limited to, any Hazardous Materials referenced in the Property Documents, and (c) all Claims relating to the physical or financial condition of the Purchased Assets. In no event whatsoever shall any of the Released Parties be obligated to investigate, monitor, remove, cleanup, mitigate, or otherwise remediate any Hazardous Materials at any time located in, on, under, or about the Purchased Assets, including, but not limited to, any Hazardous Materials referenced in the Property Documents, or to pay for any of the foregoing, or to reimburse or indemnify, defend or hold harmless Buyer for any of the foregoing. Buyer acknowledges and agrees that the foregoing release and waiver includes all rights and claims of Buyer against the Released Parties pertaining to the condition of the Purchased Assets, whether heretofore or now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, which in any way arise out of, or are connected with, or relate to, the condition of the Purchased Assets.  Buyer and Sellers acknowledge and agree that the foregoing release and waiver does not apply to any of Buyer's rights under this Agreement.

For the purposes of this Agreement, "Environmental Laws" means all applicable laws concerning the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, emission, release, threatened release, control, or cleanup of any Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq.; the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601, et seq.; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. § 11001, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f, et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 3251, et seq., as each may be reauthorized or amended from time to time, and any similar or successor laws, or any federal or state law equivalents.

3.    <u>Due Diligence Property Documents</u>. Buyer acknowledges receipt of the due diligence documents pertaining to the Purchased Assets (collectively, the "Property Documents") available through Sellers' broker, Colliers International/Keen-Summit. Buyer acknowledges that the Property Documents were delivered to Buyer as an accommodation to Buyer, and that the Trustee has not investigated, evaluated or in any way verified the content, completeness or accuracy of any of the Property Documents. Buyer understands and agrees that the Trustee makes no representation or warranty whatsoever, express or implied, with respect to the content, completeness or accuracy of any of the Property Documents, and Buyer hereby releases and agrees to hold harmless Sellers, the Trustee and Trustee's employees, agents and representatives from all loss, cost, liability and expense arising in any way in connection with Buyer's receipt of the Property Documents, including without limitation, any such loss, cost, liability or expense resulting from any reliance by Buyer on the Property Documents. Buyer agrees that Buyer will not attempt to assert any liability against Sellers (and/or the Trustee, Trustee's employees, agents and representatives) for furnishing such information, and Buyer agrees to indemnify and hold Sellers, the Trustee and Trustee's agents free and harmless from any and all such claims of liability. This indemnity shall survive the Close of Escrow or the termination of this Agreement.

## ARTICLE X
## BUYER'S CONDITIONS TO CLOSING

1.    The obligations of Buyer under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing of the conditions of this Article IX, any of which may be waived in writing by Buyer.

2.    <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Sellers shall be true and correct in all material respects on and as of the date hereof and at and as of the Closing as if made at and as of such date, unless such representation or warranty is given as of a particular date, in which case such representation or warranty will be considered only as of such particular date. Sellers shall have complied with and performed in all material respects all of the agreements, covenants and obligations required by this Agreement, each other document related hereto, and the Sale Order (or any other Final Order of the Bankruptcy Court relating to the transactions contemplated by this Agreement) to be performed or complied with by it at or prior to the Closing.

3.    <u>Bankruptcy Matters</u>. The Sale Order, in form and substance reasonably acceptable to Buyer, shall have been entered on or before May 26, 2020. The Sale Order must be in effect and must be a Final Order. For purposes of this Agreement, "<u>Final Order</u>" means an order or judgment, entered by a court of competent jurisdiction, that remains in full force and effect and has not been reversed, or amended or modified in a manner that is materially inconsistent with the terms and conditions set forth in this Agreement, and as to which (i) no stay is in effect, (ii) the time to seek rehearing, file a notice of appeal or seek other review has expired, and (iii) no appeal or request for rehearing or other review is pending.

4.    <u>Good Faith Buyer</u>. Buyer shall have been found by the Bankruptcy Court at the hearing on the Sale Motion to be a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

5.     <u>Delivery of Transaction Documents</u>. Sellers shall have delivered to Buyer all of the documents necessary to fully implement the transactions described in this Agreement (other than this Agreement itself) which shall have been fully and duly executed by Sellers to the extent required.

## ARTICLE XI
## SELLERS' CONDITIONS TO CLOSING

1.     The obligations of Sellers under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Sellers.

2.     <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Buyer shall be true and correct on and as of the date hereof and at and as of the Closing Date, unless such representation or warranty is given as of a particular date, in which case such representation or warranty will be considered only as of such particular date, except where the failure of any such representations and warranties to be true and correct would not have a material adverse effect. Buyer shall have complied with and performed in all material respects all of the agreements, covenants and obligations required by this Agreement, each other document related hereto, and the Sale Order (or any other Final Order of the Bankruptcy Court with respect to the transactions contemplated by this Agreement) to be performed or complied with by it at or prior to the Closing.

3.     <u>Delivery of Balance of Purchase Price</u>. Buyer shall have delivered to Escrow all funds necessary to satisfy its obligations under this Agreement and pay the Purchase Price in full.

4.     <u>Good Faith Buyer</u>. Buyer shall have been found by the Bankruptcy Court at the hearing on the Sale Motion to be a good faith Buyer entitled to the protections of Section 363(m) of the Bankruptcy Code.

5.     <u>Satisfaction of All Cure Payments</u>. With respect to all Assumed Contracts to be assumed and assigned to Buyer in accordance with the terms of this Agreement, Buyer shall have deposited sufficient sums into Escrow to discharge any and all liabilities (including cure or other payments) and satisfy all other requirements imposed by the provisions of Section 365 of the Bankruptcy Code to allow Sellers to assume and assign such Assumed Contracts, if such contracts are assumable and assignable under applicable law, to Buyer at the Closing.

6.     <u>Bankruptcy Matters</u>.  The Sale Order must be in effect and must be a Final Order.

7.     <u>Delivery of Transaction Documents</u>. Buyer shall have delivered to Sellers all of the documents necessary to fully implement the transactions described in this Agreement (other than this Agreement itself) which shall have been fully and duly executed by the Buyer to the extent required.

ARTICLE XII
DEFAULT, TERMINATION AND REMEDIES

1.      Breaches and Defaults; Opportunity to Cure.  Prior to the exercise by a Party of any termination rights afforded under this Article XII, if Sellers or Buyer (the "Non-Breaching Party") believes that either Sellers or Buyer, as applicable (the "Breaching Party") is in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice (a "Default Notice") specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have five (5) calendar days from the receipt of such Default Notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party; provided, however, that the cure period for a breach shall in no event extend, or cause the Closing Date to extend, beyond fifteen days after entry of the Sale Order. The Parties hereby agree that disputes concerning the validity or adequacy of any Default Notice shall be resolved by the Bankruptcy Court, and each Party hereto specifically consents to the jurisdiction of the Bankruptcy Court to resolve any such disputes.

2.      Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other Party hereto in accordance with this Article XII, at any time prior to the Closing:

a.      at any time, by mutual written consent of Sellers and Buyer;

b.      by Buyer if the Sale Order is for any reason (other than a material breach or material default hereunder by Buyer) not entered on or before May 26, 2020;

c.      (1) subject to the right to cure set forth above at any time prior to the Closing Date, by Buyer if Sellers materially breach any of their representations or warranties, or materially breach or fail to perform any of their covenants or obligations, under this Agreement and Buyer has not waived such breach in writing;

c.      (2) subject to the right to cure set forth above (except for payment of the Deposit and delivery of and remaining portion of the Purchase Price, with respect to which time is of the essence and no notice and cure right shall be afforded to Buyer), at any time prior to the Closing Date by Sellers if Buyer: (i) materially breaches any of its representations or warranties, or materially breaches or fails to perform any of its covenants or obligations, under this Agreement, or (ii) if a condition set forth in Article XI is incapable of being satisfied prior to June 10, 2020 (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have not waived such condition in writing;

d.      by Buyer if, notwithstanding the entry of the Sale Order and the Sale Order becoming a Final Order, Sellers refuse to close for any reason whatsoever, other than a breach or default by Buyer of Buyer's obligations at Closing;

19

e. by Sellers or Buyer if the Closing shall not have occurred on or before June 10, 2020, unless the failure to have the Closing shall be due to the failure of the Party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing.

3. <u>Sellers' Remedies</u>. Sellers, before entering into this transaction, have been concerned with the fact that substantial damages will be suffered by Sellers in the event Buyer shall fail to purchase the Purchased Assets by reason of its default or breaches its obligations under Article VIII(1)(d). Therefore, if Escrow shall fail to close solely by reason of Buyer's default, then, upon the written unilateral demand of Sellers and without the need for any document signed by Buyer and notwithstanding any conflicting instructions from Buyer of any type or nature, Sellers shall be entitled to retain the Deposit as liquidated damages (and not as a penalty). SELLERS AND BUYER HAVE MADE THIS PROVISION FOR LIQUIDATED DAMAGES BECAUSE IT WOULD BE DIFFICULT TO CALCULATE, ON THE DATE HEREOF, THE AMOUNT OF ACTUAL DAMAGES FOR SUCH BREACH, AND TRUSTEE AND BUYER AGREE THAT THESE SUMS REPRESENT REASONABLE COMPENSATION TO SELLERS FOR SUCH BREACH. THE PROVISIONS OF THIS ARTICLE XII(3) SHALL NOT LIMIT OR AFFECT ANY OF BUYER'S INDEMNITIES AS PROVIDED IN THIS AGREEMENT. Buyer acknowledges that the provisions of this paragraph are an integral part of the transaction contemplated by this Agreement, and that without these provisions, Sellers would not enter into this Agreement.

Buyer's Initials:_____

4. <u>Buyer's Remedies</u>. If the Close of Escrow fails to occur by reason of Sellers' default, Buyer may elect to treat this Agreement as cancelled, in which case the Deposit, together with all interest accrued thereon, shall be returned to Buyer, and the Parties shall have no further obligations hereunder, except for any provisions which expressly survive termination.

5. <u>Obstruction of Payment of Liquidated Damages or Release of Deposit</u>. If Buyer or Sellers wrongfully withholds payment or obstructs payment of any amounts in Escrow due the other, and Sellers or Buyer thereafter seeks to enforce its rights to collect such amounts by court proceedings, then Buyer and Sellers (as the case may be) agree to pay to the prevailing party, in addition to any other sums to which Buyer or Sellers may be entitled, all reasonable costs and expenses the prevailing party incurred in connection with the enforcement of its rights against the other under this paragraph, including, without limitation, court costs, reasonable attorney's fees, witness fees and expenses.

ARTICLE XIII
MISCELLANEOUS

1. <u>Further Assurances</u>. Subject to the terms and conditions of this Agreement, each of the Parties agrees to take, or cause to be taken, all action(s) and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective all of the transactions contemplated by this Agreement. In case at any time after

the Close of Escrow until entry of a final decree closing the Bankruptcy Case or order discharging the Trustee, any further action is necessary to carry out the purposes of this Agreement, to vest Buyer with full title to the Purchased Assets, or to transfer record and beneficial ownership of the Purchased Assets to Buyer, Sellers shall take all such necessary action as may be reasonably requested by Buyer.

2.    <u>Governing Law: Severability</u>. This Agreement has been negotiated and entered into in the State of Nevada and all questions with respect to this Agreement and the rights and liabilities of the Parties shall be governed by the laws of the State of Nevada, regardless of the choice of law provisions of Nevada or of any other jurisdiction. The Parties agree that the proper forum for the hearing of any matters concerning this transaction and the rights and remedies of the Parties hereunder is the Bankruptcy Court. Buyer and Trustee agree not to oppose a motion by the other that may be necessary to reopen the Bankruptcy Case. In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Agreement shall become illegal, null or void, or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void, or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in force and effect to the full extent permitted by law.

3.    <u>Limitation of Waiver</u>. No waiver of any provision of this Agreement shall be effective unless signed in writing by the Party entitled to the benefit of such provision. A waiver by either Party hereto of a breach of any of the covenants or agreements hereof to be performed by the other Party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof. The delay or forbearance by a Party in exercising any remedy or right, the time for the exercise of which is not specifically and expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right. The waiver by any Party of the performance of any covenant, condition, or promise shall not invalidate this Agreement, nor shall it be considered a waiver of any other covenant, condition, or promise. The waiver by any Party of the time for performing any act shall not constitute a waiver of time for performing any other act or an identical act required to be performed at a later time. The delay or forbearance by any Party in exercising any remedy or right, the time for the exercise of which is not specifically and expressly limited or specified in this Agreement, shall not be considered a waiver of, or an estoppel against, the later exercise of such remedy or right. The exercise of any remedy provided in this Agreement shall not be a waiver of any remedy provided by law, and the provisions in this Agreement for any remedy shall not exclude any other remedy unless it is expressly excluded.

4.    <u>Return of Property Documents</u>. If this Agreement terminates for any reason prior to the Close of Escrow, Buyer will return to Sellers all Property Documents and all other written or tangible information pertaining to the Purchased Assets, including all copies or extracts thereof within five (5) business days of such termination. In addition, if this Agreement terminates for any reason other than Sellers' breach or default, then, at Sellers' request, Buyer shall deliver to Sellers, at no charge to Sellers, all surveys, engineering studies, soils reports, maps, master plans, feasibility studies, and other similar items prepared by or for Buyer, other than    Buyer's

confidential proformas, projections, internal accounting and financial information and architectural and engineering work relating to Buyer's proposed development project on the Property. The obligations of Buyer set forth in this paragraph shall survive the Close of Escrow and the termination of this Agreement.

5.    Survival of Representations, Warranties, and Agreements. All covenants, representations, warranties, and agreements contained in this Agreement shall survive the Close of Escrow, the delivery of documents, and any performance on account of the obligations set forth herein for one (1) year following the Close of Escrow.

6.    Amendments. All amendments and supplements to this Agreement must be in writing and be executed by each Party hereto.

7.    Successors and Assigns. Subject to paragraph 8, below, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

8.    Assignment. Buyer may not assign or transfer any of its rights and/or obligations under this Agreement without the Sellers' prior written consent, which may be withheld in their reasonable discretion.  Any assignment in violation of this provision shall be void.

9.    Time of the Essence. Time is of the essence for this Agreement.

10.    Computation of Time Periods. All periods of time referred to in this Agreement shall include all Saturdays, Sundays, and Nevada or national holidays, unless the period of time specifies business days, provided that if the date or last date to perform any act or give a notice with respect to this Agreement shall fall on a Saturday, Sunday or a Nevada or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or a Nevada or national holiday.

11.    Headings. The article and section headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, extend or interpret the scope of this Agreement or of any particular article or section.

12.    Counterparts. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

13.    Entire Agreement. This Agreement, including all exhibits, schedules, and attachments, contains the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any prior agreements, negotiations, and other dealings between the parties.

14.    Exhibits. All exhibits referenced herein are incorporated herein by such reference.

15.    Recitals. All recitals referenced herein above are incorporated as if fully set forth herein.

16.    Interpretation. This Agreement has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein. In addition, each Party has been represented by experienced and knowledgeable legal counsel. Accordingly, the parties hereto agree that any rule of law or any other statutes, legal decisions, or common law principles of similar effect that would require interpretation of any ambiguities in this Agreement against the Party that has drafted this Agreement, is of no application and is hereby expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intentions of the parties hereto.

17.    No Third Party Beneficiaries. This Agreement is solely for the benefit of Trustee, on behalf of the Debtors and Sellers, and Buyer and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party (including, without limitation, any broker) or the general public.

18.    Reasonable Access to Records and Certain Personnel. For a period of one (1) year following the Closing (or until the closing of the Bankruptcy Case, if the Bankruptcy Case is closed sooner), Buyer shall provide to the Trustee's counsel and other professionals or any successor to the Trustee or the Debtors (collectively, "Permitted Access Parties") (a) reasonable access during normal business hours to the financial and other books and records relating to the Purchased Assets referenced in Article IV(1) through and including the Closing Date; provided, however, that any access provided under this paragraph shall (i) not require Buyer to produce information relating to transactions involving the Purchased Assets first entered into following the Closing Date, (ii) not materially interfere with Buyer's business operations, (iii) not require access to Buyer documents which are covered by a duty of confidentiality or impact protection of such documents under attorney-client privilege, (iv) not require Buyer's violation of any applicable law, (v) be limited to matters pertaining to litigation involving the Debtor(s) (excluding any litigation against Buyer or any of its affiliates) and/or the preparation of any Tax Return or any other document relating to Taxes applicable to the Debtor(s), and (vi) be subject to the execution of such agreements as may be necessary to preserve any confidential, privileged, proprietary or secret information. At the expiration of the one (1) year period provided for above, in the event a Party requires continued access to documents relating to the Purchased Assets, the Party requiring such access may elect to pay the other Party the costs of that Party's continued storage of the documents, or may, at its own expense, arrange for the transfer of the documents from the other Party, with such documents thereafter to be stored by the Party requiring such documents at its sole expense.

19.    _Notices._ Whenever Escrow Holder or any party hereto shall desire to give or serve upon the other any notice, demand, request, or other communication, each notice , demand, request, or other communication shall be in writing and shall be given or served personally or by confirmed telecopy, or by mail, postage prepaid, addressed as follows:

To Sellers:

Kavita Gupta
1300 Bristol St. North
Suite 100
Newport Beach, CA 92660
Tel.: (949) 387-4470
Fax:

With a copy to:

Kevin Coleman, Esq.
Nuti Hart LLP
411 30th Street
Suite 408
Oakland, CA 94609
Tel.: (510) 506-7155

To Buyer:

ED-DEN Investment Co, LLC.
50 Fremont Place, Los
Angeles, CA 0005
Attn: Edward Kim,
Managing Member
Tel. No. 323-528-8333
Fax No. 323-752-0116

With a copy to:

Kenneth W. Long, Esq.
2600 S. Rainbow, #200
Las Vegas, NV 89146
Phone: 702-787-0172
Fax: 702-220-7152
kenlongesq@hotmail.com
Alberto Jauregui
3505 E. Harmon, Ste. B
Las Vegas, NV 89121
Phone: 702-274-7755
Fax: 702-435-3494
aj@nevadaland.com

To Escrow Holder:

Bank of Nevada
1115 S. Hualapai Way, Las Vegas, NV 89117
Fidelity National Title Attention: Michele Seibold
No. 8607988521
702-932-0779

24

Service of any such notice, demand, or request so made by mail shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or at the expiration of the third (3rd) business day after the date of mailing, whichever is earlier in time. Any Party hereto may, from time to time, by notice in writing served upon the other Party as aforesaid, designate a different mailing address or additional persons to which all such notices, demands, or requests are thereafter to be addressed.

20.    Condemnation. In the event of the actual or threatened taking by exercise of right of eminent domain, of all or any part of the Real Property, of which Sellers have actual knowledge, Sellers will give Buyer prompt notice of such event. If prior to the Closing Date any part of the Real Property shall be taken or threatened to be taken by exercise by right of eminent domain, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Buyer shall be entitled to retain all proceeds and awards payable on account of such taking other than compensation relating to ownership, use or occupancy of the affected Property prior to the Close of Escrow.

21.    Casualty Loss. All risk of loss concerning the Property shall be borne by Sellers until the Close of Escrow. In the event of damage or destruction of all or a material part of the Property, the closing of the transaction contemplated hereby shall take place as herein provided without any abatement of the Purchase Price and Buyer shall be entitled to retain all insurance proceeds payable on account of such damage or destruction other than compensation relating to losses, use or occupancy of the Property prior to the Close of Escrow.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed by its duly authorized representative as of the day and year first above written.

**FOR SELLERS:**

**BUYER:**

**ED-DEN Investment Co., LLC**

**THE BANKRUPTCY ESTATES OF DESERT LAND, LLC, DESERT OASIS APARTMENTS, LLC AND DESERT**

By:_____

**OASIS INVESTMENTS, LLC**

Edward Kim
Its:  Managing Member

By:_____
Kavita Gupta, solely in her capacity as the
Chapter 11 trustee for
Desert Land, LLC, Desert Oasis Apartments,
LLC, and Desert Oasis Investments, LLC and
not individually

25

## Exhibit A-1.1

**Legal Description – Desert Land Parcels**
**[To be supplied]**

**<u>Exhibit A-1.2</u>**

**Legal Description – Desert Land Parcels**
**[To be Supplied]**

**Exhibit A-2**

**Legal Description – Desert Oasis Apartments Parcel**
**[To be Supplied]**

<u>**Exhibit A-3**</u>

**Legal Description – Desert Oasis Investments Parcel**
**[To be Supplied]**

<u>**Exhibit B-1**</u>

**Desert Land – Assumed Contracts and Leases**
**[To be Supplied]**

**Exhibit B-2**

**Desert Oasis Apartments – Assumed Contracts and Leases
[To be Supplied]**

<u>**Exhibit B-3**</u>

**Desert Oasis Investments – Assumed Contracts and Leases**
**[To be Supplied]**

**<u>Exhibit C</u>**

**Grant Deed**
**[To be Supplied]**

<u>**Exhibit D**</u>

**Bill of Sale**
**[To be Supplied]**

FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement ("First Amendment"), dated as of May 19, 2020, is by and among the bankruptcy estate of Desert Oasis Apartments, LLC, a Nevada limited liability company (the "Debtor" or "Seller"), by and through Kavita Gupta ("Trustee"), solely in her capacity as the Chapter 11 Trustee for the Debtor, not individually, on the one hand, and ED-DEN Investment Co, LLC ("Buyer"), a California limited liability company. Seller and Buyer may be referred to herein as a "Party," and, collectively, as the "Parties."

In consideration of the mutual undertakings and covenants herein contained, the receipt and sufficiency of which are hereby acknowledged, the Seller and Buyer hereby covenant and agree as follows:

RECITALS

A.      Seller and Buyer entered into a certain Purchase and Sale Agreement ("Sale Agreement") with an Effective Date of April 30, 2020.

B.      Seller is a Chapter 11 bankruptcy debtor in a case currently pending before the United States Bankruptcy Court for the District of Nevada, Las Vegas Division (the "Bankruptcy Court"), jointly administered under lead case number 18-12454-gs (the "Bankruptcy Case").

C.      The Sale Agreement is subject to the approval of the Bankruptcy Court of Buyer as the successful bidder in an auction before the Bankruptcy Court (the "Auction").

D.      The Auction was originally scheduled to be held on May 19, 2020, but will be continued by the Bankruptcy Court, per Seller's election, to on or about June 5, 2020.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and based upon the Recitals above, which the Parties agree are true and correct, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Seller Revised to Include Only Desert Oasis Apartments, LLC. The "Seller" designated in the first paragraph of the  Sale Agreement is amended to include only the bankruptcy estate of the Debtor, Desert Oasis Apartments, LLC, and to expressly exclude the estates of Desert Land, LLC and Desert Oasis Investments, LLC. The Purchased Assets identified in Recital E of the Sale Agreement are owned solely by Desert Oasis Apartments, LLC. Other assets owned by the related debtors Desert Land, LLC and Desert Oasis Investments, LLC are not subject to the Sale Agreement.

2.      Amendment to Article III, Section 2. Article III, Section 2 of the Sale Agreement is hereby stricken and replaced with the following provision:

1

Applicable Deadlines.  The order granting the Sale Motion, in a form acceptable to the Buyer in its reasonable discretion, must be entered on or before June 15th, 2020 (the "Sale Order").

3.      Amendment to Article XII, Section 2.  Article XII, Section 2 of the Sale Agreement is hereby stricken and replaced with the following provision:

Termination.  This Agreement may be terminated, and the transactions contemplated herein may be abandoned, by written notice given to the other Party hereto in accordance with this Article XII, at any time prior to the Closing:

a.      at any time, by mutual written consent of Seller and Buyer;

b.      by Buyer if the Sale Order is for any reason (other than a material breach or material default hereunder by Buyer) not entered on or before **June 15, 2020**;

c.      subject to the right to cure set forth above at any time prior to the Closing Date, by Buyer if Seller materially breaches any of its representations or warranties, or materially breaches or fails to perform any of their covenants or obligations, under this Agreement and Buyer has not waived such breach in writing;

d.      subject to the right to cure set forth above (except for payment of the Deposit and delivery of and remaining portion of the Purchase Price, with respect to which time is of the essence and no notice and cure right shall be afforded to Buyer), at any time prior to the Closing Date by Seller if Buyer: (i) materially breaches any of its representations or warranties, or materially breaches or fails to perform any of its covenants or obligations, under this Agreement, or (ii) if a condition set forth in Article XI is incapable of being satisfied prior to **June 30, 2020** (other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived such condition in writing;

e.      by Buyer if, notwithstanding the entry of the Sale Order and the Sale Order becoming a Final Order, Seller refuses to close for any reason whatsoever, other than a breach or default by Buyer of Buyer's obligations at Closing; or

f.      by Seller or Buyer if the Closing shall not have occurred on or before **June 30, 2020**, unless the failure to have the Closing shall be due to the failure of the Party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing.

2

4.    <u>No Other Modifications</u>.  Except as explicitly modified by this First Amendment, all terms and conditions set forth in the Sale Agreement shall remain in full force and effect.

5.    <u>Defined Terms</u>.  Any capitalized terms not defined in this First Amendment shall have the meaning attributed to them in the Sale Agreement.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this First Amendment to be executed by its duly authorized representative as of the day and year first above written.

**FOR SELLER:**

**THE BANKRUPTCY ESTATE OF DESERT OASIS APARTMENTS, LLC**

By: _Kavita Gupta_
Kavita Gupta, solely in her capacity as the Chapter 11 trustee for Desert Oasis Apartments, LLC and not individually

**FOR BUYER:**

**ED-DEN INVESTMENT CO., LLC**

By:_____
Edward Kim, Managing Member